UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA,                              17-cr-89 (CS)


      -v.-

JOSEPH DATELLO,

            Defendant.
-----------------------------------------------------------X


Memorandum of Law in Opposition to Government Motions in Limine


                     Theodore S. Green
                     Green & Willstatter
                     *Attorney for Joseph Datello*
                     200 Mamaroneck Avenue - Suite 605
                     White Plains, New York   10601
                     (914) 948-5656
                     theosgreen@msn.com

cc:  All counsel (by ECF)

A. Preclusion of references to Meldish

The government proposes to offer "limited evidence regarding the murder of Michael Meldish, which occurred on November 15, 2013".  As an example, the government cites to an August 18, 2014, conversation where Datello says "this guy just clipped a guy because of $100,000. And, um, just clipped the guy and leaves him, like – " to which CW-2 responds "[a]nd – I know Meldish got . . . I know, I know it was in house" to which Datello responds "Yeah." ECF Doc. 384, p. 11.   The Meldish reference here is collateral to the conversation and only serves to confuse the jury and invite speculation.  Moreover, it was CW-2, not Datello, who brought up Meldish in this conversation and there is no basis to believe that his passing reference to Meldish (or Datello's one-word remark "Yeah") was anything more than idle chatter and a regurgitation of gossip or rumor, if that.  *United States v. Romanello*, 10-cr-929, 2012 WL 27824, at *1 (EDNY 2012).

The government also seeks to offer conversations between Datello and CW-2 from March 22, 2017, including what it describes as discussions of "the murder of Michael Meldish".  Like the August 18, 2014, conversations, the topic of Meldish was introduced into the conversation by CW-2, this time by his referring to a recent newspaper article about the Meldish case.  The government also seeks to introduce portions of the March 22 conversation which it states concern a shooting commmitted by an LCN associated named Louie Zigatello and "Datello's prior interactions with member of the Russian mafia, and high ranking members of the Luchese Family in the 1980s." All of these convconversations should similarly be excluded as gossip, rumor or other idle chatter. *Id.* Furthermore, the references to prior interactions with the "Russian mafia" and Datello's interactions with persons going back to the 1980s are vague, remote, invite speculation and will create confusion so that their prejudicial affect outweighs any probative value.

For similar reasons, references to Meldish from conversations involving parties other than Datello should also be excluded.

Alleged Additional Racketeering Acts

In its enterprise letter, under the heading "additional racketeering acts involving the charged defendants", the government seeks to offer evidence that in October 2015, Datello "threatened to assault an individual who owed $5,000 on an outstanding loan." The recordings show that these events involved a personal dispute involving money that was wrongly taken from Datello's girlfriend and which evidently concerned work that was supposed to have been done on her property.

Similarly, the government seeks to offer evidence of another personal matter where in 2016, "Datello sought the assistance of CW-2 in a plan to shoot and kill a Staten Island drug dealer who was responsible for selling drugs to Frank Datello's daughter, who suffered a fatal overdose."

Evidence regarding both of these matters should be precluded on the ground that any probative weight is outweighed by prejudicial effect and invite impermissible inferences of criminal propensity.

Expert Testimony should be limited

In *United States v. Mejia*, 545 F.3d 179, 190 (2d Cir. 2008), the Court wrote that, with regard to expert testimony on criminal organization:

> despite the utility of, and need for, expertise of this sort, its use must be limited to those issues where sociological knowledge is appropriate. An increasingly thinning line separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate

and impermissible substitution of expert opinion for factual evidence. *Id.*

The *Mejia* Court added that problems arise where:

> the officer becomes, rather than a sociologist describing the inner workings of a closed community, a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt. As the officer's expertise narrows from 'organized crime' to 'this particular gang,' from the meaning of 'capo' to the criminality of the defendant, the officer's testimony becomes more central to the case, more corroborative of the witnesses, and more like a summary of the facts than an aid in understanding them *Id.* at 190-91.

In such cases, the Court continued, "it is a little too convenient that the Government has found an individual who is expert on precisely those facts that the Government must prove to secure a guilty verdict . . . When the Government skips the intermediate steps and proceeds directly from internal expertise to trial, and when those officer experts come to court and simply disgorge their factual knowledge to the jury, the experts are no longer aiding the jury in its factfinding; they are instructing the jury on the existence of the facts needed to satisfy the element of the charged offense." *Id.* at 191.

In *United States v. Gentile*, 233 F. App'x 86 (2d Cir. 2007), the Second Circuit contrasted the limited testimony given by the expert regarding the structure of an organization to two earlier cases where the testimony was held to be reversible error – *United States v. Castillo*, 924 F.2d 1227, 1233-1234 (2d Cir. 1991) and *United States v. Cruz*, 981 F.2d 659, 662-63 (2d Cir. 1992):

> Lieutenant Katz's testimony was not used to suggest criminal conduct by association. To the contrary, at no point in his testimony did Lieutenant Katz even suggest that the Hells Angels were involved in illegal activity. Nor was the testimony used to corroborate lay witness's stories. Rather, it appropriately provided the jurors a framework for interpreting the testimony of other witnesses. Thus,

3

> Lieutenant Katz's testimony was the type of 'dry explanation' of an organization's activities that is an appropriate use of expert testimony.

