UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

United States of America v.                      :

                                                 :        **AFFIDAVIT OF**
                                                          **RICHARD E. FLAMM**

Matthew Madonna, et al.                          :

                                                 :        17-CR-89 (CS)

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

I, Richard E. Flamm, declare:

1.      I am an attorney at law, duly licensed to practice before many American courts, including the United States Supreme Court.

2.      I have been a practicing attorney for 36 years, and have had my own practice since 1995, in which I concentrate exclusively on matters of judicial and legal ethics.

3.      I have often been asked to testify as an expert witness regarding such matters. This testimony has typically been by affidavit, but I have also been qualified to testify as an expert at court hearings and trials.  In December of 2009 I was invited to and did testify before a subcommittee of the House Judiciary Committee on judicial disqualification.

4.      I have taught Professional Responsibility as an Adjunct Professor at both the University of California at Berkeley and Golden Gate University in San Francisco.  In addition, I have frequently lectured on recusal and disqualification of judges.

5.      My first treatise, *Judicial Disqualification: Recusal and Disqualification of Judges* – originally published by Little, Brown & Company of Boston in 1996, and now in its Third Edition – has been relied on by a host of federal courts, including the United States Supreme Court.  *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1918, 195 L. Ed. 2d 132 (Thomas, J., dissenting).  The book has also been cited by the highest courts of many states.  *See, e.g.,*

*Whitacre Inv. Co. v. State*, 113 Nev. 1101, 1116 at n.6 (Nev. 1997), Springer, J. (referring to the undersigned as the nation's "leading authority on judicial disqualification").

6.     I have written, and annually prepare updates for, several other treatises.  Of relevance to this matter, I recently completed an extensive companion treatise to Judicial Disqualification.  The new book, Recusal and Disqualification of Judges, *For Cause Motions, Peremptory Challenges and Appeals,* is scheduled to be released later this month.

7.     In addition to writing treatises on judicial ethics I have written books on legal ethics, including Lawyer Disqualification*: Disqualification of Attorneys and Law Firms* (Banks & Jordan Law Publishing Co. (2d. Ed., 2014), and Conflicts of Interest in the Practice of Law: *Causes and Cures* (2015).  I have also authored articles on related topics which have appeared in law reviews and periodicals.  By way of example, "*The History of Judicial Disqualification in America*" was featured in the Summer 2013 edition of the ABA *Judge's Journal*.

8.      From 2000 until 2002, I served as Chair of the San Francisco Bar Association's Legal Ethics Committee.  I have also served as a member of the Advisory Council for the American Bar Association's Commission on Evaluation of Rules of Professional Conduct ("Ethics 2000"), and as Chair of Alameda County Bar Association's Ethics Committee.

9.     An attorney for Defendant Steven L. Crea recently informed me that on August 28, 2018 the judge in this case, the Honorable Cathy Seibel ("Judge Seibel"), disclosed to the defendants, for the first time, a potential basis for her recusal.  Counsel asked if I would be willing to review documents relating to this matter and provide the Court with my opinion regarding the relevant ethical standards.  After reviewing those documents, I agreed to do so.

10.     In order to be in a position to opine about this subject in a way that may be helpful to the Court I have reviewed several documents.  These include but are not limited to: (1) the

Superseding Indictment ("S.I."), (2) the Court's disclosure of ex parte communications ("August 28th Order"), (3) the government's ex parte letter responding to the Court's "directive", (4) correspondence from defense counsel to the Court and government, (5) the Court's August 30th Order, and (6) various documents that I reviewed after making a cursory Internet search.

11.     Upon completing my review of these documents and evaluating the applicable law I formed the opinion that a reasonable person, if aware of all the relevant facts and circumstances, would be likely to question the ability of the Court to preside impartially over this case; and, therefore, that the Court is required to recuse itself pursuant to Title 28 U.S.C. § 455.[1] In order to understand how I formed this opinion it may be helpful to the Court for me to briefly discuss the potentially applicable statutes,[2] a judge's duty to disclose facts that may be relevant to the question of her recusal, the legal standard federal courts employ in deciding whether

---

[1] In his August 30, 2018 letter Mr. Franklin expressed the need to be sure that the facts do not "present an unconstitutional risk for bias." This, in my view, is a legitimate concern because the right to an unbiased federal judge derives from the Due Process Clause. *See, e.g., In re Extrad'n of Singh*, 123 F.R.D. 140, 147 (D.N.J. 1988). It is true, moreover, that a fundamental component of that clause is that a litigant must be afforded a fair trial in a fair tribunal, before a judge with no actual bias in the matter. *See, e.g., Railey v. Webb*, 540 F.3d 393, 399 (6th Cir. 2008). For these reasons, it is neither improper nor unusual for a party to base his recusal request on a claimed due process violation. This is particularly so in a criminal case because, while due process entitles litigants to an impartial and disinterested tribunal in every type of proceeding, the entitlement to due process may be particularly compelling in a case where a person's liberty, and perhaps even his life, is at stake. It has often been noted, however, that nothing prevented Congress from imposing recusal standards that are more rigorous than those that are mandated by the Due Process Clause; and that it is has done just that. *See, e.g., Davis v. Jones*, 506 F.3d 1325, 1336 (11th Cir. 2007) ("the federal recusal statute establishes stricter grounds for disqualification than the Due Process Clause"). In fact, while virtually anything a judge says or does that would violate due process would almost certainly also constitute a § 455 violation, the converse is not necessarily true. *See Hardy v. United States*, 878 F.2d 94, 97 (2d Cir. 1989); *In re IBM Corp.*, 618 F.2d 923, 932 n.11 (2d Cir. 1980). Since any conduct that would violate due process would ordinarily violate § 455 as well, I have limited my opinion to an analysis of the statutory recusal standard.

[2] Section 455(a) provides the broadest grounds for disqualifying a federal judge; and is, therefore, the one I focused most heavily on in forming my opinion. But the statute also contains a part "B," which enumerates specific instances in which disqualification is mandatory without regard to what a reasonable person might think. In this case the relevant statute is § 455(b)(3) which provides, in pertinent part, that a judge must recuse when she "has served in governmental employment" and, in that capacity, "participated as counsel…concerning the proceeding…" Title 28 U.S.C. § 455(b)(3).

recusal is appropriate in a particular instance, the nature of the ex parte communications rule, and the possible applicability of the so-called "duty to sit" doctrine. In the hope and belief that such is the case I respectfully submit the following.

### The Duty to Disclose

12.    The parties to a case have no duty to ferret out whether there may exist some fact – known to the judge, but unknown to those parties – that might warrant her disqualification. *See, e.g., Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 742 (6th Cir. 1999) ("a litigant's duty to investigate the facts of his case does not include a mandate for investigations into a judge's impartiality"), cert. denied, 529 U.S. 1054 (2000). On the contrary, anytime a judge learns that a possible basis for her recusal exists she is expected to – and, in fact, required to – freely, fully and promptly disclose this fact to all of the parties to that case. As the drafters of the American Bar Association's Model Code of Judicial Conduct have articulated this requirement, a "judge should disclose on the record information that the judge believes the parties or their lawyers might reasonably consider relevant to a possible motion for disqualification, even if the judge believes there is no basis for disqualification." ABA Model Code of Professional Conduct, Rule 2.11, Comment 5.

13.    Federal judges are not bound by the Model Code; rather, they are expected to adhere to the United States Code of Judicial Conduct, which speaks of the need for judicial disclosure in general terms but does not contain the specific admonishment set forth in the Comment 5 to Model Rule 2.11. Like those jurists who sit in jurisdictions that have adopted the Model Code, however, federal judges have frequently underscored the importance of making full, frank and early disclosure of potentially disqualifying circumstances. *See, e.g., Thorpe v.*

*Zimmer, Inc.*, 590 F. Supp. 2d 492, 494 (S.D.N.Y. 2008) ("I am required to advise the parties of all the relevant facts concerning my two total knee replacements").

