# THE LAW OFFICES OF
# ANTHONY DIPIETRO, P.C.

15 CHESTER AVENUE　　　　　　　　　　　　　(914) 948 3242
WHITE PLAINS, NY 10601　　　　　　　　　　　(914) 948 5372 FAX
　　　　　　　　　　　　　　　　　　　　　　　DIPIETROLAW@YAHOO.COM

March 19, 2020

**BY ECF**
Honorable Cathy Seibel
The Hon. Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas Street
White Plains, NY 10601-4150

　　　　Re:　　*United States v. Steven L. Crea*, 17-CR-089 (CS)

Dear Judge Seibel:

　　　　We write in regard to Steven L. Crea's sentencing, which is currently scheduled for April 2, 2020. As the Court is already well aware, there has been an ongoing national pandemic due to the spread of the coronavirus since early March and the Federal Bureau of Prison has suspended all visitation at its facilities as of March 13, 2020. Since Mr. Crea does not have email (or access to unmonitored email as an inmate) and counsel's prior request of March 18, 2020 to his facility for a legal call remains unanswered, Mr. Crea's counsel relies on the previously filed objections with Probation. Those objections are attached hereto and fully incorporated by reference as part of Mr. Crea's instant sentencing submission.

　　　　Also, Mr. Crea submits that it was procedural error for the Court not to adjourn the due date of his sentencing submission until counsel could adequately confer and prepare for sentencing with Mr. Crea (*see* Dkt. 973). Even if a legal call could be executed at this time, such mechanism would be wholly inadequate to address with Mr. Crea all the outstanding issues relating to *his* sentencing (including, but not limited to, a full review of the final 35-page Presentence Report ("PSR") issued on February 27, 2020 and the Court's extensive rulings of March 13, 2020), and to attain Mr. Crea's input on *his* prospective sentencing pleadings.

　　　　In this regard, it was only seven days ago when the Government filed its opposition to Mr. Crea's request to adjourn the conference of March 13, 2020 due to the coronavirus outbreak (*see* letter of Anthony DiPietro, Esq., to Hon. Cathy Seibel (dated March 11, 2020)), in which trial prosecutors successfully argued that that conference must be held without delay in order to "*allow the parties to prepare sentencing submissions with the benefit of the Court's rulings on post-trial motions*." Dkt. 971. The apparent fact that the Government had yet to prepare its own sentencing memo, while having four months to do so, equally "illustrate[d] why that [practice] is a bad idea" (Dkt. 973), but such fact was of no moment to the Court (or of mention) when the prosecution was the claimed affected party under the circumstances.

　　　　Additionally, the Court was later made aware by defense counsel that all federal prisons shutdown without notice due to the coronavirus immediately following the

conference of March 13, 2020, leaving it virtually impossible for Mr. Crea's counsel to adequately confer with him about sentencing. *See* Letter of Joshua L. Dratel, Esq., to Hon. Cathy Seibel (dated March 17, 2020). To date counsel has not spoken to Mr. Crea about the Court's rulings of March 13th, which again the Government already successfully claimed were important for the parties to "*prepare sentencing submissions.*" Of course, as the Government claimed it needed the benefit of the Court's ruling on post-verdict motions to prepare its sentencing submission, so too did Mr. Crea and his counsel. In any event, it is truly not proper for the Court to fault any counsel for the needed adjournments here, because it was not foreseeable to anyone that there would exist a global pandemic that would threaten the well-being of all and bring our nation, daily life, and profession to a crippling halt.

Most importantly, it is the Court's duty to protect a defendant's constitutional rights in all circumstances (especially when such rights are threatened by unprecedented circumstances that is not of the defendant's own making)—not to endorse the prosecution's "knee-jerk" opposition that aimlessly seeks to undermine such protection.[1] Indeed, if the defendants are truly "entitled to all the formalities" Dkt. 973, then they should have been given such formalities without exception here—especially at the nominal expense of a normally consented to request to adjourn the filing date of a pleading (during a global pandemic) that will neither substantively impact the proceeding or cause prejudice to the Government. Ultimately, Mr. Crea has not been provided the basic formalities in this case––resulting from a relentless and unambiguous pattern by prosecutors to have it their way on virtually every single issue that comes to a decision (*i.e.,* Tr. 1985—after ample pestering by prosecutors, the Court ruled "You know what? Do what you want."), which ultimately led to numerous errant rulings by the Court that first worked to deny Mr. Crea a fair trial (s*ee* Dkt. 928) and that now threaten the fairness of his sentencing proceeding.

