

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

July 21, 2025

**BY EMAIL AND ECF**

The Honorable Cathy Seibel
United States District Judge
Southern District of New York
United States Courthouse
300 Quarropas Street
White Plains, NY 10601

    Re:    **United States v. Steven L. Crea,**
            **17 Cr. 89 (CS)**

Dear Judge Seibel:

      The Government respectfully submits this letter in opposition to defendant Steven L. Crea's motion for compassionate release pursuant to 18 U.S.C. § 3582(c) ("Mot."), ECF No. 1312. The Motion should be denied because, even assuming Crea has established extraordinary and compelling reasons to warrant release considering his terminal Stage IV lung cancer diagnosis, the defendant remains a danger to the community, and the Section 3553(a) factors weigh strongly in favor of the defendant's original sentence of life imprisonment. For these reasons, and as set forth below, the Motion should be denied.

    **I.**    **Background**

      On May 24, 2017, a grand jury sitting in this District returned Indictment 17 Cr. 89 (CS) (the "Indictment"), charging Crea and eighteen other members and associates of the Luchese Family with conspiring to participate in the affairs of La Cosa Nostra through a pattern of racketeering activity. (Revised Final Presentence Investigation Report ("PSR") ¶¶ 1, 15). Crea was also charged with conspiring to commit murder in aid of racketeering and murder in aid of racketeering in connection with the murder of Michael Meldish, and with using a firearm during the murder of Meldish, among other offenses. (PSR ¶¶ 2-10).

      The charges in the Indictment stemmed from a long-term investigation by this Office and the Federal Bureau of Investigation into the criminal activities of La Cosa Nostra, with particular focus on the Luchese Family. La Cosa Nostra, also known as the "Mafia," operates through entities known as "Families." The Luchese Family is one of six families that operate in the New York City area. (PSR ¶ 17).

Crea was a long-term member of the Luchese Family, serving as the official Underboss for the Family. (PSR ¶ 22). During the times that Crea was the Underboss, co-defendant Matthew Madonna served as Acting Boss of the Family. (PSR ¶ 22). As the Underboss of the Family, Crea helped oversee the Family's criminal activities and was entitled to a portion of the profits from every crime the Family committed. (PSR ¶ 23).

The Luchese Family routinely used violence and the threat of violence to make money and maintain power. (PSR ¶ 30). When new members of the Family were inducted into the Family, the prospect agreed to kill for the Family and was directed that if a member of another Family laid their hands on the prospect, he should immediately kill the other Family member. (PSR ¶ 30).

In 2013, after Michael Meldish had disrespected Madonna by failing to collect money that Madonna and Meldish had lent, Madonna ordered Meldish killed. (PSR ¶ 31). The order was passed from Madonna to Crea, down to Steven D. Crea (Crea Jr.), who assigned the murder to Christopher Londonio, a Soldier in the Family. (PSR ¶ 31). Acting on those orders, on November 15, 2013, Londonio enlisted the help of Terrence Caldwell, who killed Meldish in an execution-style murder with one bullet directly to Meldish's head. Londonio and Caldwell then fled the scene together. (PSR ¶ 31).

Crea was involved in additional acts of violence as well. In late July 2012, a group of Bonanno members and associates made an armed incursion into a Luchese social club, to intimidate the Luchese leadership. During the ensuing confrontation, a Bonanno associate named Carl Ulzheimer showed disrespect to Crea. As a result, Crea directed that Ulzheimer be killed. Crea Jr. relayed the order to a soldier in his crew, Paul Cassano, and an associate of Cassano's, Vincent Bruno. In late 2012, Cassano and Bruno, who was carrying a firearm, drove to Ulzheimer's house at night. While Cassano waited in the vehicle, Bruno went to Ulzheimer's door and knocked. Bruno intended to shoot and kill Ulzheimer had he come to the door, but Ulzheimer did not. Bruno and Cassano made a second, similar attempt later the same evening. The Luchese and Bonanno Families subsequently resolved the dispute before any further attempts on Ulzheimer's life. (PSR ¶ 30).

In addition to acts of violence, the evidence at trial proved that Luchese Family members and associates participated in illegal gambling, robbery, assault, and trafficking of stolen cigarettes. (PSR ¶ 32).