*Gentile*, *supra*.

Further, when based on such sources as hearsay and custodial interrogations, such testimony violates the defendant's confrontation rights under the Sixth Amendment. *United States v. Dukagjini*, 326 F.3d 45, 55, 58-59 (2d Cir. 2003); *United States v. Mejia*, *supra*, 545 F.3d at 193 ("because the officer expert [in *Dukagjini*] had relied on hearsay and custodial interrogations when forming his opinions, his testimony that went outside the scope of his expertise violated the Federal Rules of Evidence and the Confrontation Clause of the Sixth Amendment.").

As part of its expert disclosure to the defense, the government is proposing to offer testimony from John Carillo, "an expert on organized crime". In its disclosure, the government states that the propose substance of the testimony

> will include the following: (1) the names of the LCN families in New York (i.e., the Lucchese, Gambino, Genovese, Bonnano (a/k/a "Masino), and Colombo families and the operations of those families in New York and other geographic areas; (2) the structure of the organized crime families (i.e., the Boss, Underboss, Consigliere, Capos, Soldiers, and associates); (3) the rules and protocol governing the organized crime families (e.g., how members are introduced to each other, how money flows among the various LCN ranks, etc.); and (4) the purpose for which organized crime families exist and the illegal means by which they typically generate income.

Carillo's testimony should be limited to the structure of such organizations in general. He should not be permitted to name the "LCN families in New York", or refer to "the Lucchese . . . famil[y]"in his testimony. He should not be permitted to testify to specific illegal activities, and not the specific workings, membership, illegal activities or structure of the Lucchese organization as alleged in the indictment. If Carillo were to name the "Lucchese" family and describes his

4

understanding of its structure, rules, purposes and illegal means of generating income, Carillo's testimony would amount to factual evidence disguised as opinion, including on facts and elements that the jury must find to have been proven, or will likely be instructed to consider, in reaching a verdict, including 1) the existence of an "enterprise" for purposes of the RICO conspiracy ( *e.g.* "a common purpose or purposes", "an ongoing formal or informal organizational structure", "core personnel who functioned as a continuing unit during a substantial period of time within the time frame charged in the indictment"), 2) "the requisite relationship between the RICO enterprise and a predicate racketeering act" for purposes of nexus and relatedness, and 3) in connection whether a pattern of racketeering activity existed "the nature of the enterprise, and other unlawful activities of the enterprise and its members viewed in their entirety, including both charged and uncharged criminal activities."[1]

The government either has competent proof to establish these facts and elements with respect to the particular RICO enterprise and pattern of racketeering alleged in the indictment or it does not. It cannot rely on opinion evidence as a substitute for that necessary proof.

Nor should the expert be permitted to testimony about the meaning of specific conversations in this case

Further, there should be a hearing prior to Carillo's testimony concerning his basis of knowledge for his testimony in order to determine whether his proposed testimony is violative of the Confontation Clause rights of the defendant. In a sample of prior testimony provided by the government herein, and taken from *United States v. Delligatti*, 15-cr-491 (SDNY), Carillo stated

---

[1] The above-quoted excerpts are from the jury instructions in *United State v. Gayle*, 16-cr-361 (CS) (SDNY) ECF Doc. No. 238, pp. 43-55.

that much of his information came from debriefings of confidential informants and cooperating witnesses.

Proffer of prior convictions

The government seeks to offer proof of a 2010 conviction of Datello in New York Supreme Court (Richmond County) of attempted criminal usury in the first degree. NY Penal Law 110.00/190.42. During the plea allocution, Datello was asked by the Court whether, without authorization or permission by law, he "knowingly received money from a person known to the grand jury as interest on a loan at a rate exceeding 25 percent per year and this conduct is part of a business or scheme of making money or collecting usurious loans." Datello responded "Yes" and that was the extent of his factual allocution. In addition to the transcript of the guilty plea, the government has provided us with a copy of a certificate of disposition.

This bare documentary record does not furnish a sufficient basis to introduce this evidence at Datello's trial on racketeering conspiracy charges and invites speculation without sufficient foundation. Accordingly, it should be precluded.

The government also seeks to introduce evidence of earlier prior convictions of Datello. These include a 2003 guilty plea in the Southern District of New York of the offense of extortionate extensions of credit. In the plea allocution from that case, Datello stated that the offense conduct occurred from November 1997 through 1999, whereas the instant indictment alleges that the RICO conspiracy took place "at least in or about 2000" until "at least in or about May 2017." Datello was not charged with conspiracy and, although the accusatory instrument alleged that the substantive offense conduct occurred "through his membership in the Lucchese Organized Crime Family of La

6

Cosa Nostra", he did not admit to such in his factual allocution.

The government's theory on the attempted murder charges is that Datello was seeking to retaliate against a witness from that prosecution. However, the circumstances of that witness' cooperation can be established without proving up the conviction itself.