14.     The fact is, moreover, that while the Model Code does not bind federal judges, courts in the Second Circuit have frequently looked to that Code in deciding whether recusal is appropriate.  Earlier this year, for example, Chief Judge McMahon cited Rule (4)(C) of the Model Code in deciding a question regarding the need for her recusal.  *In re Tremont Secs. Law, State Law & Ins. Litig.*, 08 Civ. 11117 (CM), 2018 U.S. Dist. LEXIS 30543, at *15 (S.D.N.Y. Feb. 2, 2018).  *See also, e.g., Neroni v. Grannis*, 3:11-CV-1485 (LEK/DEP), 2016 U.S. Dist. LEXIS 108967, at *6 (N.D.N.Y. Aug. 17, 2016) (J. Kahn) ("The American Bar Association's standard of impropriety is an objective one"); *Nickey v. Coward*, 11 Civ. 3207 (AMD) (RLM), 2016 U.S. Dist. LEXIS 4979, at n.3 (E.D.N.Y. Apr. 13, 2016) (J. Donnelly).

15.     The admonishment that a court advise the parties of potential grounds for recusal is not merely aspirational; it is an ethical imperative.  *See, e.g., In re McCarthey*, 368 F.3d 1266, 1269 (10th Cir. 2004) ("A judge <u>must</u> make disclosure on the record of circumstances that may give rise to a reasonable question about his impartiality") (emphasis added); *Am. Textile Mfrs. Inst., Inc., supra*, at 742 (6th Cir. 1999) (a judge has "an ethical duty to 'disclose on the record information which the judge believes the parties or their lawyers might consider relevant to the question of disqualification'"), cert. denied, 529 U.S. 1054 (2000).

16.     There is an eminently practical reason for placing the burden of disclosure on judges.  As many courts have noted, if the rule were otherwise the parties or their counsel would be obliged, in every instance in which possible judicial bias was suspected, to undertake a factual investigation in an attempt to unearth possible reasons for objecting to a judge's participation in a case.  Apart from the fact that it is not entirely clear what procedures would be available for

gathering such information [*In re McCarthey, supra*, 368 F.3d at 1270 ("§ 455 does not provide for discovery, and no case we have reviewed has endorsed such a procedure")], the process of taking discovery would be undesirable – it would transform the judge from a neutral presiding officer into an adversary, or at least a potential adversary, of the investigating party.

<u>The Federal Recusal Standard</u>

17.     A judge always has a duty to disclose potential grounds for her disqualification to the parties; but, in some instances, disclosure alone is not enough – the judge is required to recuse herself, either sua sponte or upon a party's motion.  The circumstances in which a federal judge must recuse have evolved over time.  As I noted in my treatise, at common-law a judge was disqualified "'for direct pecuniary interest and for nothing else.'"  *United States v. Williams*, *supra*, 136 S. Ct. at 1917-1918, Thomas, J., dissenting, quoting Flamm, Judicial Disqualification (2d Ed. 2007) at §1.4, p.7.  The first federal judicial disqualification statute, which was enacted in 1792, was similarly limited; but Congress subsequently amended that statute on multiple occasions – enlarging the grounds for seeking judicial disqualification virtually every time.

18.     In *Offutt v. United States*, the United States Supreme Court flatly stated that "justice must satisfy the appearance of justice."  348 U.S. 11, 13-14 (1954).  At the time it expressed this sentiment no ethics code or federal statute expressly required a judge to recuse herself on the basis of an untoward appearance.  In the early 1970's, however, a Canon of Judicial Conduct was adopted which mandated that a judge must recuse herself not only when she is actually biased in a matter, but whenever her impartiality could "reasonably be questioned."  *See United States v. Haldeman*, 559 F.2d 31, 130 n.284 (D.C. Cir. 1976), *cert. denied*.

19.    The ethical imperatives enumerated in the Code were much more stringent than any that had been previously prescribed.  Therefore, immediately following the Code's adoption federal judges who were called upon to decide whether they were obliged to recuse themselves were obliged to choose between inconsistent legal and ethical imperatives.  In 1974, Congress acknowledged the conflict between the Code and 28 U.S.C. § 455 by amending that statute to the point of virtual repeal.  *Durhan v. Neopolitan*, 875 F.2d 91, 97 (7th Cir. 1989).

20.    The primary purpose of the 1974 amendments to § 455 was to enact a comprehensive law that would promote confidence in the federal judiciary by eliminating even a possible appearance of impropriety.  *See United States v. Amico*, 486 F.3d 764, 775 (2nd Cir. 2007) (Section 455(a)'s "purpose is the protection of the public's confidence in the impartiality of the judiciary"); *Barnett v. United States*, 2012 U.S. Dist. LEXIS 41259, 2012 WL 1003594, at *1 (S.D.N.Y. Mar. 26, 2012) ("The purpose of these…provisions is 'to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible'").  Specifically, pursuant to § 455(a), as well as the Code of Conduct, a federal judge is required to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned," and that is so regardless of whether he or she is actually biased or not.  Title 28 U.S.C. § 455(a).

The Standard for Deciding if a Judge's Impartiality Might be Questioned

21.    At first blush, § 455(a) might appear to set forth a relatively simple and straightforward formula for determining whether a federal judge must recuse herself from a case, but the language of the statute has proven to be much easier to state than to apply.  This is so, in part, because the drafters of the statute did not specify from whose standpoint the determination of whether a judge's impartiality might reasonably be questioned is to be made.

22.     Even after the 1974 amendments to § 455 went into effect judges have sometimes recused themselves even when they have found it to be unlikely that a reasonable person would question their ability to be fair.  *See, e.g., United States v. $ 15,716.00 in U.S. Currency*, 2008 U.S. Dist. LEXIS 72248, at *3 (W.D. Va. 2008) ("it is unlikely that a reasonable person would question the impartiality of the court…the court nevertheless finds it appropriate to recuse").  It has been generally agreed, however, that in a situation where a motion to disqualify has been based on § 455(a) the judge who has been called upon to decide the motion is obliged to attempt to determine whether a "reasonable person" might harbor doubts concerning the ability of the challenged judge to be impartial.  *See, e.g., In re IBM Corp.*, 45 F.3d 641, 644 (2d Cir. 1995). This determination is to be made, in other words, without regard to the subjective view of a party litigant that the judge appears to be biased [*see, e.g., Hunt v. Mobil Oil Corp.*, 557 F. Supp. 368 (S.D.N.Y.), *aff'd*, 742 F.2d 1438 (2d Cir. 1983)], or the judge's equally subjective belief that she is not.  *See, e.g., City of N.Y. v. Exxon Corp.*, 683 F. Supp. 70, 72 (S.D.N.Y. 1988).

23.     The person from whose standpoint the decision of whether a judge's impartiality might reasonably be questioned is to be made is not only a reasonable person, but an informed one.  *See Goodwine v. AMTRAK*, 2014 U.S. Dist. LEXIS 1057, at *2 (E.D.N.Y. Jan. 6, 2014) ("The fundamental question presented by [a motion to recuse] is whether 'a reasonable person knowing and understanding all the relevant facts' would doubt my ability to be fair in this case"). Thus, the determination must be made from the point of view of not just a person who has received *some* information about the relevant facts and circumstances, but from the standpoint of one who is thoughtful, knowledgeable, and well-versed in all of the relevant facts and circumstances of the case; including those that have been made public, and those that are hidden from public view.  *Fed. Repub. of Braz. v. Am. Tobacco Co.*, 535 U.S. 229, 232-233 (2002) (per

curiam) (the appellate court must consider what a reasonable person, "'knowing all the circumstances,' would believe") (citation omitted); *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988) (the § 455(a) test "assumes that a reasonable person knows and understands all the relevant facts"), cert. denied, 490 U.S. 1102, 104 L. Ed. 2d 1012 (1989).