Nevertheless, Mr. Crea will be prepared to advance any issues not covered by his attached objections that may be necessary at the time of sentencing and will request an evidentiary hearing on any remaining dispute that may be warranted at such time.

Respectfully submitted,

*/s/*_____
Anthony DiPietro, Esq.
Robert Franklin, Esq.

---

[1] For example, trial prosecutors absurdly claimed that an adjournment would affect the Government's ability to retry its case if the defendants conviction is reversed on appeal, because "the more time elapses, the more likely that witnesses will prove difficult to locate or their memories will fade." Dkt. 973, at 2. Such a fabricated dilemma—that the Government's witnesses' will suddenly disappear or that their memories will fade because of an extension of a few months in light of a global pandemic—is facially frivolous in any case, but especially in this one when considering that an adjournment of sentencing is already inevitable under current circumstances due to the coronavirus outbreak and that several of the Government's witnesses at trial offered no material testimony beyond claiming to remember events that occurred over 20/30-plus years ago (i.e., Sean Richard, Randy Silverstein)—rendering the precept of these witnesses' having fading memories a non-issue.

# THE LAW OFFICES OF
# ANTHONY DIPIETRO, P.C.

**15 CHESTER AVENUE**               **(914) 948 3242**
**WHITE PLAINS, NY 10601**        **(914) 948 5372 FAX**
                                               **DIPIETROLAW@YAHOO.COM**

February 4, 2020

**BY EMAIL**
Nichole Brown-Morin
U.S. Probation Officer
United States District Court
Probation Office (S.D.N.Y)

       Re:    Steven L. Crea (*USA v. Matthew Madonna*, et al., 17-cr-89 (CS))
                 Objections to Presentence Report

Dear Ms. Brown-Morin:

       Defendant Steven L. Crea, by and through undersigned counsel, respectfully submits the following objections in connection with the Presentence Report ("Report") that was provided to the parties on January 22, 2020:

1. **Objection 1, ¶ 16**: Unless sufficient supporting references to the trial record are provided to Probation, there is no legitimate basis for the Report's inclusion of the prosecution's "case summary." As explained below, this portion of the Report (namely, ¶¶ 22-32) contains numerous inaccurate statements related to the offense conduct. As a result, Probation's act of summarily adopting the prosecution's "case summary" defeats the very purpose of this process, which is for Probation to act as an independent fact finder for the Court as well as to provide the Court with relevant, unbiased information.

2. **Objection 2, ¶ 22:** Mr. Crea maintains that he was not the "Acting Boss" of the "Luchese Family of La Cosa Nostra" during the timeframes relevant to this indictment. Also, there is no record-based evidence that Mr. Crea served as the "Underboss" during "*all times* that codefendant Matthew Madonna was Acting Boss of the Family." The trial record does not support that claim, and the records produced by the Government in discovery establish that another individual was identified as the "Underboss" *during times* in which Matthew Madonna was alleged to be the "Acting Boss."

3. **Objection 3, ¶ 23**: There is no record-based evidence that Mr. Crea received "tribute" money and/or profits from "every crime the Family committed." Also, there is no record-based evidence that Mr. Crea ever received any "tribute" monies and/or profits as part of a commission from any person's engagement in a specific criminal act.

4. **Objection 4, ¶ 24:** The assertions concerning Mr. Crea's prior admissions are grossly exaggerated. The transcript related to Mr. Crea's guilty plea in any prior case is available to both Probation and the Court. Those documents are dispositive to this issue. Accordingly, the inclusion of the Government's inaccurate "summary" of Mr. Crea's admissions is both unnecessary and improper, especially since Probation later explains Mr. Crea's criminal history in Part B of the Report.