Crea also participated in and directed the Family's extortion activities, particularly of construction businesses, as well as the Family's conduct of manipulating bids and price-fixing schemes. (PSR ¶ 24). Crea used his influence in the construction industry to obtain lucrative contracts for companies that he controlled to ensure that La Cosa Nostra-connected contractors were employed on those projects; to resolve labor disputes to the benefit of La Cosa Nostra; and to commit fraud to maximize the profit of these projects for himself and his associates. (PSR ¶ 24). For example, Crea leveraged a lifelong relationship with a senior executive at Bronx Lebanon Hospital to assist general contractor, Sparrow Construction, in obtaining construction contracts from the Hospital. (PSR ¶ 25). During the project, Sparrow and some of its subcontractors engaged in fraud, wherein they inflated the cost of otherwise legitimate change orders (essentially

2

overbilling for work that was done) and billed for work by subcontractors that was never completed. (PSR ¶ 26).

Crea also extorted Luchese Soldier Joseph Datello regarding a $100,000 debt related to a former associate and witness, Sean Richard, who was partially responsible for a previous conviction of Datello and Crea in 2004. In connection with collecting that debt, Crea threatened to kill Datello, but he never executed that threat because Datello collected what money he could to make the recurring payments. (PSR ¶ 27).

In addition, Luchese Family members also engaged in drug trafficking. There was evidence at trial that Datello distributed approximately 4.6 kilograms of cocaine to pay his debt to Crea. (PSR ¶ 29).

Crea has a long history of criminal activity. In 1996, Crea was convicted of federal conspiracy charges in the Eastern District of New York and sentenced to nine months in prison followed by a term of supervised release. (PSR ¶ 50). Crea violated the terms of his supervised release by associating with Dominic Truscello, another member of the Luchese Family, and was sentenced to an additional nine months' imprisonment. (PSR ¶ 50). In 2004, Crea was convicted of enterprise corruption charges in New York State court, stemming from his association with La Cosa Nostra and their price fixing, bid rigging and other anti-competitive arrangements in the construction industry, and was sentenced to two to six years' imprisonment. (PSR ¶ 51). In 2004, Crea was also convicted of conspiracy to commit extortion in this Court, again relating to extortion in the construction industry, and sentenced to 34 months' imprisonment followed by a term of supervised release (which he violated by the conduct charged in this case). (PSR ¶ 52).

In October and November 2019, Crea was tried and convicted in this Court of conspiracy to commit racketeering as part of the Luchese Family (Count One); conspiracy to commit murder in aid of racketeering, and murder in aid of racketeering in connection with the murder of Michael Meldish (Counts Two and Three); and the use of a firearm in connection with the Meldish murder (Count Seven).

On August 27, 2020, the Court sentenced Crea to a term of life imprisonment on Count One; ten years' imprisonment on Count Two; the mandatory term of life imprisonment on Count Three; and a consecutive term of life imprisonment on Count Seven. (Sent. Hr'g Tr. 14). In imposing sentence, the Court addressed each of the Section 3553(a) factors, explaining how the factors weighed in favor of a life sentence, even on the counts where the Court had discretion not to impose a life sentence. The Court explained:

> First is the nature and circumstances of the offense. As I said in I think just about every sentencing in this case, the Mafia is a terribly dangerous and destructive organization, everything from extorting protection from small businesses to shootings in the streets. It affects our society at many levels and exacts a financial toll on any number of transactions. This defendant was at the highest level of this murderous and dangerous organization and used violence to advance the organization's goals and his own, including murdering another person who was no angel and perhaps accepted the risk of that sort of thing because of the life he chose

3

> to lead, but, nevertheless, this defendant, for decades, was the leader of a horribly destructive organization that really needs to be fully irradicated. That has not been done. It's not what it used to be, but this case shows that the Mafia still controls labor unions, it still greatly inflates the cost of buildings. In this case, it was a hospital that was corrupted. And people get killed or injured if they cross the Mafia. So this is at the far end of the spectrum of serious cases.
>
> The history and characteristics of the defendant are next. The defendant is a lifelong loyal made member of the Mafia. He appears to [] have a good family life. That's not unusual with mobsters. Generally they are very good to their family and friends and very bad to people who get in their way. The defendant has several prior convictions, all relating to the same association with the Lucchese Family. He's clearly not going to be deterred or stopped. And as the evidence in this case made clear, every made member takes an oath of loyalty. So far, this defendant has abided by that oath, and we have every reason to think he would continue to do so were he at liberty to do so.
>
> The remaining factors all militate in favor of a long sentence: Promoting respect for the law, just punishment, deterrence, protecting the public from further crimes. I guess I should say I don't think Mr. Crea himself can be deterred. I think he's a lifetime Mafia leader. But protecting the public is certainly an issue, and maybe there are some young people who think that this is a glamorous life who will think twice at the lengthy sentence that Mr. Crea is going to get. So specific deterrence may not be a factor, but general deterrence is a factor.
>
> I've considered all the 3553(a) factors, even the ones I haven't specifically discussed.
>
> Given the seriousness of the conduct and the defendant's lifelong devotion to the murderous organization and his leadership and direction to others in that organization, I find a life sentence to be more than justified.