Accordingly, the conviction should be precluded. The government should also be precluded from offering any non-evidentiary accusatory instruments from that conviction and, if Datello's allocution is admitted over our objection it should be limited to the portion of the transcript where he allocutes to his conduct, and exclude other portions where the charge are set forth or the government recites what it would intend to prove, or which otherwise suggest facts outside the defendant's admissions.

The government also seeks to offer a conviction by guilty plea in New York County Supreme Court for enterprise corruption. The only documentation that the government has provided us from that case is the non-evidentiary indictment. As the government has not provided us with any competent documentary proof of this conviction as required by Rule 16, we seek to preclude it.

Government's application to restrict cross examination of witnesses

The government seeks to preclude cross examination of CW-3 regarding prior acts of domestic violence. As an initial matter, the government should be required to furnish us with all prior statements of the witness and any other documentary evidence concerning these acts and we seek to reserve further arguments upon receipt of such information. The government should also be required to inform us whether the acts of domestic violence occurred while CW-3 was assisting any law enforcement agency (that is, not simply after entering into a formal cooperation agreement with

SDNY, if the witness ever did, but while working with or assisting any local, state or federal prosecuting or law enforcement agency. The government should be required to disclose how promptly (or not) the witness disclosed the abuse to authorities. The government should also be required to disclose what it knows about why the domestic abuse "did not result in any judicial proceedings." For example, does the government have any information concerning whether the fact that the witness was assisting law enforcement played any part in the victim not reporting the abuse or not going forward with a prosecution or being dissuaded by anyone from doing so?

In any event, domestic violence is a proper subject of cross examination. Unlike some other types of assaultive conduct, violence against a domestic partner evinces a profound breach of the trust that is supposed to govern domestic relationships. In New York, for example, domestic abuse cases (which is not restricted to marital partnerships) enjoy a special status that permits the state to adjudicate them in both criminal courts and family courts. New York has also instituted special domestic violence courts and integrated domestic violence courts in recognition of the "physical, emotional and psychological harm" suffered by domestic violence victims which "negatively impacts on the communities where victims live and work."

https://www.nycourts.gov/courts/family-violence/dv/index.shtml

The National Institute of Justice as similarly recognized the "immediate and long-term health, social, and economic consequences" of domestic violence[2] and the Department of Justice has established an Office on Violence against Women (OVW),

In their memorandum, the government initially somewhat cryptically describes the instant

---

[2]https://www.nij.gov/topics/crime/intimate-partner-violence/Pages/welcome.aspx, (accessed September 3, 2018).

matters as "prior physical altercations with domestic partners." However, an altercation is "a noisy argument or disagreement, especially in public"[3] , or "warm contention in words; dispute carried on with heat or anger; controversy; wrangle."  "Altercation".*Webster's New Twentieth Century Dictionary of the English Language* 52 (1968).  But, the incidents must be more serious than that, else why would the government make a point of emphasizing that they were not prosecuted.  While the government later comes around to calling the incidents "domestic violence", its use of the term "altercation" also implies a dispute on more or less equal terms, whereas "physical" domestic violence often involves decidedly one-sided aggression where one partner enjoys a substantial size and strength advantage over the other.  Indeed, this exploitation of a superior position is relevant to trustworthiness and credibility, as it evinces a willingness to put one's personal interests over those of others and in a way that harms not only that individual victim but the community.

Accordingly, cross examination on these matters should be permitted and there should be further disclosure by the government concerning same.

With regard to CW-5, the government seeks to preclude evidence of the witness' prior violent acts committed in relation to his drug dealing activity in the late 1980s.  The defense should be permitted to cross examine CW-5 about these matters.

The government, in its enterprise letter, alleges that "Datello orchestrated a scheme to import and/or distribute cocaine, heroin, and marijuana" and that CW-5 was part of this scheme.  ECF Doc. No. 384, pp. 4-5.

Datello has no prior convictions for drug dealing offenses and the evidence will show that

---

[3] https://en.oxforddictionaries.com/definition/altercation

government agents and a cooperating witness had extensive direct dealings with CW-5 prior to CW-5 becoming a government witness.  The defense disputes that Datello "orchestrated" a drug dealing scheme.  Accordingly, CW-5's prior acts of violence in relation to drug dealing are relevant both to his general credibility and to his status as a drug dealer who not only had years of experience but was willing to go to extreme and violent means to carry out his trade and which undercuts the notion that Datello was "orchestrat[ing]" his conduct.  Further, at least one of the incidents is described as an extortionate debt collection but sounds more like a completed or attempted armed robbery, which is a species of theft offense that is germane to credibility and trustworthiness.

Dated:  September 3, 2018

                                                Yours, etc.,

                                                /s/ Theodore S. Green
                                                Theodore S. Green
                                                Green & Willstatter
                                                *Attorney for Joseph Datello*
                                                200 Mamaroneck Avenue - Suite 605
                                                White Plains, New York   10601
                                                (914) 948-5656
                                                theosgreen@msn.com

cc:  All counsel (by ECF)