24.     Even when it is understood that a judge's impartiality is to be determined from the point of view of a fictitious "reasonable person," rather than from that of a litigant or a judge, problems often arise in determining precisely what such a person would think.  *See Roberts v. Ace Hardware, Inc.*, 515 F. Supp. 29, 30 (N.D. Ohio 1981) (it "is not as easy as the Congress and the Court of Appeal seem to think it is to determine what a 'reasonable person knowing all the relevant facts' would think about anything, much less about the impartiality of a judge").  Still, because the court is charged with the affirmative duty of attempting to ascertain how a reasonable person would react to the relevant facts, it is imperative that the judge who has been called upon to decide a § 455(a) motion carefully consider all of the facts that an objective observer would know.  *Liljeberg v. Health Servs. Acq'n Corp.*, 486 U.S. 847, 108 S. Ct. 2194, 2205 (1988).

25.     It should be noted, further, that while some have suggested that the proper test for recusal under § 455(a) is whether a reasonable person "would" question a judge's impartiality, this is not accurate.  Because the purpose of § 455(a) was to enhance public confidence in the judicial system a federal judge is expected to disqualify herself not only when she finds that a reasonable person "would" question her ability to be impartial, but any time the judge thinks that such a person "might" do so.  *See, e.g., United States v. Fazio*, 487 F.3d 646, 653 (8th Cir. 2007) ("the key ingredient in a § 455(a) recusal case is avoidance of the appearance of impropriety, as judged by whether the average person on the street might question the judge's impartiality").

## The Ex Parte Communications Rule

26.     Ex parte communications are either oral discussions about a pending proceeding between a judge and another that not all of the attorneys of record in that proceeding are present to hear, or written communications about such a proceeding that less than all the attorneys of record have contemporaneously received copies of.  The mere fact that a judge has engaged in these types of contacts does not necessarily mean that she has become biased in the matter.  It has generally been agreed, however, that whenever a judge engages in ex parte communications a question may reasonably be raised about her ability to be impartial in disposing of questions germane to the subject of such communications.  It is, therefore, ordinarily considered improper for a judge to either initiate or consider such communications, except to the limited extent authorized by law.  Specifically, pursuant to the Code of Judicial Conduct for United States Judges, a judge should not ordinarily "initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers."  United States Code of Judicial Conduct, Canon 3(A)(4) ("If a judge receives an unauthorized ex parte communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested").

27.     The ex parte communications rule was prompted by concerns about the integrity of the judicial system.  These include preserving the appearance of open and public judicial proceedings; as well as one of our system's basic precepts – that a fair hearing requires that the parties be afforded a reasonable opportunity to know and meet the claims of the opposing party.  Because all litigants are entitled to have equal access to tribunals – and must be afforded the

same opportunity to attempt to persuade the court – the ex parte communication rule is also justified by the need to protect the adversarial nature of judicial proceedings.  *See, e.g., In re Kensington Int'l, Ltd.*, 368 F.3d 289, 309-310 (3d Cir. 2004) ("If judges engage in ex parte conversations with the parties…the adversary process is not allowed to function properly and there is an increased risk of an incorrect result"); Martin v. McQuiggin, 2010 U.S. Dist. LEXIS 20966, at *6 (W.D. Mich. 2010) ("Subject to a few exceptions, judges should not engage in ex parte communications, as they may lead [to becoming] biased in favor of one party").

28.    There are additional reasons for the ex parte communications rule.  For one thing, a party cannot effectively challenge ex parte information in the way it can confront a live witness through cross-examination.  The fact is, moreover, that although ex parte contacts may cause a judge to be improperly influenced, or inaccurately informed, because such communications are rarely on the record they are effectively unreviewable on appeal.

29.    It has been said that ex parte contacts between a judge and anyone who is involved in a proceeding pending before that judge are disfavored, even "strongly" so; and that these types of contacts are to be "discouraged."  *See Blixseth v. Yellowstone Mt. Club, LLC*, 742 F.3d 1215, 1217-1220 (9th Cir. 2014).  However, not every ex parte communication is improper. On the contrary, the Code of Conduct for United States Judges carves out four exceptions to the usual rule.  Pursuant to these exceptions, a judge may: "(a) initiate, permit, or consider ex parte communications as authorized by law; (b) when circumstances require it, permit ex parte communication for scheduling, administrative, or emergency purposes, but only if the ex parte communication does not address substantive matters and the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result of the ex parte communication; (c) obtain the written advice of a disinterested expert…; or (d) with the consent

of the parties, confer separately with the parties and their counsel in an effort to mediate or settle

pending matters."  These are the *only* exceptions to the ex parte communications rule.

The "Duty to Sit" Doctrine

30.    Even before the 1974 amendments to 28 U.S.C. § 455 went into effect a federal

judge had a self-enforcing obligation to recuse herself from presiding over a proceeding

whenever she felt that there would be an appearance of impropriety in her continuing to sit, but

she was subject to being disqualified on the motion of a party only in specifically enumerated

circumstances.  This was a significant distinction because, at that time, the fact that a reasonable

person might question a judge's ability to be impartial did not constitute a mandatory basis for

recusal; and, where such a remedy was not mandated, the judicial gloss on the statute articulated

a "duty to sit" that was often construed in such a way as to oblige the judge to stay on the case.

31.    In 1973 the American Bar Association adopted Canon 3C of the Model Code of

Judicial Conduct.  This Canon was designed by its drafters to do away with the "duty to sit"

doctrine as a restriction on a judge's exercise of discretion when she was called upon to decide

whether to recuse herself; however, because the "duty to sit" was statutory in origin, the adoption

of this Canon did not entirely resolve the problem.  The following year Congress acknowledged

the conflict between the Code and § 455 by changing the latter to conform to the former.  *See*

*United States v. Coven*, 662 F.2d 162 (2d Cir. 1981), *cert. denied*, 456 U.S. 916 (1982).

32.    Even though the amendments to § 455 were expressly intended by their drafters to

eliminate the duty to sit doctrine as a constraint on a judge's ability to recuse in appropriate

circumstances, in recent years many courts – including the Second Circuit – have indicated that,

where valid reasons for recusal have not been shown to exist, a judge is still ordinarily expected

to stay on the case.  *See, e.g., In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 136, 140 (2nd Cir. 2007).  For these courts the primary impact of the 1974 amendments on the duty to sit doctrine was to reverse the result in situations where the judge who had been called upon to decide the disqualification motion determined that the question of whether the judge should sit or recuse was "close."  Disqualification, in other words, became the prescribed course of action for any judge whose examination of the facts led her to conclude that the question of whether a reasonable person, knowing all of the facts, might question the judge's ability to be impartial was a "close call."  *See, e.g., German v. Fed. Home Loan Mort. Corp.*, 943 F. Supp. 370, 373 (S.D.N.Y. 1996) ("Under the rule, close calls are to be decided in favor of recusal").

## What a Reasonable Person Would Know

33.     According to an online article, on or about February 14, 2017 two reported "underlings" of the "Luchese Crime Family," Christopher Londonio and Terrance Caldwell, were indicted by federal prosecutors for their alleged roles in the murder of Michael Meldish. https://aboutthemafia.com/feds-charge-lucchese-family-members-with-murder-and-attempted-murder.  Even though the murder occurred in New York City, the case appears to have been initially assigned to Judge Nelson Roman of the White Plains Division of the Southern District of New York.  https://aboutthemafia.com/tag/christopher-londonio.

34.     Caldwell and Londonio were the only defendants named in the original indictment, but on May 31, 2017 the United States Attorney's Office for the Southern District of New York ("U.S.A.O.") issued a press release in which it announced that charges had been filed against the "entire Administration of the Luchese Family."  https://www.justice.gov/usao-sdny/pr/alleged-street-boss-and-underboss-la-cosa-nostra-family-charged-murder-and-

racketering.  It does not appear that Judge Roman recused himself; yet, shortly after the original Indictment was returned the case was reassigned to Judge Seibel.

35.     A reasonable person would know that, while each of the district judges who sit on the bench in White Plains spent at least part of their legal career serving as federal prosecutors, Judge's Seibel's tenure with the U.S.A.O. was the most extensive by far.  According to publicly available records, prior to being confirmed as a federal judge in 2008 Judge Seibel, for more than two decades – nearly the entire span of her legal career – served the Southern District; including a multi-year stint as AUSA-in-charge of the White Plains Branch of the U.S.A.O. which appears to have been the one that indicted this case.  https://en.wikipedia.org/wiki/Cathy_Seibel.