5. **Objection 5, ¶¶ 25, 26:** The allegations contained in these paragraphs are largely false and misleading. As explained below, there is no record-based evidence that Mr. Crea leveraged his relationship with a "senior executive at Bronx Lebanon Hospital to assist general contractor, Sparrow Construction ["Sparrow"], in obtaining construction contracts from the Hospital." There is also no record-based evidence that Mr. Crea "handpicked contractors" for Sparrow in connection with the work it performed at the Bronx Lebanon Hospital ("Hospital"). Finally, there is no record-based evidence that Mr. Crea extorted Sparrow Construction. In fact, the trial testimony of Randy Silverstein, who controlled Sparrow Construction and was responsible for the "Ambulatory Care" project at the Hospital, specifically contradicts these allegations, and it proves them to be false as follows:

   - Prior to Sparrow being given the "Ambulatory Care" project with the Hospital, Silverstein had personally secured several smaller projects with the Hospital. The first person that Silverstein dealt with for these projects was Shelly Ortsman, who was introduced to Silverstein by his father sometime prior to 1997. (*See* Trial Tr. 3432, l. 24–3433, l. 4);

   - With respect to these prior projects, Mr. Silverstein entered into joint ventures with other contractors and paid a $25,000 kickback to a Bronx Lebanon official, Mr. Fuentes. (*See* Trial Tr. 3453-3461);

   - Mr. Crea had nothing to do with Sparrow being given the Ambulatory Care project (*See* Trial Tr. 3465, l. 19-22):

     > Q.  When you were in the process of being awarded that job, the ambulatory care, you did not discuss that with Steve Crea, did you?
     >
     > A.  No;

   - Mr. Crea did not introduce Silverstein to Ortsman. In fact, Silverstein never saw Mr. Crea and Ortsman together. (*See* Trial Tr. 3555, l. 1-9);

   - Silverstein's crimes against the Hospital consisted of an over-billing scheme, in which his office created inflated invoices for services performed. In some instances, Silverstein created phony invoices on behalf of his sub-contractors, seeking additional monies for the work performed based on inflated values. Silverstein required that the sub-contractor pay to Silverstein the inflated amount when received. (*See* Trial Tr. 3469, l. 5 – P. 3470, l. 1). The sub-contractor received none of the criminal proceeds (*See* Trial Tr. 3554, l. 14 – 21):

>   Q. And the money would come to you in the form of a check to a subcontractor, you would then give that check to the subcontractor and whatever the added amount was, you would get it back from the subcontractor, correct?
>
>   A. Yes.
>
>   Q. The subcontractor didn't get any money from your scam of overbilling, correct?
>
>   A. No;

- Notably, Mr. Crea was not involved in any of Silverstein's crimes against the Hospital, and Mr. Crea had no participation in the over-billing scheme that Silverstein was conducting with his sub-contractors (*See* Trial Tr. 3556, l. 9-11):

  >   Q. And Mr. Crea was not involved in your change-order scheme that you have described, correct?
  >
  >   A. Correct;

- The Hospital hired an independent company to represent them to oversee the "Ambulatory Care" project. Mr. Crea was never introduced to those representatives, and he had nothing to do with that entity. (*See* Trial Tr. 3556, l. 20 – P.3557, l. 8);

- Sparrow handled the project independently, and it selected the sub-contractors that worked on its behalf. Mr. Crea did not "handpick subcontractors" on any of Sparrow's projects at the Hospital. For example, on the "Ambulatory Care" project, Sparrow employed approximately 25 subcontractors. Of all those sub-contractors, Silverstein asked Mr. Crea for referrals for two, and Silverstein rejected one and hired one. Silverstein even rejected a referral from Mr. Crea that involved a company affiliated with his son (*See* Trial Tr. 3553, l. 21-24);

- Mr. Crea did not extort Sparrow Construction as a matter of fact and law. The only connection that Mr. Crea had to Sparrow regarding the project at the Hospital was that Mr. Crea was an investor in a legitimate loan that was provided to Silverstein by a third-party lender, so that Silverstein could acquire the bonding necessary for the project. As explained below, that loan only came about as a result of Silverstein's inability to obtain the loan from other lenders. At trial, Mr. Silverstein explicitly refuted any claim of extortion in connection with the loan (*See* Trial Tr. 3564, l. 24- P. 3565, l. 3):