(Sent. Hr'g Tr. 12-14).

> With respect to Count Seven in particular, the Court noted the following:
>
> And on Count Seven it's life consecutive. I recognize that the guidelines call for five years consecutive, but it just doesn't sit right with me that using a firearm to commit a murder only results in five years. It is a symbolic sentence because, obviously, you can't serve consecutive life terms. So it's only a symbolic statement, but it just seems to me that a cold-blooded mob-related hit is a particularly heinous form of firearm use and, given all the 3553(a) factors, that symbolic consecutive life term is merited.

(Sent. Hr'g Tr. 14).

4

Crea is currently incarcerated at FMC Butner. To date, he has served a little more than eight years in prison.

## II. The Defendant's Compassionate Release Motions and BOP Medical Records

Crea submitted his first request for compassionate release to the Bureau of Prisons (BOP) in November 2023, shortly after he was diagnosed with Stage IV non-small cell lung cancer. That request was referred to the BOP General Counsel's Office (GCO), which denied compassionate release. The GCO noted that, considering Crea's diagnosis of stage IV non-small cell lung cancer, Crea "meets the criteria for RIS under section 3(a)," but "given the nature and circumstances of Mr. Crea's offense and his criminal history, his release at this time would minimize the severity of his offense and could pose a danger to the community." (Def. Mem. Ex. 2). Crea submitted a supplemental request for compassionate release to the BOP on January 14, 2025. (Def. Mem. Ex. 3).

The defendant filed this Motion on June 17, 2025. In his Motion, the defendant argues that his September 2023, diagnosis of terminal Stage IV lung cancer constitutes an "extraordinary and compelling reason" to warrant release. (Mot. 1). He further argues that his conditions have worsened since his September 2023 diagnosis; among other things, in 2024, he was diagnosed with an undifferentiated neoplasm of the jejunum (a malignant mass in the small intestines), and Nephrotic Syndrome, a kidney disorder. (Mot. 7-8). The defendant proposes that he be released to receive only "palliative care at his residence and court-approved medical facilities," and that he be subject to "home confinement and electronic monitoring, conditioned on a government-approved visitation list of family members only." (Mot. 9).

The Government obtained the defendant's medical records in connection with this Motion. (*See* Gov't Mem. Ex. A, filed under seal). These records reflect that Crea is receiving regular medical care at FMC Butner, and that his medical conditions appear to be relatively stable since diagnosis. Crea has already outlived the initial 18-month prognosis of his September 2023 cancer diagnosis. In addition, he appears to be functioning relatively well in custody. His medical records consistently reflect that he is "able to complete all ADLs [activities of daily living] and transfers along with all mobility without use of assistive device." (Ex. A at 56, 61).[1] In April 2025, after he had complained of "knee pain," Crea reported that he was feeling better, and was doing "all exercises," was able to "walk 2 laps around [the] nursing station," and was "going outside to get sun and move around." (Ex. A at 56). On June 16, 2025, medical staff noticed that Crea's "CT shows enlarging abdominal lymph nodes" and decided to start him on "biweekly Opdivo SQ," a cancer medication. (Ex. A at 17). Since then, Crea has been seen biweekly by the oncology unit. Those visits reflect that Crea "is okay" with "no significant findings/no apparent distress." (Ex. A at 1, 8, 11).

---

[1] The BOP defines "Activities of Daily Living" as "eating, urinating, defecating, bathing, and dressing/undressing." *See* https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf, last accessed July 21, 2025.

### III. Crea Should Not be Released

#### A. Applicable Law

Under Section 3582, the Court "may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

As courts in this District have explained, "there are three prerequisites for granting a compassionate release motion": (1) "the defendant must have exhausted his administrative rights"; (2) "the court must find that 'extraordinary and compelling reasons warrant' a reduction of sentence"; and (3) "the court must consider the sentencing factors set forth in 18 U.S.C. § 3553(a)." *United States v. Freeman*, No. 02 Cr. 150 (LAP), 2022 WL 1785578, at *2 (S.D.N.Y. June 1, 2022). As the movant, the defendant bears the burden of proving that he is entitled to relief under Section 3582. *Id.*; *see also United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease.").