36.     An argument has sometimes been made that a judge who was once a prosecutor is subject to disqualification on the ground that, by virtue of her work experience, she is likely to have acquired a pro-prosecution bias.  *See, e.g., Parchman v. U.S. Dept. of Agr.*, 852 F.2d 858, 866 (6th Cir. 1988).  A reasonable person would know, however, that the majority of the courts that have been called upon to consider the matter have found that the fact that a judge once served as a prosecutor does not, standing alone, provide a recognized basis for questioning her ability to preside over a subsequent criminal proceeding; and that is so even when, as here, the judge was employed by the very same government agency which later appears before her as counsel.  *See, e.g., Matson v. Bd. of Educ. of the City Sch. Dist. of N.Y.,* 631 F.3d 57, 78 (2d Cir. 2011), Straub, C.J., dissenting in part ("A judge's prior governmental service, even with the same entity appearing before the judge as a party, does not automatically require recusal").

37.     A reasonable person would also know, however, that the fact that Judge Seibel once served as a prosecutor does not stand alone.  Judge Seibel did not work in just any division of the U.S.A.O. – for approximately two years she was assigned to the Organized Crime Unit

("O.C.U."). Although the Wikipedia entry for Judge Seibel does not mention her work with that unit, in the August 28th Order she disclosed that she worked for the O.C.U. from "about the Fall of 1989 to the middle of 1991."

38.     A reasonable person would know, further, that while she was with the O.C.U. the judge was not only involved in, but "responsible for," an investigation into alleged members of La Cosa Nostra ("LCN") – which is the very same "enterprise" that has been described in the indictment that was returned in this case. S.I., ¶ 2. The August 28th Order disclosed, more specifically, that the judge was responsible for investigating reputed members of "the Lucchese Crime Family" – the very same "entity" that is discussed in the operative indictment. S.I., ¶ 3.

39.     Another thing a reasonable person would know, because the August 28th Order says so, is that just as the U.S.A.O.'s investigation of reputed members of the "Luchese Family" resulted in the indictment of the current defendants on racketeering and other charges, the judge's investigation of the "Luchese Family" ultimately led to an indictment of reputed members of that "Family" on racketeering and other charges. A review of the Docket Sheet in *United States v. Baratta* reflects that the defendants in that case were charged with, among other things, gambling, extortion, robbery, threats, racketeering and "violent acts in aid of racketeering." Defendants in this case were charged with each of the same felonies.

40.     A reasonable person would know, too, that while the judge's active involvement in investigating the "Luchese Family" seems to have concluded in or about 1991, the government claims that much of the criminal conduct that it alleges took place in this case – including alleged "racketeering activity" and firearms offenses – date back "at least" as far back as the year 2000. *See, e.g.,* S.I. ¶ 15. A reasonable person would realize that the wording the prosecutors chose to use in drafting the S.I. leaves open the possibility that some of the conduct

which defendants are being charged with in this case took place at the time Judge Seibel was

investigating reputed members of the "Luchese Family" for the very same sorts of activity.

41.     The Wikipedia entry for Judge Seibel reflects that from 1997 to 1999 she not only

served in, but was AUSA-in-charge of, the White Plains Branch of the U.S.A.O. – the division

that is prosecuting this case.  A reasonable person would realize, therefore, that the government

has alleged that the current defendants engaged in criminal activity that not only took place while

Judge Seibel still worked at the U.S.A.O., but that some of that activity is alleged to have

occurred during or around the time she was the head of the office that indicted this case.

42.     It does not appear that, at the time she was first assigned to the case, Judge Seibel

disclosed to the defendants that she had investigated reputed members of the "Luchese Family;"

or, in fact, that such disclosure was made at any time prior to August 28, 2018.  The August 28th

Order suggests that there was a good reason for this: prior to the time that defense counsel filed a

motion to suppress "related to a wiretap authorized by a judge in the Southern District" in 1998,

which defense brief mentioned that the AUSA responsible for the wiretap was David Kelley, her

memory of the fact that she had investigated the "Luchese Family" had not been "triggered."

43.     If another judge was called upon to evaluate the veracity of this representation

that judge would be highly unlikely to question it, for at least three reasons.  First, federal courts

presume that judges are persons of honesty and integrity who would freely and fully disclose a

potentially disqualifying circumstance if they were aware of it.  Such a judge would recognize,

too, that Judge Seibel's investigation of the "Luchese Family" took place many years ago, and

that memory does not tend to improve over time.  The judge would realize, also, that in light of

the information that has been disclosed to date it is conceivable that Judge Seibel played a very

limited role in investigating the "Luchese Family," or that her role was very brief in duration.

44.    Another judge would not likely have doubts about Judge Seibel's account, but the fictitious "reasonable person" is not a judge, and he or she would be likely to have some concerns.  For one thing, this is not a situation where Judge Seibel, as a junior attorney at a personal injury firm, investigated the details of a "fender bender."  On the contrary, the judge – only a few years removed from law school – had been tasked with investigating alleged criminal misconduct by a group of people who were reputed to be members of one of the most notorious crime syndicates in the world.  This is not something that a reasonable person would ordinarily expect the judge to easily forget.  The reasonable person would know, too, that the Court has not suggested that the judge had any problem with her memory that might have caused her not to recall her work on the Luchese investigation, or that her role in it was so attenuated or narrowly circumscribed in duration that it is unsurprising that she had initially forgotten about it.

45.    But even if a reasonable person would conclude that the judge had initially forgotten that she had investigated the "Luchese Family," that person would be likely to have serious concerns about the way the Court conducted itself once she remembered this fact.  For one thing, a reasonable person would know that while the August 28th Order disclosed a few things to defendants – including the general nature of the judge's potential conflict, what had caused her to remember it, and that she had directed the government to investigate it – there were many details regarding both the nature and contents of her contacts with the government that the Order did not spell out.  The Order did not say, for example, which defense brief jogged her memory of having investigated the "Luchese Family," or when this occurred.  The Order also did not specify when it was that the Court directed the government to look into whether the Court had investigated any of the defendants in this case, when the government responded to the

Court's "directive," or whether the two ex parte communications alluded to in the Order were the only ones the Court had with the government regarding the subject matter of this case.

46.    A reasonable person would also realize that there were many other things that any defendant who had been told that the Court had engaged in ex parte communications with the government regarding a possible basis for the judge's recusal would want to know, and expect to be told, which the Order did not explain. The Order did not say, for example, why, instead of advising all parties of the potential conflict simultaneously, the Court first communicated with the government on an ex parte basis. The Order also did not say who at "the government" the Court communicated with about this matter, or whether the judge initiated the contact with the government, or if this happened the other way around. The Order also did not identify the manner in which the Court had communicated with the government; that is, whether the ex parte contacts had been oral or written; and, if oral, what exactly was discussed and for how long, and whether those communications took place in person or were affected by some other means.[3]

47.    Perhaps most fundamentally, a reasonable person would know that a judge who becomes aware of a potentially disqualifying circumstance is not normally supposed to relay that information to one of the parties to the case, while keeping the other parties completely in the dark for an extended period of time. On the contrary, the judge is charged with the duty of fully, frankly and promptly advising *all* of the parties of all of the information they might reasonably consider to be relevant to the question of whether a possible basis for the judge's recusal exists. A reasonable person would know, further, that in spite of this fact the Court communicated with

---

[3]In addition, while Judge Seibel said that, to her recollection, "no indictments were returned while the case was in my hands, but after it was reassigned to AUSA Kelley, he indicted a case captioned *United States v. Anthony Baratta*, et al, No. 92-CR-529," the Order did not explain how Judge Seibel had come to learn that Kelley had filed that indictment, or how she happened to know the caption of that case. A reasonable person might assume that she learned this fact from the U.S.A.O., but in its July 25th Letter the government referred to the *Baratta* prosecution by its U.S.A.O. number – not by the case caption.

the government about the subject matter of this case on an ex parte basis, at least twice, without

notice to defense counsel or an opportunity to be heard.