  >   Q. Now, at any time when the - - during the course of this loan when payments are being made, when you're late, when you're extending it out, were any threats made to you? Any physical harm done to you?
  >
  >   A. No;

- To be sure, the loan that was provided to Silverstein resulted only after he struggled to obtain a loan from other lenders, because his credit was very poor due to a prior bankruptcy. Silverstein unsuccessfully attempted to borrow the necessary funds for the bond with a bank, but he was denied. In addition, Silverstein unsuccessfully attempted to find a joint venture construction partner to do the project, which was met with no success.

- Silverstein ultimately received the financing from Lance Fallow, Esq., an attorney who was referred to Silverstein by Mr. Crea. Mr. Fallow performed a "due diligence" review of Sparrow Construction, the project documents related to the Hospital, and the proposed real estate collateral that Sparrow provided. Mr. Fallow was the decisionmaker as to whether Silverstein would be provided the loan, which would be funded by independent investors. Ultimately, Mr. Fallow decided to fund the loan, and Mr. Crea was one of the lender's investors. All the dealings concerning Silverstein and the loan were with Mr. Fallow. When Mr. Silverstein was late in making payments, he negotiated extensions with Mr. Fallow (totaling 18 months in extensions), who he described as "fair". (*See* Trial Tr. 3559, l. 12-25; *see also* 3562, l. 1-13);

- After the loan for the bond was paid off, Silverstein sought and received another legitimate loan from Mr. Fallow in the amount of $105,000. (*See* Trial Tr. 3564, l. 13-16);

- The Government conceded that the "loan" given to Sparrow by Mr. Fallow and other investors was legitimate (*See* Trial Tr. 4341, l. 21-24).

6. **Objection 6,** ¶ 27. Mr. Crea did not extort Joseph Datello, nor did Mr. Crea "impose" a $100,000 debt on Datello. There is also no-record based evidence that Mr. Crea threatened to kill Mr. Datello. On the contrary, the record demonstrates that Mr. Datello and his former business partner, Sean Richard, took a $100,000 loan from Mr. Crea in or about 1999, because they were unable to satisfy their construction company's payroll. Several years later, Datello volunteered and attempted to payback such loan to Mr. Crea when Richard had failed to do so. The record also demonstrates that after twenty years, Mr. Crea has still not been paid back the full amount of that legitimate loan. And, notwithstanding the fact that Datello was delinquent in repaying such loan for the last twenty years, Datello has never been threatened or harmed by Mr. Crea.

7. **Objection 7,** ¶ 28. The prosecution's claim that more than $1 million in criminal proceeds was received by Mr. Crea is baseless. First, there is not a scintilla of record-based evidence to support the prosecution's "estimate" that more than $1 million was received by Mr. Crea in connection with any criminal conduct. Second, as explained above, there is no record-based evidence that Mr. Crea extorted Sparrow Construction. The fact that Silverstein had obtained a legitimate loan from Mr. Crea and several other investors does not amount to extortion or any other crime. Finally, Mr. Crea's co-defendant Joseph DiNapoli, who the prosecution also alleged was part of the "Family's leadership" and had received the same claimed

"tribute" payments around Christmas, was recently sentenced without the prosecution's advocating for forfeiture based on that allegation. Accordingly, given (1) the lack of sufficiently supporting references to the trial record to support the statements in this paragraph, (2) the inapposite trial testimony of Silverstein that he was not extorted, and (3) the worthlessness of the prosecution's "estimate" when the Court recently sentenced a similarly situated co-defendant, requires the striking of this paragraph from the Report. Indeed, the "$1 million estimate" now provided by the prosecution is based purely on its own speculation, and that "estimate" appears only to be advanced by the prosecution as a vindictive attempt to exaggerate any potential financial penalties as it relates to Mr. Crea and to punish him for exercising his constitutional right to a trial by jury—unlike his similarity situated co-defendant, Joseph DiNapoli, who was recently sentenced by the Court pursuant to a plea agreement.