The defendant is deemed to have satisfied the first prong, the exhaustion requirement, after he has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

As to the second prong, as the movant, "the defendant bears the burden of proving 'extraordinary and compelling reasons' exist justifying early release." *United States v. Rodriguez*, No. 88 Cr. 642 (LAP), 2022 WL 2533468, at *3 (S.D.N.Y. July 7, 2022). The Second Circuit has held that the First Step Act of 2018 "allows [district] courts independently to determine what reasons, for purposes of compassionate release, are extraordinary and compelling" and that the BOP Director is no longer the sole arbiter in determining whether the threshold is met." *See United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020) ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion."); *accord United States v. Amato*, 48 F.4th 61, 66 (2d Cir. 2022).

Subsequent to *Brooker*, however, the U.S. Sentencing Commission revised the Sentencing Guidelines and updated Section 1B1.13, to "harmonize" its language with the First Step Act. *United States v. Feliz*, No. 16 Cr. 809 (VM), 2023 WL 8275897, at *4 (S.D.N.Y. Nov. 30, 2023). Accordingly, courts in this District have held that "*Brooker* does not apply to the new version of Policy Statement 1B1.13 because the Policy Statement, as amended, is now 'applicable' to compassionate release motions brought in court by defendants." *United States v. Feliz*, No. 16 Cr. 809 (VM), 2023 WL 8275897, at *4 (S.D.N.Y. Nov. 30, 2023); *accord United States v. Young*, No. 17 Cr. 364 (CS), 2024 WL 3184977, at *1 n.1 (S.D.N.Y. June 26, 2024), *aff'd* 2025 WL 1416738 (2d Cir. May 16, 2025). On that reasoning, "a court must now, in addition to finding that the other elements of the compassionate release standard are satisfied, also find that granting such relief is consistent with Policy Statement 1B1.13." *Id.*

6

The relevant Sentencing Commission policy statement is U.S.S.G. § 1B1.13. That statement provides that the Court may reduce the term of imprisonment if "extraordinary and compelling reasons warrant the reduction," *id.* § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3).

Section 1B1.13(b) describes the following circumstances under which "extraordinary and compelling reasons exist":

(1) Medical Circumstances of the Defendant.—

   (A) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

   (B) The defendant is—
      (i)   suffering from a serious physical or medical condition,
      (ii)  suffering from a serious functional or cognitive impairment, or
      (iii) experiencing deteriorating physical or mental health because of the aging process,

   that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

   (C) The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

…

(2) <u>Age of the Defendant</u>.—The defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

….

(5) Other Reasons.—The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

*Id.* § 1B1.13. Crea seeks compassionate release under § 1B1.13(b)(1)(A). (Mot. 1-2).

7

Lastly, the court's finding of such extraordinary and compelling reasons permits release but does not mandate it, for the court must still consider the Section 3553(a) factors. *United States v. Monsanto*, No. 87 Cr. 555 (LAP), 2021 WL 355049, at *2 (S.D.N.Y. Feb. 2, 2021). Where the court determines "that the Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances," the motion for compassionate release may be denied. *United States v. Lisi*, 440 F. Supp. 3d 246, 252 (S.D.N.Y. 2020) (finding compelling reasons warranting defendant's release but nevertheless denying motion for compassionate release because the Section 3553(a) factors "weigh[ed] heavily against [a] reduction of [the defendant's] sentence").

### B. Discussion

As an initial matter, it appears that Crea's Stage IV lung cancer diagnosis may satisfy the "extraordinary and compelling" language of Section 1B1.13(b)(1)(A). That section provides that a defendant has established an extraordinary and compelling reason for release when he "is suffering from a terminal illness." Here, Crea's lung cancer diagnosis does appear to qualify as a terminal illness. Nevertheless, for the reasons set forth below, the Motion should be denied because the defendant remains a danger to the community, and the Section 3553(a) factors weigh heavily in favor of the original sentence of life imprisonment.