48.    In cases where parties have moved to disqualify judges on the basis of their

having engaged in ex parte communications courts have sometimes denied those motions on the

grounds that the complained of contacts were not, in fact, ex parte.  A reasonable person would

know, however, that such is not the case here.  The August 28th Order specifically referred to the

judge's directive to the government as being "ex parte," and the first words of the government's

July 25th Letter, in black and bold lettering, were "**SUBMITTED EX PARTE**."

49.    A reasonable person would also recognize that there are exceptions to the ex parte

communications rule, and that the Court may have believed that one of these apply.  Such a

person would know, however, that neither the Court nor the government has articulated any

reason to believe that any such exception applies in this case.  In its August 28th Order the Court

did not explain what its rationale was, if any, for its decision to unilaterally communicate with

the government on an ex parte basis, rather than fully disclosing the situation to all parties

simultaneously; and a reasonable person would wonder why this was not done.

50.    A reasonable person would realize, further, that while there are exceptions to the

ex parte communications rule, three of the four would appear to be completely irrelevant to the

Court's ex parte contacts here.  Specifically, while Canon 3(A)(4)(a) allows a judge to engage in

ex parte communications if they are "authorized by law," a reasonable person would know that

the Court has not shown or even suggested that any law authorized the ex parte communications

that took place in this case.  Likewise, while a judge is permitted to obtain the written advice of a

disinterested expert [Canon 3(A)(4)(c)], or to confer with the parties on an ex parte basis for the

purpose of mediating or settling matters [Canon 3(A)(4)(d)], neither of these exceptions explain

the Court's ex parte contacts.  It would seem, therefore, that for the Court to find that a reasonable person would believe that the ex parte contacts in this case were proper it would have to conclude that the circumstances were such as to "require" the judge to communicate with the prosecution ex parte; that the communications were only for "scheduling, administrative, or emergency purposes;" that the contacts did not address "substantive" matters; and that the judge reasonably believed that no party would gain any advantage as a result.  Canon 3(A)(4)(d).

51.    It is conceivable that more fulsome disclosure by the government or the Court might have provided an objective observer with a reason to think that this exception to the usual rule forbidding ex parte communications applies.  However, based on the facts that a reasonable person would presently be in a position to know it would appear to be highly unlikely that he or she would conclude that the Court's ex parte contacts with the government in this case were proper.  As a threshold matter, the Court has not identified any circumstances that would warrant the Court in communicating with the government about this case on an ex parte basis – much less any that would "require" it to do so.  Certainly, the communications were not about "scheduling," and neither of the Court's Orders regarding the ex parte contacts suggest that the Court considered that its communications with the government to have been justified by any "emergency."  It would seem, therefore, that for a reasonable person to conclude that the ex parte contacts were proper, he or she would have to find that they were "administrative" in nature.

52.    There have been times when ex parte communications have been justified on the grounds of administrative necessity.  In a 1980 case, for example, a bankruptcy judge in the Eastern District of New York cited a footnote in an earlier District of Columbia Circuit Court case for the proposition that "a judge's ex-parte communications with prosecutors arising from the judge's administrative duties did not stem from an extrajudicial source."  *In re Parr*

*Meadows Racing Assoc.*, 5 B.R. 564, 567 (Bankr. E.D.N.Y. 1980), citing *United States v. Haldeman*, 181 U.S. App. D.C. 254, 559 F.2d 31, 133 n.301 (D.C. Cir. 1976).  A reasonable person would know, however, that in the cited case the challenged judge was the Chief Judge of the District Court during the pretrial era of the relevant cases; and, as such, had supervisory responsibility over grand jury matters.  Such a person would also know that, while the judge acknowledged that he had discussed procedural matters with prosecutors before the indictment in the cases was returned, those "discussions occurred as a part of his official duties."  Id.

53.    A reasonable person would be unlikely to see any analogy here.  It does not appear that Judge Seibel is the Chief Judge of the District, that she communicated with the government in any administrative capacity, or that the matters she communicated with the government about were procedural in nature.  Nor is this a case in which the Court's communications with one party can be overlooked on the grounds that they were de minimis in nature.  This is not a case like *United States v. Feneziani*, 2007 U.S. Dist. LEXIS 54737 (W.D.N.Y. 2007), for example, in which the court found that an ex parte communication which did no more than advise the Court that the grand jury subpoena at issue was no longer effective "was procedural."  Id. at *7.  On the contrary, the Court in this case engaged in at least two ex parte communications with the government, during the course of which she "directed" the government to conduct a seemingly extensive investigation of U.S.A.O. case files for documents which would reflect on whether Judge Seibel had investigated any of the defendants in this case for criminal activity during a period of time which either included or directly preceded the time when the defendants in this case are alleged to have engaged in the same or similar activity.[4]  A

---

[4]As will be discussed, from the present record the possibility that the U.S.A.O. reviewed the government's *Baratta* files *before* returning the current indictment, and selecting White Plains as the venue, cannot be ruled out.  It should be noted, however, that if the U.S.A.O. did not previously review

reasonable would also know that, whereas the *Haldeman* court emphasized that the judge's ex parte discussions took place before the indictment was returned, the ex parte contacts Judge Seibel is known to have had with the government took place long after the S.I. was returned.

54.    A reasonable person would know that in a situation where a judge communicates with the prosecution regarding the subject matter of a pending case it is readily foreseeable that those communications would give pause for concern; not only to the charged defendants, but to the public at large.  A reasonable person would also understand that, to the extent that the Court engaged in oral ex parte communications with the government, it could have taken steps to assuage such concerns by having a court reporter present to transcribe those discussions; but that, in this case, the Court has given no indication that it did so.  *See In re United States*, 572 F.3d 301, 310 (7th Cir. 2009) ("The Judge called an off-the-record meeting with the U.S. Attorney…This manner of proceeding in a federal criminal matter is indeed unusual and necessarily raises substantial concerns in the mind of any well-informed observer.  We must take special note of the fact that no record was taken of the meeting").

55.    In the same vein, while concerns about any written ex parte communications the Court received from the government could have been mitigated by the Court immediately forwarding copies of such writings to defense counsel, the only written ex parte contact in this case that defendants are presently aware of, although received by the Court on July 25, 2018, was not disclosed to defendants until more than a month later.  *See United States v. Barnwell*, 477 F.3d 844, 851 (6th Cir. 2007) ("What makes this case [persuasive] is that in addition to the defense counsel not knowing the substance of [the judge's ex parte communications with the

those files the "directive" the Court gave it may have prompted the government to search for documents which could conceivably be used against the defendants in this case.

prosecution], they had no knowledge that [they] were taking place…counsel were 'mushrooms…kept in the dark'").

56.    The government's July 25th Letter, which was appended to the August 28th Order, seems to answer a couple of the questions the Order did not.  While the Order did not say when the Court and government communicated about the inquiry the Court wanted the government to make, according to the government the Court's "directive" was issued on July 6, 2018 – thereby establishing that the Court's memory of her investigation of the "Luchese Family" had been refreshed at least 7 weeks before the potential conflict was disclosed to the defense.  Defendants learned from the same letter that the government had completed its inquiry no later than July 25th; but, even so, the Court did not disclose this fact to defense counsel for another month.

57.    In her August 28th Order Judge Seibel said that she had wanted at make sure that her investigation of the "Luchese Family" did not "involve" any of the defendants in this case, and further disclosed that she had specifically asked the government to determine whether anyone who had been charged in this case was either a "subject" or "target" of her prior investigation.  A reasonable person would realize, however, that the government seems to have had a different idea about what the Court had asked it to do.  While at one point in its July 25th Letter the government said that it "did not believe" that any of the current defendants had been targets *or subjects* of the judge's investigation, the government, on more than one occasion – including in the very first sentence of its letter – said that the only thing it had been "directed" to do was to find out whether any defendant was a "*target*" of Judge Seibel's prior investigation.