8. **Objection 8, ¶** 29. Mr. Crea never participated in the sale of drugs. There is no record-based evidence to the contrary.

9. **Objection 9, ¶** 30. The statements provided in this paragraph, as it relates to Mr. Crea, are inaccurate. Mr. Crea never ordered or participated in an alleged attempted murder of Carl Ulzheimer. Notably, the jury found him *not guilty* of that offense. The fact that the jury's verdict is referenced only in a footnote demonstrates the Government's heavy hand in manipulating the contents of the Report regardless of the true facts that exist. Furthermore, none of the other persons cited, who previously plead guilty to an offense relating to this alleged incident, ever implicated Mr. Crea or agreed to the version of events as provided by the prosecution. In any event, the fact that someone else plead guilty to a related offense is surely not dispositive to whether another defendant is guilty of the same. *Cf.*, Hon Jed S. Rakoff (U.S.D.J., S.D.N.Y.) *Why Innocent People Plead Guilty*, The New York Review of Books (November 20, 2014) (noting that plea bargains have led many innocent people to take a deal, and that in plea bargaining "the outcome is very largely determined by the prosecutor alone.").

10. **Objection 10, ¶** 31. Mr. Crea maintains his innocence as to the murder of Michael Meldish, and he reasserts that he had no knowledge or participation in such offense. In addition, there is no credible evidence that Steven D. Crea was involved in this offense whatsoever. In fact, Steven D. Crea passed a polygraph test denying both Mr. Crea and his own involvement in such offense, which was a test administered by a former FBI agent. (*See* Dkt. 547-1).

11. **Objection 11, ¶** 32. Mr. Crea was not involved in illegal gambling, robbery, assault, or trafficking of stolen cigarettes.

12. **Objection 12**, ¶ 38. The statements in this paragraph are ambiguous and inaccurate. Mr. Crea was not involved in other acts of attempted murder, extortion, extortionate debt collection, wire fraud, and the operation of an illegal gambling business.

13. **Objection 13,** ¶ 40. Mr. Crea acknowledges that Count 3 statutorily requires a term of life imprisonment pursuant to 18 U.S.C. § 1959(a)(1). In this regard, section 1959(a) provides no alternative punishment for murder other than death or life imprisonment. However, as it pertains to a calculation under the Guidelines, Mr.

Crea submits that Section 2A1.1 (First Degree Murder) is inapplicable here, because the Court broadly charged *Pinkerton* liability stemming from the RICO conspiracy charge (rather than the conspiracy to murder charge set forth in Count Two) in connection with the murder of Michael Meldish (Count 3). Section 2A1.1 applies only in cases in which the defendant was convicted of a "premeditated" and intentional killing, which is inapposite to the theory of *Pinkerton* liability that was charged against Mr. Crea. Thus, section 2A1.2 should be referenced when determining the offense level, which is 38.

14. **Objection 14, ¶ 43.** Mr. Crea maintains that he was not the "Underboss" in the Luchese Family during the timeframes relevant to this indictment.

15. **Objection 15, ¶¶ 45, 48.** Given the facts stated above, Mr. Crea submits that the adjusted and total offense level is 38.

16. **Objection 16, ¶¶ 51, 52.** Section 4A1.2 should not apply in these circumstances, because such section requires that the "prior sentence" must be "for conduct not part of the instant offense." Here, the Government presented these prior convictions as part of its case-in-chief and it utilized the underlying offense conduct as *direct evidence of the instant offense* (i.e., the RICO Conspiracy charged in Count One).

17. **Objection 17, ¶¶ 53, 55.** Mr. Crea's criminal history score should be 5.

18. **Objection 18, ¶ 84.** Based upon a total offense level of 38 and a criminal history category of III, the guideline imprisonment range is 292-365.

Please feel free to contact undersigned counsel if you have any questions concerning the above objections. Your time and consideration are greatly appreciated.

Respectfully submitted,

*/s/Anthony DiPietro*
Anthony DiPietro

*/s/Robert Franklin*
Robert Franklin
2465 Mercer Ave. (Suite 301)
West Palm Beach, FL 33401

*Counsel for Steven L. Crea*