First, the defendant's Motion should be denied because of the nature and circumstances of the offense, and the need for the sentence to reflect the seriousness of the crime. The defendant is serving a life sentence because he was a leader of the Luchese Family, a violent criminal organization responsible for murder, extortion, drug dealing, loansharking and many other crimes. As the Family's Underboss, Crea directed other members of the Family to commit crimes, and he financially profited from their actions. In 2013, he and Madonna ordered Christopher Londonio to kill Michael Meldish, after Meldish had disrespected Madonna. Londonio, in turn, enlisted the help of Terrence Caldwell to fulfill Madonna's orders, and Caldwell shot and killed Meldish in cold blood in the front seat of his car. Londonio then helped Caldwell drive away from the murder scene. Crea gave similar orders with respect to Carl Ulzheimer, although fortunately he was not killed. In addition to actual violence, through the threat of violence, Crea extorted individuals in the construction industry, extracting millions of dollars for himself in connection with the Bronx Lebanon Hospital project. As the Court previously observed in imposing multiple life sentences on the defendant, the defendant's conduct is "at the far end of the spectrum of serious cases." (Sent. Hr'g Tr. 12).

Second, the defendant's Motion should be denied because of the need to protect the public from further crimes of the defendant and to provide adequate deterrence. The defendant's incarceration to this point has not served as a deterrent to future violent and criminal conduct because, as the Court noted in imposing sentence, the defendant cannot be deterred. (Sent. Hr'g Tr. 13). Rather, the defendant is a "lifelong loyal made member of the Mafia." (Sent. Hr'g Tr. 12). He has multiple convictions for participating in activities with other Luchese Family members, and engaging in extortionate and illegal conduct, particularly with respect to the construction industry. As the Court previously explained, "every made member takes an oath of loyalty. So far, this defendant has abided by that oath, and we have every reason to think he would continue to do so were he at liberty to do so." (Sent. Hr'g Tr. 13).

Third, the cases the defendant cites do not compel release or a reduction in sentence. *See, e.g.*, *United States v. Winckler*, No. CR 13-318, 2020 WL 1666652, at *3 (W.D. Pa. Apr. 3, 2020) (granting compassionate release to defendant who pled guilty to non-violent embezzlement); *United States v. Ramirez*, No. 98 Cr. 438 (PGG) (SDA), 2021 WL 4150891, at *6 (S.D.N.Y. Sept. 13, 2021) (granting compassionate release to defendant who had served 23 years in prison and completed "close to 1,000 hours of rehabilitative programming"); *United States v. Tidwell*, 476 F. Supp. 3d 66 (E.D. Pa. 2020) (granting compassionate release to defendant who served 25 years in prison and "has shown significant rehabilitation in prison"); *United States v. Fisher*, 493 F. Supp. 3d 231 (S.D.N.Y. 2020) (granting compassionate release to defendant who served 38 years in prison and whose "considerable and sustained efforts to rehabilitate himself bespeak a changed man"); *United States v. Underwood*, No. 88-CR-822 (SHS), 2021 WL 3204834, at *2 (S.D.N.Y. Jan. 15, 2021) (granting compassionate release to defendant who served 33 years in prison and "has by all accounts been a manifestly model inmate, a mentor to countless young men in custody, and an active and devoted father and grandfather, all while under the specter of a life-without-parole sentence"); *United States v. Perez*, 02 Cr. 7 (JBA), 2021 WL 837425 (D. Conn. Mar. 4, 2021) (granting compassionate release to defendant who served 23 years in prison and where "the two former [AUSAs] who prosecuted [Perez's] case wrote an unsolicited letter to the Court sharing their view that "life behind bars is too harsh a sentence"); *United States v. Trucchio*, No. 8:04-cr-348-CEH-TGW, 2024 WL 4869547 (M.D. Fla. Nov. 22, 2024) (granting compassionate release to defendant who served over 20 years in prison and for whom the Court received "letters of support" [] from his Chaplain and the BOP officials who interacted with [the defendant] for years"); *United States v. Russo*, 643 F. Supp. 3d 325 (E.D.N.Y. 2022) (sentence reduced to 35 years where defendant served 29 years in prison, demonstrated "extraordinary rehabilitation" and was at higher risk of severe illness from COVID-19); *Reynolds v. United States*, No. 99-CR-520 (NGG), 2022 WL 1444167, at *7 (E.D.N.Y. May 6, 2022) (granting "modest" 6-year sentence reduction for defendant who already had served half of his 42-year sentence); *United States v. Grecco*, No. CR 89-00250, 2022 WL 17080748, at *5 (D.N.J. Nov. 18, 2022) (granting compassionate release to defendant who served 33 years of his 65-year sentence and made "several rehabilitative efforts" while in custody).