58.    In its July 25th Letter the government says that it reviewed, in some manner, 46 "records file boxes from the investigation and prosecution" of *United States v. Anthony Baratta*.[5]

---

[5]The Court has said that the prosecution reviewed 49 boxes.  August 31, 2018 Order p.2, n.3.

From reviewing that letter, however, a reasonable person would not be able to determine how diligently the government performed its task. The government's description of what it had come to learn about any defendants in this case who may have been possible targets, subjects or otherwise "involved" in the judge's investigation of the "Luchese Family" was contained in a letter that spanned barely a page and provided virtually no details regarding the specifics of the government's inquiry. The letter did not say, for example, who had conducted that inquiry, what they had been told their assignment was, or whether the investigators had been tasked with reviewing every one of the documents in each of the case files, as opposed to attempting to perform some sort of computerized "word" search. The government also did not say how much time whoever it was that looked for whatever they looked for spent on performing that role.

59.    The court seems to have anticipated that the government would perform a comprehensive search for any document that may have been relevant to the question of whether any of the current defendants were involved, in any way, in any of the criminal activity that was investigated by the judge; but the government's view of the role it was to perform appears to have been considerably less expansive. For example, at one point in its letter the government advised the Court that none of the documents the government had "located" from the *Baratta* files in which Judge Seibel's name had "appeared" mentioned any of the current defendants. A reasonable person would realize that this statement left open the possibility that the U.S.A.O.'s *Baratta* files do contain documents that are relevant to the question of whether the current defendants were involved in criminal activity, but either the government failed to "locate" those documents, or the documents they located were not ones on which Judge Seibel's name "appears."

60.     Another thing a reasonable person would know is that, even though the July 25th Letter does not manifest that the government did the most exhaustive review of the *Baratta* files in the world, it has not claimed that it was unable to locate *any* documents which implicate the current defendants in criminal activity.  On the contrary, the government conceded that those files did contain "FBI intelligence and surveillance reports" that "mention criminal activity" on the part of three of the defendants in this case.  The government further stated that the Reports it found were "made between 1989 through 1993;" and, therefore, that they were made during the exact period of time in which the Court was involved in investigating the "Luchese Family."

61.     Judge Seibel said in her August 28th Order that what prompted her request to the government was the desire to "make sure" that her investigation of the "Luchese Family" did not "involve any of the defendants in this case."  If FBI Reports on the current defendants were in the O.C.U.'s *Baratta* files at the time of her investigation, a reasonable person would certainly assume that the investigation involved some of those defendants; but, in its July 25th Letter, the government posited two possible reasons why those Reports may not have been in the O.C.U.'s files at the time Judge Seibel was there: first, there was "no indication in these documents that these three defendants were targets of the *Baratta* investigation;" and, second, it "appeared" to the government that "these files were added to the larger case file at some point."

62.     These are interesting theories, but a reasonable person would know several things about them.  First, while it may well be that the agents who filed the FBI Reports that are contained in the *Baratta* files gave no "indication" that any current defendants were targets of a U.S.A.O.  investigation, the government has not shown that FBI Reports like the ones in the *Baratta* files typically indicate that the individuals being investigated or surveilled by the FBI are targets of U.S.A.O. investigations.  As to this, a reasonable person would know that that,

although the F.B.I. and the U.S.A.O. are both branches of the Department of Justice – and while both perform investigative functions – the F.B.I. and U.S.A.O. are distinct entities with different personnel, and there is no reason why an FBI agent who had investigated an individual would either know or need to know whether the person he was reporting on was being investigated by the U.S.A.O.; much less that, if this is something the FBI agent did know, he would feel compelled to put that fact in his Report.  A reasonable person would know, too, while "other figures" the government mentions who were "targets in the Baratta case" were purportedly "discussed in" the same Reports, the government has not suggested that those Reports contain any indication that these "other figures" were targets of the *Baratta* investigation either.

63.     As for the government's contention that the FBI Reports may have been placed in the file "later" – presumably after Judge Seibel was no longer investigating the Luchese Family – a reasonable person would recognize that the government has not adduced any evidence to support this suggestion, and that it is only rank speculation.  The government has not ruled out the possibility that the multiple FBI reports contained in the U.S.A.O.'s files (the government does not say how many) which attest to "criminal activity" on the part of defendants in this case were in Judge Seibel's files at the time that she was at the O.C.U.; and, in the absence of any evidence to the contrary, a reasonable person would be likely to assume that they were.

64.     Yet another thing a reasonable person would be likely to be concerned about is why the Court, having seemingly taken so long to disclose to defendants that the U.S.A.O. had been investigating whether a potential basis for recusal exists, ordered defense counsel to take any action it wished to take with respect to what the Court had disclosed immediately.  In its August 28th Order the Court said that it did not see any basis for recusal but wanted the parties "to have the opportunity to make an application…if they disagree."  Presumably the Court could

have stopped there and left it up to counsel to decide whether and when to make such an application; but, even though the Court and government had been aware of the potential conflict for at least 7 weeks, the Court initially gave the defense only one week to take action.

65.     Two days after receiving that Order counsel for defendant Steven L. Crea wrote the Court to advise of his belief that additional disclosure from the government was needed, as well as more time to evaluate whether there was an undue risk of bias requiring recusal.  In that letter defense counsel pointed out that the government had not stated whether the FBI Reports the government had disclosed in its July 25th Letter that identified Steven L. Crea as "an LCN figure" had been received while Judge Seibel was investigating the "Luchese Family," or if other documents received by the judge in the course of that investigation may have "perpetuated the allegation that Mr. Crea is an 'LCN Figure.'"  The same day the court issued an order in which it directed the government to provide limited additional information to the defense, and extended counsel's time for filing a recusal motion by 12 days.[6]

66.     A reasonable person would know that § 455 does not specify any time period within which a motion to disqualify a judge must be made.  Such a person would also know that many courts have held or implied that a motion for recusal is a serious step that should never be undertaken lightly, nor without a solid basis in fact and law; and that, because that is so, counsel is under an affirmative duty to conduct a reasonable investigation before filing a recusal motion.

---

[6]After directing the government to make additional disclosure the Court said "such information should be provided to [counsel] but not to me.  I do not remember any of the information and do not want to learn it…" August 30th Order, n.1.  The Court's desire to avoid exposure to prejudicial information is laudable.  It seems, however, that the dispositive question is not whether Judge Seibel may become aware of information she should not know, but whether she was aware of such information at the time she was investigating the "Luchese Family."  If the possibility exists that the Court's exposure to additional details about the criminal activity alleged in the S.I. might further refresh her memory as to her investigation of the current defendants, it is surely in the interests of all concerned that recusal take place now, rather than after more judicial resources have been expended by the Court.

*See In re Evergreen Sec., Ltd.*, 570 F.3d 1257, 1276 (11th Cir. 2009) ("Instead of engaging in a reasonable fact-finding investigation…Ginsberg supposed bias and [in the judge's] actions").

67.    In a 2003 decision a judge in this District did say that, while there is no "statute of limitations" on a recusal motion, a party must raise its claim at the earliest possible moment after learning the relevant facts [*178 E. 80th St. Owners, Inc. v. Jenkins*, 2003 U.S. Dist. LEXIS 14687, a *5 (S.D.N.Y. 2003)] – a sentiment the Second Circuit appeared to endorse four years later. *United States v. Amico*, 486 F.3d 764, 773 (2d Cir. 2007).  A reasonable person would also know, however, that the "earliest possible moment" has usually been interpreted to mean that counsel must act with due diligence, not that it must move for recusal immediately.

68.    One reason that courts have held that a challenge to a judge must be made in a diligent manner rather than immediately is that, as the First Circuit has explained, a motion to recuse must have a "factual foundation," and "it may take some time" to "build that foundation." *In re United States*, 441 F.3d 44, 2006 U.S. App. LEXIS 7779, at *52-53 (1st Cir. 2006).  The Second Circuit itself has said that, before filing a motion to disqualify a judge, counsel for the moving party is ordinarily expected to thoroughly investigate and evaluate all the relevant facts and circumstances.  *Gil Enter., Inc. v. Delvy*, 79 F.3d 241, 247 (2d Cir. 1996).