Crea argues that courts nationwide have recognized that defendants with terminal medical issues "pose at most a negligible risk of danger to the community, and their significantly changed medical circumstances warrant the granting of compassionate release." (Mot. 11 (collecting cases)). But the cases the defendant cites are distinguishable. For instance, in *United States v. Wong Chi Fai*, No. 93-CR-1340 (RJD), 2019 WL 3428504, at *3 (E.D.N.Y. July 30, 2019), the court granted compassionate release to a defendant who had served 26 years in prison and was "frail, [] require[d] a walker and [could] barely eat on his own." By contrast, Crea's medical records reflect that he is "able to complete all ADLs [activities of daily living] and transfers along with all mobility without use of assistive device." (Ex. A at 56, 61); *see also United States v. Rice*, No. 83 CR 150-3 (LGS), 2020 WL 4505813, at *4 (S.D.N.Y. Aug. 5, 2020) (granting compassionate release to defendant who served more than 37 years in prison and demonstrated "post-sentencing rehabilitation").

Crea also argues that a defendant's terminal diagnosis and deteriorating medical condition "render further imprisonment unnecessary to serve the goals of deterrence and promoting respect

9

for the law, even when the amount of time served by the defendant is far less than the sentence initially imposed." (Mot. 11 (collecting cases)). But that argument is unpersuasive where, as here, the defendant—a lifelong mobster—has served only slightly more than eight years of a lifetime prison sentence; the defendant appears to be functioning in prison, notwithstanding his medical diagnoses; and the Court was explicit at sentencing that a life sentence was appropriate given the serious nature of the defendant's conduct. (Sent. Hr'g Tr. 14).[2]

Crea attempts to draw a comparison to his co-defendant Joseph Datello, who was granted compassionate release. (Mot. 12). Crea argues that the Court granted compassionate release to Datello "after he was diagnosed with a serious debilitating medical condition" even when the Section 3553(a) factors "still supported a substantial sentence." (Mot. 12). But Crea overlooks at least two relevant considerations with respect to Datello. First, while Datello's conduct was serious, he was not the Underboss of the Luchese Family. Second, the Government repeatedly opposed Datello's motions for compassionate release, and the Court repeatedly denied those motions, until Datello's condition had so greatly deteriorated that he was unable to function. By contrast, Crea's medical records make clear that he is continuing to function in BOP custody.

Crea's remaining arguments are no more persuasive. He argues at various points in his Motion that his eight years in prison have "not been punitively inconsequential," citing to the fact that he served a portion of his sentence during the COVID-19 pandemic and while battling Stage IV lung cancer. (Mot. 13, 17-18). But the Court was aware of these prison conditions during the COVID-19 pandemic and still chose to impose life imprisonment even when not mandatory under the statute. And, as set forth above, while it is true that Crea has had Stage IV lung cancer while in custody, he has continued to function meaningfully well, already outliving his 18-month prognosis. Crea also argues that he was offered an eighteen-year plea deal before trial and that his co-defendants who pleaded guilty received shorter sentences than he did. (Mot. 15). Of course, that less culpable defendants who accepted responsibility by pleading guilty were sentenced to less jail time is as unsurprising as it is irrelevant. It does nothing to suggest that Crea—the Underboss of the Family—should receive a sentencing break after his conviction at trial.

In sum, Crea remains a danger to the community, and the Section 3553(a) factors still weigh heavily in favor of the Court's original sentence of life imprisonment, notwithstanding the defendant's current medical diagnosis.

---

[2] *United States v. Karr*, 611 F. Supp. 3d 395, 408 (E.D. Ky. 2020), a case cited by Crea, is distinguishable. (*See* Mot. 11-12). There, the defendant had served a quarter of his 108-month sentence; the Warden had initially approved the defendant's release; the defendant's cancer had meaningfully worsened during his time in custody; and the defendant's crimes, while serious, did not involve leading one of the Families of La Cosa Nostra. *See also United States v. Kelley*, 464 F. Supp. 3d 1134 (N.D. Cal. 2020) (granting compassionate release where defendant had served nearly half of his sentence and was not receiving timely oncology care in custody).

## CONCLUSION

For the foregoing reasons, the Motion should be denied.

                                                Respectfully submitted,

                                                JAY CLAYTON
                                                United States Attorney

                                        By: _____
                                                Alexandra Rothman
                                                Assistant United States Attorney
                                                Southern District of New York
                                                (212) 637-2580


cc:      Defense counsel (by Email and ECF)