69.    In its August 30th Order the Court said that it did not see that a document alleging that defendant Steven L. Crea was a member of the "Luchese Family" or an LCN member would be of "particular significance" because "such allegations have been made publicly for decades." In support of this contention the judge cited a single case, *United States v. Int'l B'hd of Teamsters*, No. 88-CV-4486, 1999 WL 359763, at *1 (S.D.N.Y. June 4, 1999).

70.    A reasonable person would know that *United States v. Int'l B'hd of Teamsters* is a two-page unreported decision in which the court granted the application of an Independent

Review Board for sanctions against the defendant's Treasurer, John Ferrara; and, in passing, mentioned an FBI agent's testimony regarding the Bureau's stated belief that Mr. Crea was affiliated with the "Luchese Family." The Court did not say how it came to learn of the existence of this seemingly obscure case, or how its existence justified the conclusion that "such allegations have been made publicly for decades."

71.    A reasonable person would not be apt to believe that the fact that the Court may have performed legal research in an attempt to establish that if it knows anything about facts in dispute in this case that knowledge derived from "public" sources, rather than from what the judge might learned as a prosecutor, would in and of itself be a cause for questioning the Court's ability to be impartial in this case. Likewise, a reasonable person would not be inclined to think that the fact that the judge ordered the defense to file any challenge it wished to make immediately, even though the Court showed no similar sense of urgency in disclosing the potential conflict to the defense, would alone raise concerns about the judge's impartiality.

72.    A reasonable person would know, however, that in deciding whether an objective observer might have doubts about a judge's partiality courts have frequently emphasized the fact that there are a great many situations known to the law in which facts, although insignificant separately, have been found to be compelling in combination. *See, e.g., In re United States*, 441 F.3d 44, 2006 U.S. App. LEXIS 7779, at *61-62 (1st Cir. 2006) ("the cumulative effect is to establish a reasonable basis for questioning the [judge's] impartiality"). Federal courts have often indicated, in fact, that it is possible for a confluence of facts to create a reasonable basis for questioning a judge's impartiality, even though none of those facts individually would have required the challenged judge to step away from the case. *See, e.g., Obert v. Repub. W. Ins. Co.*, 398 F.3d 138, 145 (1st Cir. 2005) ("sometimes a multiplicity of small grounds will persuade even

though each alone is weak"). It follows that, in deciding what a reasonable person would think the Court must consider not whether the individual facts in isolation would cause a reasonable person to question her ability to be impartial, but whether the "totality of the circumstances" might do so. In this case, one more circumstance a reasonable person would know is that it is not just the conduct of the Court that is a source of concern, but the actions of the prosecution.

73.     Michael Meldish was murdered in the Bronx. For this reason, a reasonable person would ordinarily expect that the indictment of his alleged murderers would have been returned in Manhattan. A reasonable person would know, however, that the U.S.A.O. elected to bring this case in the Court's White Plains Division. A reasonable person would also know that the judge who was initially assigned to preside over this case, Judge Roman, questioned why the prosecution had filed in White Plains, instead of than Manhattan; and that, when he did, the government advised that it had done so because "a substantial part of the planning and execution" of the murder had "occurred in Westchester County." Even if a reasonable person would find this explanation to be plausible, he or she would know that government prosecutors, like other attorneys, often have more than one reason for the actions they take; and a reasonable person would be apt to wonder if, perhaps, the true motivation for filing in White Plains – a branch that has only four district judges, instead of Manhattan, which has 44 – was that the government was shopping for what it considered to be a more favorable forum.

74.     Another thing a reasonable person would know is that once a judge has been assigned to preside over a case she usually continues to sit on that case unless and until she recuses herself, grants a motion for a change of venue, or is unable to preside for some other reason. A reasonable person would know that, while it does not appear that Judge Roman recused, within days after the S.I. was returned the case was reassigned to Judge Seibel.

75.     Courts are presumed to conduct their business in a detached and neutral manner, and a reasonable person would assume that this reassignment was made randomly and fairly. Such a person would know, however, that while the rationale for reassigning a case is usually clear to both the parties and the public, it does not appear that the public record of this case explains the reason for the judge change.  A reasonable person would know, too, that after unsuccessfully attempting to ascertain the cause for the transfer – either from the court or from the judges themselves – the author of an online article dubbed the switch "mysterious." Bonannos%20Charged%20In%20$26%20Million%20Racketeering%20Scheme%20(1).pdf.

76.     A reasonable person would have no reason to believe that the prosecution played any role in having the case reassigned to Judge Seibel.  Such a person would know, however, that in light of her pre-bench service as a career prosecutor the prosecution would be unlikely to have had any reason to object to the reassignment; and that it did not, in fact, do so.  A reasonable person would consider that the prosecution would have been especially unlikely to object to the case having been transferred to Judge Seibel if had happened to know, before the S.I. was returned, that she had formerly worked in the Organized Crime Unit; and that, in that capacity, she had led an investigation into the very same "entity" that the prosecutors described in the S.I., for precisely the same sorts of criminal activity that is alleged in the S.I..

77.     Although a reasonable person would have no reason to assume that, at the time the case was reassigned to Judge Seibel the prosecution was aware of her prior investigation of the "Luchese Family," such a person would know that before returning an indictment prosecutors are duty-bound to perform a diligent investigation of all the relevant facts and circumstances; that even a cursory "conflict check" would have allowed the U.S.A.O. to identify the fact that it had previously investigated and prosecuted Anthony Baratta and other reputed members of the

"Luchese Family" for racketeering and other felonies analogous to the ones alleged in the S.I.; that the Baratta investigation and prosecution had occurred either during the time period when some of the criminal activity alleged in the S.I. is alleged to have taken place or only shortly before then; and that, if prosecutors had reviewed the U.S.A.O.'s *Baratta* files in the course of investigating the case against the current defendants, it is very likely that they would have learned of Judge Seibel's role in investigating the "Luchese Family." A reasonable person would know, further, that while the government said in its July 25th Letter that the Court had directed it to investigate Judge Seibel's possible conflict on July 6, 2018, the government did not say that this was the first time it had learned about the Court's investigation of the "Luchese Family."

78. A reasonable person would know that, even if the government was unaware of Judge Seibel's investigation of the "Luchese Family" until July 6, 2018 the U.S.A.O. did not – at that time or, in fact, at any time – disclose to the defense that it had engaged in ex parte contacts with the Court; that, as a result of those communications, it had undertaken a review of U.S.A.O. files that may have contained documents ascribing criminal activity to the defendants in this case; or that the government had performed that review and, again on an ex parte basis, reported back to the Court. A reasonable person would be apt to find this fact to be significant because, just as it is usually improper for a judge to engage in ex parte communications with a prosecutor, it is ordinarily improper for a prosecutor to engage in ex parte contacts with a court. *Norton v. Town of Brookhaven*, 33 F. Supp. 3d 215, 232 (E.D.N.Y. 2014). In fact, as a federal district court in Florida recently pointed out, "ex parte communications between judge and prosecutor are presumptively improper…and in appropriate cases can implicate due process concerns." *Solis v. Jones*, 2016 U.S. Dist. LEXIS 178098, *24 (S.D. Fla. Dec. 21, 2016) (citations omitted).

79.     The government's failure to disclose the fact that it had engaged in ex parte communications with the Court – or that, in the course of those contacts, the Court had directed it to search the U.S.A.O.'s *Baratta* file for documents that might implicate the defendants in this case in criminal activity – would certainly give a reasonable person cause for concern.  But this would not be the only aspect of the government's conduct that would give such a person pause.

80.     A reasonable person would know that since Judge Seibel no longer works for the U.S.A.O. she was not in a position to personally inquire into what her investigation of the "Luchese Family" entailed; and that, because this is so, the Court was obliged to rely on the government to perform a "conflicts search" for her.  A reasonable person would ordinarily assume that the prosecution would conduct this inquiry in a thorough manner, and to fully and frankly report back to the Court the results of its search.  A reasonable person would realize, however, that if the U.S.A.O. does not wish to have Judge Seibel recuse herself from presiding over this case, locating documents that might prompt her to do so would not aid its cause.

81.     It is likely that despite whatever concern he or she may have about the fact that the government engaged in ex parte communications with the Court that it did not disclose, as well as the fact that the government might have had a powerful incentive for not disclosing documents it found which could have prompted the Court's recusal, a reasonable person would be inclined to assume that the government was being fully transparent when it advised the Court, in its July 25th Letter, that it did not locate many relevant documents.  There is, however, one other thing that both a reasonable person and the Court would know.

82.     A reasonable person would know that, according to recent online articles, at multiple bail hearings in this case the prosecution – in an attempt to keep certain defendants behind bars – "erroneously claimed to have three tape recordings" that do not exist and made

other misrepresentations to the Court. A reasonable person would not know whether this reporting is accurate or not, but he or she would know that, if what the author of the article says is true, the Court "slammed the prosecution" for "playing fast and loose with the facts." www.ganglandnews.com/members/column1089. A reasonable person would be apt to wonder why, if the prosecution cannot be trusted to be honest about the evidence in its possession, the Court – much less the defendants – would be expected to trust that the U.S.A.O. would not also have "played fast and loose" with facts that might have prompted the Court's recusal.

83.     In the Second Circuit a judge is expected to disqualify herself if a reasonable person, "knowing all the facts, would conclude that the court's impartiality <u>might</u> reasonably be questioned." *See, e.g., Apple v. Jewish Hosp. and Medical Center*, 829 F.2d 326, 333 (2d Cir. 1987). Disqualification is in order, in fact, not only when the Court concludes that a reasonable person might question her ability to be impartial, but when a Court finds that the question of whether she might do is a close one. *German v. Fed. Home Loan Mort. Corp.*, 943 F. Supp. 370, 373 (S.D.N.Y. 1996). I am of the opinion that a reasonable person, if considering the totality of the circumstances, might question the ability of the judge to be impartial, and that this is not a "close call."

84.     One other point bears mentioning. Even were the Court to find that there is no chance whatsoever that a reasonable person would question her ability to be impartial – and, therefore, that disqualification is not mandated by § 455(a) – the Court must still consider whether her recusal is required by § 455(b)(3); that is, whether she "served in governmental employment" and, in such capacity, "participated as counsel...concerning the proceeding."

85.     It has generally been agreed that when a judge formerly performed the role of prosecutor in conjunction with a matter that subsequently comes before her in her judicial

capacity it is improper for her to sit unless the defendant has waived his right to seek

disqualification on this basis. This is true, *a fortiori*, where the judge, while a prosecutor,

performed a primary decision-making function with respect to the prosecution. *United States v.*

*Arnpriester*, 37 F.3d 466, 467 (9th Cir. 1994) ("The attorney responsible for the precedent

investigation of a person suspected of [violating U.S. law] would reasonably be believed not to

be impartial when that person was subsequently indicted, tried and convicted").

86.     The Second Circuit has indicated, however, that a judge who once served as a

United States Attorney is not considered to have been "counsel" with respect to a case if the

investigation that "led to the indictment" began after she left the U.S.A.O. *United States v.*

*Thompson*, 76 F.3d 442, 450-451 (2nd Cir. 1996) (disqualification is not required "merely

because some part of the offense was committed while the judge was the United States Attorney,

if [she] left that position before that office's investigation of the offense began").

87.     The S.I. makes it clear that it is the government's position that "some part of the

offense was committed while" Judge Seibel was a United States Attorney. According to the S.I.,

some of the described activity took place "at least" as far back as 2000 – eight years before Judge

Seibel left the U.S.A.O. Should it oppose this motion, however, the government is likely to

contend that the investigation of the defendants began long after Judge Seibel left the U.S.A.O.

88.     As far as certain aspects of the investigation are concerned, this is undoubtedly

true. It is obvious, for example, that the investigation of the Michael Meldish murder could not

have begun prior to November 15, 2013 – the date on which the murder took place – and that this

was long after Judge Seibel left the U.S.A.O. It is not as clear, however, when the government's

investigation of other criminal activity charged in the Indictment – including the "Racketeering

Conspiracy" (Count One), and the "Firearms Offense" (Count Nine) – commenced.

89.     The government would likely say that the U.S.A.O.'s investigation of these alleged offenses also post-date Judge Seibel's ascension to the bench, but the S.I. would appear to be contradict this claim. According to the indictment, La Cosa Nostra is an "enterprise," as "that term is defined" in 18 U.S.C. § 1961(4) – "that is a group of individuals associated in fact." S.I., ¶ 2 ("the Enterprise constituted an ongoing organization, whose members functioned as a continuing unit"). It seems that the U.S.A.O.'s investigation of this "group of individuals" for racketeering and some of the other crimes alleged in the S.I. did not begin recently, or after 2008, but long ago – likely even before Judge Seibel was involved in investigating LCN.

90.     The S.I. further alleges that La Cosa Nostra "operated through entities known as 'Families,'" including the "Luchese Family." S.I., ¶ 3. The U.S.A.O.'s investigation of the "Luchese Family" for "racketeering activity" and many of the other crimes alleged in the S.I. also did not begin recently, or after 2008. On the contrary, as the August 28th Order reflects, that investigation began no later than 1989, when Judge Seibel was responsible for investigating the "Luchese Family" for many of the same crimes that the government has alleged in the S.I.

91.     The government would probably say that the fact that Judge Seibel investigated the same "organization" or "group of individuals" that it describes in the S.I. is irrelevant – what matters is whether she investigated the current defendants *individually*. It is not clear that this is so or why it would be: if the statutory prohibition exists to guard against the possibility that a judge, while serving as a prosecutor, may have extrajudicially acquired information or a predisposition about facts in dispute, then surely the concerns raised by the fact that the judge once investigated the same "group of individuals" for some of the crimes that have been alleged in the present case would not be assuaged by the fact that none of the current defendants – even

though alleged by the government to have been members of the group the judge investigated at the time of her investigation – were personally investigated by the judge at that time.

92.    But even if the operative question is whether the judge investigated any of the current defendants individually, it cannot be categorically said that she did not.  It is not like that investigation took place so long ago that none of the defendants had been born yet.  There is, moreover, reason to believe that Judge Seibel did investigate one or more of the defendants.

93.    As far as defendant Steven L. Crea is concerned, according to an organizational chart that appeared in a book called "*Mob Boss: The Life of Little Al D'Arco, the Man Who Brought Down the Mafia*" – a chart that had apparently been used as a government exhibit – in 1991, one of the years in which Judge Seibel was investigating the "Luchese Family," Mr. Crea was reputed to have been the "Acting Consigliere;" which, according to the S.I., would mean that he would have been "among the highest ranking members" of that "Family."  S.I., ¶ 6. Further according to the chart, Anthony Baratta (the person who ultimately became the lead defendant in the case Judge Seibel investigated and David Kelley indicted) served, at the time, as the Acting Underboss of the "Family;" and, so, was alleged to have had the same level of responsibility within the "entity" as Mr. Crea.

94.    The author of "*Mob Boss*" was not the only one who alleged, at the time, that Mr. Crea was a high-ranking member of the "Luchese Family."  In fact, according to the Court, allegations that Mr. Crea was a member of the "Luchese Family" have been made "for **decades**." Given the widespread dissemination of allegations of this nature at the time it is highly likely that the prosecutor who investigated Mr. Baratta would have performed at least some investigation of Mr. Crea; and, indeed, it would seem to be extremely unlikely that she did not.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on this 15th day of September, 2018, in Berkeley, California

Richard E. Flamm, Esq.



**State of California, County of Alameda**
Subscribed and sworn to (or affirmed) before me on this
15 day of September, 2018
by Richard E. Flamm
proved to me on the basis of satisfactory evidence to be
the person(s) who appeared before me.



, Notary Public

COLLIN BECKER
COMM. # 2106174
NOTARY PUBLIC - CALIFORNIA
ALAMEDA COUNTY
My Comm. Exp. 4-9-2019