UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X
STEVEN CREA,                                :
                                            :
                    Petitioner,             :
                                            :    26 CV. _____
          - against -                       :    (17 CR 89 (CS))
                                            :
UNITED STATES OF AMERICA,                   :
                                            :
                    Respondent.             :
-------------------------------------------X


MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' MOTION TO
VACATE CONVICTION UNDER 28 U.S.C. § 2255


BRENDAN WHITE
524 East 20th Street, # 6D
New York, NY  10009
(646) 303-0267
hendonbgb@gmail.com

*Attorney for Petitioner Steven
Crea*

**Table of Contents**

Page

Table of Authorities ................................... iii

Preliminary Statement ..................................... 1

Procedural History ........................................ 4

Argument ................................................. 8


POINT I

THE GOVERNMENT VIOLATED <u>BRADY</u>, <u>GIGLIO</u>, AND <u>NAPUE</u>
BY FAILING TO DISCLOSE TO THE DEFENSE FAVORABLE,
MATERIAL INFORMATION, SPECIFICALLY THE TRIAL
PROSECUTOR'S NOTES OF A MID-TRIAL INTERVIEW
WITH COOPERATING WITNESS ROBERT SPINELLI
THAT UNDERMINED THE GOVERNMENT'S THEORY AND
CONTRADICTED THE GOVERNMENT'S EXPERT WITNESS,
THUS RESULTING IN PREJUDICE TO MR. CREA ............. 8

The Testimony of Agent Carillo and
Cooperating Witness Robert Spinelli ................ 9

The Disclosure—More Than Three Years
After Trial—Of the Spinelli Notes ................ 14

The Relevant Law ................................... 17

Discussion ........................................ 21

A. The Statements Were Suppressed For <u>Brady</u>
   Purposes And Otherwise Demonstrate That
   The Government Failed To Correct
   Misleading Testimony And Cumulatively
   Denied Crea A Fair Trial ...................... 21

B. The Suppressed Notes Were Material For
   <u>Brady</u> Purposes And Otherwise Demonstrated
   That The Expert Testimony Was
   Misleading, And Deprived Mr. Crea
   Of His Right To A Fair Trial .................. 25

Page

    C. The Government's Suppression Of The
       Brady/Giglio Material Was Prejudicial
       And Otherwise Demonstrated The Failure
       To Correct Misleading Testimony, Depriving
       Crea Of A Fair Trial ........................... 33

POINT II

    THE GOVERNMENT VIOLATED BRADY AND GIGLIO BY
    FAILING TO DISCLOSE TO THE DEFENSE BENEFITS
    THAT HAD BEEN PROMISED TO COOPERATING WITNESS
    SEAN RICHARD IN EXCHANGE FOR HIS TESTIMONY .......... 37

POINT III

    GIVEN THAT BRADY REQUIRES A CUMULATIVE ANALYSIS,
    THE COURT MUST RECONSIDER INSTANCES OF PREVIOUSLY
    SUPPRESSED EVIDENCE IN CONNECTION WITH THE BRADY
    EVIDENCE AT ISSUE IN THIS 2255 PROCEEDING ........... 51

POINT IV

    AN EVIDENTIARY HEARING IS WARRANTED TO DETERMINE
    THE SCOPE OF THE BRADY/GIGLIO VIOLATION AND TO
    ENGAGE IN ADDITIONAL FACTFINDING WITH RESPECT
    TO THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE
    AND ULTIMATELY DISCLOSED TO THE DEFENSE ............. 52


Conclusion ............................................. 53

# Table of Authorities

Cases

Page

Banks v. United States,
920 F.Supp. 688 (E.D. Va. 1996) ........................... 44

Brady v. Maryland,
373 U.S. 83 (1963) ................................... passim

Clay v. United States,
537 U.S. 522 (2003) ....................................... 6

Cone v. Bell,
556 U.S. 449 (2009) ...................................... 51

DiSimone v. Phillips,
461 F.3d 181 (2d Cir. 2006) .......................... 17, 19

Drake v. Portuondo,
553 F.3d 230 (2d Cir. 2009) .............................. 21

Giglio v. United States,
405 U.S. 150 (1972) ................................. passim

Glossip v. Oklahoma,
604 U.S. 226 (2025) .................................. 20, 21

Kyles v. Whitley,
514 U.S. 419 (1995) ......................... 18, 19, 20, 51

Leka v. Portuondo,
257 F.3d 89 (2d Cir. 2001) ............................... 17

Napue v. Illinois,
360 U.S. 264 (1959) ............................. 2, 3, 8, 21

Padilla v. Kentucky,
559 U.S 356 (2010) ....................................... 45

Ranta v. Bennett,
189 Fed. Appx. 54 (2d Cir. 2006) ........................ 51

United States v. Abel,
469 U.S. 45 (1984) ................................... 45, 48

United States v. Agurs,
427 U.S. 97 (1976) ....................................... 18

Page

United States v. Bagley,
473 U.S. 667 (1985) ..................................... 19

United States v. Bin Laden,
397 F.Supp. 2d 465 (S.D.N.Y. 2005) ..................... 43

United States v Carpenter,
2024 WL 4008251 (E.D.N.Y. Aug. 30, 2024) ................ 6

United States v. Coppa,
267 F.3d 132 (2d Cir. 2001) ............................ 18

United States v. Escobar,
2024 WL 923591 (E.D.N.Y. Mar. 4, 2024) ................. 43

United States v. Figueroa,
548 F.3d 222 (2d Cir. 2007) ........................ 45, 48

United States v. Jackson,
345 F.3d 59 (2d Cir. 2003) ......................... 19, 51

United States v. Jackson,
780 F.2d 1305 (7th Cir. 1986) ...................... 20, 33

United States v. Londonio,
2024 WL 3770712 (2d Cir. Aug. 13, 2024) ................ 6

United States v. Mahaffy,
693 F.3d 113 (2d Cir. 2012) .................... 18, 19, 42

United States v. Orena,
145 F.3d 551 (2d Cir. 1998) ............................ 36

United States v. Payne,
63 F.2d 1200 (2d Cir. 1995) ................... 18, 19, 42

United States v. Spinelli,
551 F.3d 159 (2d Cir. 2008) ........................ 19, 36

United States v. Tang Yuk,
885 F.3d 57 (2d Cir. 2018) ............................. 51

United States v. Thomas,
981 F.Supp.2d 229 (S.D.N.Y. 2013) ..................... 18

Page

United States v. Triumph Capital Group,
544 F.3d 149 (2d Cir. 2008) ............................. 20

United States v. Williams,
81 F.3d 1434 (7th Cir. 1996) .................... 43, 44, 48

Statutes

18 U.S.C. § 924(j) ....................................... 1

18 U.S.C. § 1959(a) ...................................... 1

18 U.S.C. § 1962(c) ...................................... 1

18 U.S.C. § 3582(c) ...................................... 8

28 U.S.C. § 2255(b) ..................................... 53

28 U.S.C. § 2255(f)(1) ................................... 6

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X
STEVEN CREA,                              :
                                          :
                  Petitioner,             :
                                          :    26 CV. _____
         - against -                      :    (17 CR 89 (CS))
                                          :
UNITED STATES OF AMERICA,                 :
                                          :
                  Respondent.             :
-------------------------------------------X
```

MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' MOTION TO
VACATE CONVICTION UNDER 28 U.S.C. § 2255

Preliminary Statement

This memorandum of law is submitted in support of Petitioner STEVEN CREA's motion, pursuant to 28 U.S.C. § 2255, to vacate his conviction of one count each of racketeering conspiracy in violation of Title 18, United States Code, Section 1962(d); VICAR murder conspiracy in violation of Title 18, United States Code, Section 1959(a)(1); VICAR murder in violation of Title 18, United States Code, Section 1959(a)(5);and use of a firearm resulting in death in violation of Title 18, United States Code, Section 924(j)(1).  Mr. Crea was sentenced on August 6, 2020, to a term of life imprisonment, which he is currently serving at FMC Butner in North Carolina.

The motion to vacate is based on the Government's suppression of information favorable to the defense, in violation of Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405

1

U.S. 150 (1972), specifically a trial prosecutor's handwritten notes of a mid-trial interview with cooperating witness Robert Spinelli ("the Spinelli notes") (Exhibit A), regarding a murder ordered directly by the "boss" of the Lucchese Crime Family. This undermined the Government's theory that, as alleged "underboss" of the Lucchese Family, Mr. Crea would have been involved in the decision to order the murder of Michael Meldish and to pass down that order.

Moreover, since the Spinelli notes necessarily contradicted the testimony of the Government's expert witness, FBI Agent John Carillo, that he had never heard of a murder ordered by the boss of an organized crime family that did not also include the underboss in the planning and giving of orders, the failure to disclose that material to the defense or to perform its independent duty to otherwise correct Carillo's testimony, also requires that a new trial be ordered, pursuant to Napue v. Illinois, 360 U.S. 264 (1959).

The suppression of this information inevitably affected the outcome of Mr. Crea's motion to preclude certain testimony of jailhouse informant David Evangelista, which the Court initially granted, but then reversed itself midtrial following the Government's application for reconsideration predicated on the testimony of Carillo and Spinelli regarding the prosecution's central chain-of-command theory, and also affected the post-

2

verdict Rule 29/33 motion filed by Mr. Crea alleging that the Government had allowed Agent Carillo to testify falsely regarding the underboss always being involved in the decision to order a murder, as well as the joint Rule 33 motion filed on behalf of all defendants, alleging multiple <u>Brady</u> violations by the prosecutor, both of which are incorporated herein by reference.

In addition to the <u>Brady</u>/<u>Giglio</u>/<u>Napue</u> violations regarding the Spinelli notes, the Government also suppressed evidence of benefits that had been promised to cooperating witness Sean Richard in exchange for his testimony, information that only became known to the defense when Richard personally contacted Mr. Crea by letter ("the Richard Letter") (Exhibit B) several years after trial.

In a case where there was minimal evidence directly implicating Mr. Crea in the murder plot at the center of the case, and where the failure to turn over favorable evidence permeated the entirety of the trial and related litigation, it is impossible to avoid the conclusion that the Spinelli notes and Richard letter were highly material to the case and their suppression—which by all indication was done for tactical advantage—created at least a reasonable probability that the result would have been different had they been disclosed, and otherwise deprived Mr. Crea of his right to a fair trial under the Fifth and Fourteenth Amendments. For those reasons and for the reasons further discussed below, the Petition should therefore be granted.

Procedural History

Following extensive pretrial litigation, Mr. Crea, proceeded to trial with Co-defendants Matthew Madonna, Christopher Londonio, and Terrance Caldwell in October, 2019. At the end of the six-week trial, the jury returned on November 16, 2019, with a verdict of guilty to racketeering conspiracy, as well as VICAR murder conspiracy, VICAR murder, and use of a firearm, all of which related to or included the charged murder of Michael Meldish. Mr. Crea was acquitted of attempted murder and use of a firearm in connection with the attempted murder of Carl Ulzheimer, reputed to be an associate of the Bonnano Crime Family.

Following the verdict, on December 30, 2019, Mr. Crea moved for a judgment of acquittal or for a new trial pursuant to Federal Rule of Criminal Procedure 29 and 33. For the purposes of this Petition, the central basis for the new trial motion was that there was insufficient evidence to sustain Mr. Crea's convictions and that newly uncovered evidence had revealed that Agent Carillo was previously involved in other organized crime investigations in which he became aware that murders were carried out on the boss's order without the involvement of the administration. (Doc. # 926 at 6-7) In connection with this motion, Mr. Crea expressly referenced the Government's continuing obligation to provide Brady/Giglio material.

4

In response, the Government made the following representation in addressing the trial evidence against Mr. Crea:

> Crea is wrong that the only evidence offered against him on the Meldish murder was the Datello and Londonio Statements. While these statements may have provided the most direct proof against Crea on the Meldish murder, Crea overlooks the overwhelming circumstantial evidence also offered by the Government that Crea participated in the murder. (See Tr. 4685 ("instructing the jury that '[ c ]ircumstantial evidence is of no less value than direct evidence' and '[t]he law makes no distinction between the two'")). This evidence included the testimony of Luchese Soldier John Pennisi, Luchese associates Robert Spinelli and Sean Richard, and Bonanno Captain Peter Lovaglio, among others, that Crea was the Underboss of the Luchese Family; photographs of Crea at various Luchese social events, including the Luchese Christmas party at or around the time of the Meldish murder (see GXs 1021-C 1, 1021-B 1, 1022-Cl, 1022-D1); and the testimony of Special Agent John Carillo and Spinelli that any murder sanctioned by the Family's Boss would also involve the Underboss, as well as Pennisi's testimony that the Family's Administration had the sole power to order murders. (Doc. # 949 at 3; emphasis added.)

Mr. Crea and his co—defendants timely appealed, with Mr. Crea specifically arguing that this Court should have inspected and dismissed the indictment after it was shown that numerous false and misleading statements had been made to the grand jury; that the prosecution was improperly permitted to present inadmissible hearsay and improperly refused to allow Crea to call Londonio as a witness to rebut the claimed jailhouse confession; that the Government was improperly permitted to introduce irrelevant and prejudicial FRE 404(b) evidence; that the Court gave the jury an

improper Pinkerton instruction that required the VICAR murder convictions to be vacated; and finally that the life sentence for RICO conspiracy was unlawful.

By Summary Order of August 13, 2024, (United States v. Londonio, 2024 WL 3770712), the United States Court of Appeals for the Second Circuit affirmed the judgment of conviction in its entirety with respect to all Appellants, including Mr. Crea.  By petition of October 28, 2024, Mr. Crea timely sought panel rehearing and rehearing en banc, and by order of December 11, 2024, the Second Circuit denied rehearing.  (2d Cir. Dkt No. 20-2479, Doc. # 430)

No Petition for a Writ of Certiorari was filed in the United States Supreme Court, which pursuant to Supreme Court Rule 13(1), (3), would have had to be filed by March 11, 2025, 90 days from the denial of rehearing.  Since this motion is being filed prior to March 11, 2026, less than one year after the date by which Certiorari was required to be sought, the motion is thus timely pursuant to 28 U.S.C. § 2255(f)(1).  See Clay v. United States, 537 U.S. 522 (2003); United States v Carpenter, 2024 WL 4008251 (E.D.N.Y. Aug. 30, 2024) (the law appears settled that the one-year limitations period does not commence until the last day that the petitioner was eligible to file a petition for certiorari even if he does not do so).

6

During the pendency of the appeal, on May 4, 2023, the Government disclosed for the first time to all defense counsel, including counsel for Mr. Crea, handwritten notes of Assistant United States Attorney Alexandra Rothman made during an October 17, 2019, interview with Government witness Robert Spinelli. According to the Government, the notes had first been located by a paralegal in the United States Attorney's Office in November, 2022, when they were being prepared for storage. The Government further represented that it was only approximately six months later, on May 2, 2023, that the trial prosecutors reviewed the notes. The Government had no records indicating that the notes had been disclosed to any of the defense counsel at trial nor to the Court.

Although the Government contended that the notes were duplicative in all material respects to disclosures that had previously been made at the time of trial, even a cursory review shows that they directly contradicted the 3500 material the Government had turned over with respect to Spinelli, and provided information favorable to Mr. Crea's defense that went beyond anything about which Spinelli had testified.

This Petition followed.[1]

---

[1] In September, 2023, while the appeal was pending, Mr. Crea was diagnosed with terminal Stage IV lung cancer, an illness with an end-of-life trajectory, and several other serious medical conditions, which ultimately formed the basis for his March 28,

POINT I

THE GOVERNMENT VIOLATED BRADY, GIGLIO, AND NAPUE BY FAILING TO DISCLOSE TO THE DEFENSE FAVORABLE, MATERIAL INFORMATION, SPECIFICALLY THE TRIAL PROSECUTOR'S NOTES OF A MID-TRIAL INTERVIEW WITH COOPERATING WITNESS ROBERT SPINELLI THAT UNDERMINED THE GOVERNMENT'S THEORY AND CONTRADICTED THE GOVERNMENT'S EXPERT WITNESS, THUS RESULTING IN PREJUDICE TO MR. CREA.

The prosecution theory was that Mr. Crea was a long-time member of the Lucchese Family of La Cosa Nostra, who served as the "underboss" of the family, who helped oversee the enterprise's criminal activity, and profited from the criminal activity committed by the Enterprise. Among the criminal activities specifically attributed to Mr. Crea were extortion, labor rackets, as well as having ordered, in his capacity as underboss, violent crimes including murder.

The prosecution case against Mr. Crea was largely presented through the testimony of cooperating witnesses and the Government's expert witness, although even with their testimony there was little to no direct evidence implicating Mr. Crea in the violent crimes with which he was charged.

---

2024, motion in the Second Circuit for bail pending appeal, and for his June 17, 2025, motion in this Court for a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(l)(A)(i), which motion was denied by Order of August 27, 2025.  (Doc. # 1323)

The Testimony of Agent Carillo and
Cooperating Witness Robert Spinelli.

Centrally, the Government relied on the testimony of an organized crime expert who testified that, as underboss, Mr. Crea would necessarily have been a part of the "chain of command," together with alleged "boss" Matthew Madonna, in ordering and approving any murder committed in connection with the Lucchese Family. Specifically, the Government's organized crime expert testified that in his law enforcement experience, he had never heard of an instance where the underboss was not also involved in the case of a murder ordered by the boss. (T 1216)

This testimony, which clearly was intended to form the central basis of the prosecution theory at trial, was undermined somewhat by the apparently unexpected testimony of subsequent prosecution cooperating witness Robert Spinelli, who described an incident from the 1990s in which Vic Amuso, who Spinelli alleged to have then been the boss of the Lucchese Family, passed an order directly to Lucchese captain Richard Pagliarulo to murder Patricia Capozzalo, sister of cooperating Lucchese captain Pete Chiodo, without underboss Anthony "Gaspipe" Casso acting as an intermediary. In the midst of his direct examination, the following exchange occurred:

> Q. Now, at some point, did you participate in a murder conspiracy on behalf of the Lucchese Family?
>
> A. Yes, I did.

9

Q. Who was the intended target?

A. Patricia Capozzalo.

Q. Who was she?

A. She was the sister of Pete Chiodo.

Q. Remind us, who is Pete Chiodo?

A. Pete Chiodo was a captain in the Lucchese Family.

Q. Why was Pete Chiodo's sister being targeted, to your knowledge?

A. Because Pete Chiodo was in the Witness Protection Program. He was scheduled to testify in April 1992 against Vic Amuso, the Boss of the Lucchese Family. So, in order to stop him from testifying, we were ordered to make sure that the message gets sent to kill her.

Q. When did you first become aware of the plan to kill Patricia Capozzalo?

A. About two months prior.

Q. Who told you?

A. My brother.

Q. What did your brother tell you?

A. He told me that we had to do this, this order came directly from the top, and this had to be done before Vic starts trial.

Q. When your brother said the order came from the top, what did you understand that to mean?

A. It meant it came right from Vic Amuso.

Q. And how was the order passed from Mr. Amuso down to your brother and then to you?

A. My brother told me it went from Vic Amuso directly to Richie Pagliarulo, right to my brother, and

my brother was told to get his own guys.  He had Lucchese associates and a member with him to participate.

Q. Who was the Underboss of the Family at the time?

A. Stevie Crea.  Oh, Gaspipe, Anthony Casso.

Q. Was Anthony Casso involved in the -- to your knowledge, involved in the plan to kill Ms. Capozzalo?

A. I don't believe so.   (T 1733-35)

A few transcript pages later, the prosecutor returned to the circumstances surrounding the order to commit the Capozzalo shooting:

Q. And who did Mr. Pagliarulo, Richie, get the order from?

A. I believe directly from Vic, I believe.  I could be wrong.

Q. Do you know one way or the other?

A. As far as I know, it came directly from -- usually, the protocol, it goes from Vic to the underboss to captain to soldier.

Q. And when you say, "usually, the protocol," what are you talking about, Mr. Spinelli?

A. That's protocol.  That's how a Mafia order is given.

Q. The order would come from the Boss down the chain; is that correct?

A. Yes, ma'am  (T 1738)

The above testimony was given by Spinelli on October 16, 2019, near the tail end of the day.   The following day, October 17, 2019, Spinelli returned to the witness stand and the prosecutor

11

returned to the subject of Amuso's order to murder Patricia Capozzalo without being passed by underboss Casso. In doing so, the prosecutor took pains to elicit from Spinelli that these events occurred at a time when Casso was a fugitive, thus creating the implication that he would otherwise have been involved. (T 1801-02)

> Q. Now, you testified previously that the order to kill Patricia Capozzalo got to your brother through his captain, Richie Pagliarulo, right?
>
> A. Yes, ma'am.
>
> Q. And you also testified that Richie Pagliarulo learned of that from Vic Amuso, the Boss, correct?
>
> A. Yes, ma'am.
>
> Q. So, why was it, to your knowledge, the Underboss of the Family involved in passing down that order to kill Patricia Capozzalo?
>
> A. Because Gaspipe was on the run at that time. He was in hiding. Vic Amuso was already arrested. So, the order came directly from Vic out of New York. (T 1802-03)

Three days later, by motion of October 20, 2019, the Government asked the Court to revisit its prior decision precluding the introduction of David Evangelista's testimony regarding hearsay statements that implicated Mr. Crea in passing the order to murder Meldish, purportedly made by Londonio while they were incarcerated together. (Doc. # 873) In arguing that evidence admitted subsequent to the Court's ruling had now corroborated Evangelista's account, the Government specifically highlighted

12

Carillo's testimony, stating that "perhaps most directly on point, when asked if he had ever heard of 'any murder that was sanctioned by the boss that did not involve the administration' or any 'murder ordered by the boss . . . where the underboss was not also involved,' SA Carillo unequivocally responded 'No.'"  (Doc. # 873 at 4)  The Government added that Spinelli's testimony concerning the attempted murder of Patricia Capozzalo corroborated that testimony, on account of the unique circumstances under which the order was given without the input of the alleged underboss.  (Doc. # 873 at 4)  But the Government made no reference to the attempted murder of Pete Chiodo, with respect to which the Spinelli notes—taken only three days earlier—provided yet another instance of a murder having been ordered directly by the alleged boss.  (Doc. # 873 at 4)

The Government further made no reference to the fact that Carillo's testimony was predicated in material part on Spinelli's pretrial proffer statements, where the 3500 material demonstrates that Spinelli then told Carillo and other members of the Government that the underboss was involved in both murder order involving Capozzalo and Chiodo.  Accordingly, Carillo's expert testimony that could not have been viewed as accurate by any measure in the wake of Spinelli's trial testimony and his undisclosed proffer statements contained in the Spinelli notes.

13

The Disclosure—More Than Three Years
<u>After Trial—Of the Spinelli Notes</u>.

   More than three years after trial, following a joint Rule 33 motion relating in part to undisclosed <u>Brady</u> material, and after Mr. Crea had filed his appellate brief, the Government provided defense counsel on May 4, 2023, with several documents that they stated had been located only recently.  Of particular importance for the purposes of this motion, the Government disclosed handwritten notes taken on the morning of October 17, 2019, by Assistant United States Attorney Alexandra Rothman—the Assistant United States Attorney then in the middle of examining Spinelli, which included a reference to Spinelli's account of <u>a second murder</u> apparently ordered by the alleged boss without the involvement of underboss Casso, specifically the attempted murder of cooperator Pete Chiodo himself:

   <u>RS</u>

   Prep

   --Vic & Gaspipe on lam in '91 when Pete got shot

   --Vic ordered murder of Pete Chiodo

   - disarray in family @ time

   --Gaspipe still on lam in 1992

(Exhibit A)

   Despite the exculpatory nature of a second murder ordered outside the chain of command, memorialized in the notes of the

14

trial prosecutor in the midst of the direct examination of Spinelli, the notes were not disclosed to the defense as Brady/Giglio material or as 3500 material. Of equal significance, the prosecution had not asked Spinelli anything on direct or redirect examination about his account of Amuso having ordered an additional murder outside the chain of command, namely that he directly ordered Chiodo killed at time when there was disarray in the hierarchy.

In response to inquiries from counsel for Mr. Crea regarding the circumstance of how the Spinelli notes were uncovered, the Government stated the following in a letter dated May 26, 2023:

> First, a paralegal located the notes referenced in our May 4, 2023 letter in late-November 2022. After confirming the notes had not been marked as part of the witnesses' prior disclosures, and as a result of delays unrelated to the instant matter, including the winter holidays, two additional trials in which the paralegal was engaged, and the relocation of the Government to a new office space, the notes were not reviewed for their substance until May 2, 2023. We then produced the notes to you on May 4, 2023.

(Exhibit C)

In its opposing supplemental brief on appeal, pertaining to the appeal of the denial of the defendants' joint Rule 33 motion, the Government stated the following with respect to the disclosure:

> After the District Court denied the defendants' motion, the Government discovered that it had inadvertently neglected to produce a handful of notes from its meetings with a witness before and during trial. The Government believes that the content of the notes was duplicative, in all material respects, of other

15

materials that were produced before trial, but understands that at least one defendant disagrees. Because the notes were not considered by the District Court on the instant motion, to the extent the defendants believe that the notes entitle them to any post-trial relief, the proper recourse is for the defendants to file a new motion in the District Court following the conclusion of this appeal. (2d Cir. Dkt No. 20-2479, Doc. # 319, Gov. Supp. Brf. at 30, n.4)

By letter of August 8, 2023, counsel for Crea inquired further as to and when the other trial prosecutors learned of the Spinelli notes, the extent to which the other trial prosecutors participated in Spinelli's preparation as a witness and the preparation of motions filed subsequent to his testimony, and whether Agent Carillo had been advised of the information in the Spinelli notes. (Exhibit C)

By letter of September 22, 2023, the Government responded as follows, in pertinent part:

> As you are aware, on May 4, 2023, we provided you with copies of an Assistant United States Attorney's notes from five witness meetings. As we explained in our May 4, 2023 letter accompanying these notes, the notes were duplicative, in all material respects, of prior disclosures made by the Government and testimony included in the trial record. We included in our May 4, 2023 letter a non-exhaustive list of citations to prior witness notes and trial testimony that overlapped with the substance of these notes. We further informed you by letter dated May 26, 2023, that, although a paralegal had located the notes in late-November 2022, while boxing up trial materials for off-site storage, the prosecutors in this case did not review the notes for substance until May 2, 2023, and then, as noted above, produced the notes to you two days later.
>
> From our review of your August 8, 2023 letter, and in light of your prior correspondence in this matter, it

appears that you are focused on one set of notes from an October 17, 2019 meeting with Robert Spinelli. As you know, these notes consist of four sentence fragments. Like the other notes produced on May 4, 2023, they are duplicative, in all material respects, of prior disclosures made by the Government and testimony included in the trial record.

We have reviewed the inquiries within your August 8, 2023 letter. With respect to question three, we do not believe that Special Agent John Carillo was "advised" of the October 17, 2019 Spinelli meeting in any way, and also note that October 17, 2019 was several days after Special Agent Carillo completed his trial testimony. With respect to question four, we do not have any record indicating whether the notes in question were produced to the District Court. With respect to the remaining questions, it is not apparent to us either the legal basis for your requests, or how the answers to your questions would be material to any motion you may file in the District Court.

If you are able to provide us with legal authority for these requests, or otherwise explain their materiality, we will be happy to look into them so that we can narrow any possible issues.  (Exhibit E)

The Relevant Law

Under the familiar requirements of Brady v. Maryland, 373 U.S. 83 (1963), the Government has "'a due process obligation [grounded in the 14th Amendment]'" to disclose to the defendant "'evidence favorable to the defendant in a criminal prosecution.'" DiSimone v. Phillips, 461 F.3d 181, 192 (2d Cir. 2006) (remanding after finding Brady violation; subsequent grant of new trial affirmed, 518 F. 3d 124 (2008)), quoting Leka v. Portuondo, 257 F.3d 89, 98 (2d Cir. 2001).  Evidence favorable to the defendant includes evidence that could be used to impeach the credibility of

witnesses against him, or would serve as an effective tool in disciplining a witness. Giglio v. United States, 405 U.S. 150, 154 (1972); United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001); United States v. Mahaffy, 693 F.3d 113, 131 (2d Cir. 2012); see also U.S. Const., Amend. VI ("[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with witnesses against him").

"Under Brady and its progeny, the government has an affirmative duty to disclose favorable evidence known to it, even if no specific disclosure request is made by the defense." United States v. Payne, 63 F.2d 1200, 1208 (2d Cir. 1995), citing Kyles v. Whitley, 514 U.S. 419 (1995), and United States v. Agurs, 427 U.S. 97, 108-10 (1976). If this obligation is violated, a new trial is warranted because, as courts have long recognized, "[w]hen Brady material is withheld, the Government's case is 'much stronger, and the defense case much weaker, than the full facts would have suggested.'" United States v. Thomas, 981 F.Supp.2d 229, 233 (S.D.N.Y. 2013), citing Kyles v. Whitley, 514 U.S. at 429.

"The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation." Payne, 63 F.2d at 1208; see also Kyles v. Whitley, 514 U.S. at 437 ("prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in

the case, including the police"). "Where the government's suppression of evidence amounts to a denial of due process, the prosecutor's good faith or lack of bad faith is irrelevant." Payne, 63 F. 2d at 1208. Even in a scenario where the defendant may have some general knowledge that a conversation may have taken place, the failure to disclose the substance of that conversation still constitutes suppression where the defense did not know what was actually said. United States v. Mahaffy, 693 F.3d at 131 (vacating defendant's conviction due to Brady violation and expressly rejecting Government's argument that prosecution had not suppressed evidence).

In order to constitute a Brady violation, a reviewing court must find that "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." DiSimone v. Phillips, 461 F.3d at 192. The "touchstone of materiality is 'a reasonable probability' of a different result." United States v. Jackson, 345 F.3d 59, 73 (2d Cir. 2003).

A "reasonable probability of a different result is shown when the government's failure to disclose 'undermines confidence in the outcome of the trial.'" United States v. Spinelli, 551 F.3d 159, 165 (2d Cir. 2008) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). Under Kyles v. Whitley, "[t]he question is not

19

whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." 514 U.S. at 433-34; see also United States v. Triumph Capital Group, 544 F.3d 149 (2d Cir. 2008) ("We must conclude that there is a reasonable probability that if the government had not inexplicably withheld Agent Urso's proffer notes, the jury would have harbored a reasonable doubt about Spadoni's guilt[, and a]ccordingly, Spadoni is entitled to a new trial").

Although the requirements of Brady apply regardless of whether the suppression was willful or inadvertent, 373 U.S. at 87, courts have observed that the fact of willful suppression of information in bad faith can in itself serve as proof that the information was material. As one court noted, "[w]e are doubtful that any prosecutor would in bad faith act to suppress evidence unless he or she believed it could affect the outcome of the trial." United States v. Jackson, 780 F.2d 1305, 1311 n.4 (7th Cir. 1986). Thus, where there is reason to conclude that suppression was intentional, courts should reasonably consider that in determining the materiality of the evidence. Id.

Finally, prosecutors have a duty to correct a witness's false testimony, and failure to do so will require a new trial where that failure could have contributed to the jury's verdict. Glossip

20

v. Oklahoma, 604 U.S. 226, 229 (2025); Napue v. Illinois, 360 U.S. 264 (1959) ("a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment," and "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears"); Drake v. Portuondo, 553 F.3d 230, 241-47 (2d Cir. 2009) (reversed and remanded after Government failed to correct false testimony from expert witness).

<u>Discussion</u>

**A. The Statements Were Suppressed For Brady Purposes And Otherwise Demonstrate That The Government Failed To Correct Misleading Testimony And Cumulatively Denied Crea A Fair Trial.**

The statements were not disclosed to the defense until May 4, 2023, approximately three-and-a-half years after the trial concluded. Significantly, the statements by Spinelli were made directly to the Assistant United States Attorney actively engaged in trying the case on the very day the notes were taken, so the Government was indisputably in possession of them at all points from the time they were made until their untimely disclosure. And the prosecutor would necessarily have been aware of her duty to disclose the notes, especially in the midst of trial, and to have otherwise corrected the misleading expert testimony that preceded it from agent Carrillo, as well as the duty not to rely on

21

misleading or otherwise incomplete versions of Spinelli's account in motion practice.

Contrary to representations made by the Government in their correspondence following their disclosure, the defense was not otherwise in possession of the information nor were the statements duplicative of information already in possession of the information.   Among other things, in its communications with defense counsel, the Government conceded that it had not provided the Court with a copy of the notes, nor was there any reference on the record to the prosecution having disclosed the notes or the statements to the defense on the morning of October 17, 2019.   (T 1777)

Moreover, the 3500 material provided at trial with respect to Spinelli stated that he understood both the Chiodo and Capozzalo attempted homicides had been ordered by Amuso and Casso, and expressly that Casso had passed down the orders for the Capozzalo shooting to Pagliarulo. (Exhibit F at 4-5)   Accordingly, the new information contained in the Spinelli notes not only was not duplicative of information already in Mr. Crea's possession, it directly contradicted the information in the 3500 material.   And since the Government did not seek to walk Spinelli back from his testimony or otherwise correct it (T 1802-04), the only logical conclusion is that the Government accepted that the testimony and the information contained in the Spinelli notes were accurate, and

22

the previously disclosed 3500 material was inaccurate. Accordingly, contrary to the Government's representations in 2023, the information in the notes was not previously supplied to Mr. Crea, nor was it duplicative of other information.

In their accompanying affirmations, Mr. Crea's trial counsel confirm that they did not receive copies of the October 17, 2019, notes at the time of trial, or in any fashion prior to the untimely disclosure three years after trial. (Exhibits G & H) And ultimately, the significance of the suppressed notes in undermining the prosecution theory was so immediately obvious that counsel would undoubtedly have remembered being handed notes of a mid-testimony interview with Spinelli while he was still on the witness stand, and which impacted the central theory of the case and the admissibility of evidence regarding that theory.

The remaining circumstances further make clear that the defense was not given the notes nor were they otherwise aware of the information contained in the notes. At the outset, the information came from a cooperating witness entirely within the control of the Government, and it is difficult to conceive of how Mr. Crea or any of his co-defendants could have gained access to the information without Spinelli himself coming forward with it, or the Government disclosing it.

Although defense counsel briefly cross-examined Spinelli with respect to the attempted murder of Capozzalo (T 2043-44), there

23

was no similar cross-examination with respect to the attempted murder of Chiodo, nor was there any reference to that attempted murder in defense counsel's summation. In light of the centrality of that information to undermining the prosecution case, it is beyond imagination that defense counsel would have avoided cross-examining on the topic had they been independently aware of the information contained in the undisclosed notes.

Finally, the disclosure came more than three years after Mr. Crea's post-verdict Rule 29/33 motion in which he expressly referenced the Government's continuing obligation under Brady and Giglio to disclose evidence undercutting Carillo's testimony, more than a year-and-a-half after the filing of the Rule 33 motion based on newly discovered evidence, and approximately 11 months after the Court issued an order denying the Rule 33 motion, following extended briefing and argument.

If anything, the litigation of the two Rule 33 motions should have led the Government to review carefully the existing case file containing the prosecutor's notes regarding Spinelli, handwritten notes that were undeniably within the personal knowledge of the prosecutor who had written them and who was actively involved in the litigation of the Rule 33 motion. The Government's failure to timely disclose the notes deprived Mr. Crea of the opportunity to have this issue heard and decided by the Court as part of the Rule

24

33 motions and ultimately to have been included in the consolidated appeal, if necessary.

Accordingly, the notes were suppressed by the Government for Brady purposes.

**B. The Suppressed Notes Were Material For Brady Purposes And Otherwise Demonstrated That The Expert Testimony Was Misleading, And Deprived Mr. Crea Of His Right To A Fair Trial.**

The suppressed notes of the October 17, 2019, mid-trial interview with Spinelli went directly to the core factual question at trial of whether Mr. Crea was involved in the decision to kill Meldish, which was the central factual allegation driving the charges against Mr. Crea, including the racketeering conspiracy and firearms counts.

The Government theory, repeated throughout trial, as shown below, was that as the purported "underboss" of the Lucchese Family, Mr. Crea would necessarily have been involved in reaching the decision with the "boss," and then would have been responsible for passing down the order through the chain of command. But since there was minimal evidence of any such communications in this case, and there was no evidence that Mr. Crea otherwise had a motive to want Meldish killed, the Government sought to prove the theory through evidence that it was the pattern and practice of organized crime families to pass such orders down through the hierarchy.

25

That evidence was principally provided through the testimony of expert witness Carillo and cooperating witness Spinelli, both of whom claimed to have extensive knowledge of the inner workings of the Lucchese Family and other organized crime family hierarchies. The suppressed note of a mid-trial interview with Spinelli, pertaining to a murder ordered by the alleged boss of the Lucchese Family but which did not involve the underboss, would have had the dual effect of undermining the testimony of the Government's expert witness, and would have cast considerable doubt on the prosecution theory of Mr. Crea's guilt. See Giglio v. United States, 405 U.S. at 154 (where reliability of a witness could determine guilt or innocence, "nondisclosure of evidence affecting credibility falls within" the general Brady rule "that suppression of material evidence justifies a new trial 'irrespective of the good faith or bad faith of the prosecution'.

The Government, forced to pivot when Spinelli unexpectedly answered a question by pointing out that the attempted murder of Capozzalo did not involve the underboss, zeroed in on the apparently unique circumstances surrounding underboss Casso, specifically that: "Gaspipe was on the run at that time. He was in hiding. Vic Amuso was already arrested. So, the order came directly from Vic out of New York." (T 1803) For the remainder of the trial and afterwards, they framed this as a sui generis occurrence, concealing the fact that Spinelli had alerted them of

26

a separate order with respect to a different murder attempt, and perhaps even more significantly, under different circumstances.

At the outset, the only logical interpretation of the Spinelli notes' statement that "Vic ordered murder of Pete Chiodo" (Exhibit A), was that Casso was not involved, since common sense dictates that under the circumstances, the prosecutor surely would have asked and would have taken note of it, had Spinelli indicated that Casso was involved.  Spinelli had stated the order came directly from Amuso because there was "disarray in family @ time" (Exhibit A), a very different—and likely much more common—reason than the unique circumstances seized on by the Government to explain why the Capozzalo shooting was an exception to the general pattern and practice testified to by Carillo and Spinelli.

Evidence contradicting Carillo's expert testimony that he had never heard of an instance in which a murder ordered by a boss without involving the underboss did not exist as part of a simple binary.  To be sure, evidence of a single exception would potentially be useful to the defense, but could likely be explained away by the prosecution as the exception that proves the rule. If, however, more than one exception were to be exposed, they would stop being seen as exceptions at all, and would instead cast serious doubt on the very existence of the purported rule.  As the context showed, the Government recognized this vulnerability in

27

their case, which from the outset had relied heavily on Carillo's expert testimony.

That Carillo's testimony was central to the case against Mr. Crea is manifest in the words and actions of the prosecution throughout the pendency of the case.  From the very beginning, in their opening statement, the Government focused on the shooting death of Michael Meldish and the evidence they claimed would show that it was committed by Londonio and Caldwell, the prosecutor made the following statements:

> All of this evidence will prove to you who killed Meldish.  <u>But you will need to hear and see more evidence to understand why</u> Londonio and Caldwell killed Meldish.
>
> <u>You'll hear from an expert in organized crime</u> and from a member of the Lucchese family who will tell you how the family is structured, who was in charge and how murders are carried out.  (T 576-77; emphasis added.)

Early in the Government's case, Carillo testified at length about the structure and methods of the various organized crime families in the New York City area.  Specifically, he gave the following testimony, which clearly was intended to be the cornerstone of the Government's case against Mr. Crea:

> Q. When it comes to killing someone, be it an associate or made member, can any Cosa Nostra make that decision?
>
> A. No.  Any murder, which -- I mean, are you talking about a sanctioned murder?
>
> Q. Who is allowed to make the decision?

28

A. An approved murder can only be made, the final decision is by the boss or the acting boss of the family. Within -- and dealing with the administration of that family.  So the calls for murders and violent crimes always get kicked up to the administration of the family with the final say being made by the boss.

Q. And does the administration itself typically carry out the murder?

A. They can.  There's been times where people in the administration have, but sometimes they will give that murder to a crew, to a captain, and then it's up to that captain to decide who to assign the murder to. Sometimes it's given, in particular they will request that a particular member of that captain's crew does the murder.

***

Q. Is a sanctioned murder typically carried out by just one person?

A. No.

Q. What do you mean?

A. I mean, it's been my experience that it could be two or three people involved in the murder.  It could be six or seven people in the murder with different roles and different assignments.

***

Q. Are you familiar with any murder that was sanctioned by the boss that did not involve the administration?

A. Not to my knowledge, no.  (T 1020-21)

On redirect examination, the prosecutor returned quickly to the subject of how decisions to commit a murder are made and carried out:

29

Q. Do you remember being asked if it was in the boss' absolute authority to order a murder?

A. Yes.

Q. In the case of a murder ordered by the boss, have you ever heard of an instance where the underboss was not also involved?

A. No, I haven't.  (T 1216; emphasis added.)

As the circumstances make clear, the Government undoubtedly expected to hear the same testimony from cooperating witness Spinelli on October 16, 2019, and were seemingly taken by surprise when he testified that the Capozzalo shooting was ordered by the boss directly to a captain, bypassing the underboss.  Agent Carillo had, in fact, met with Spinelli in connection with his cooperation (T 1194-95), and had relied on Spinelli's representations during proffers that Amuso and Casso had ordered the Chiodo and Capozzalo shootings, in making the categorical claims during his direct examination.

In that context, it becomes obvious that the follow-up questioning the next morning—in which Spinelli answered that underboss Casso was a fugitive at the time the Capozzalo order was given—was intended as damage control, to avoid undermining the Carillo's testimony and the Government's position that an order to kill Meldish would necessarily have involved Mr. Crea in his role as underboss.  Indeed, the mid-testimony proffer session the AUSA conducted of Spinelli that morning concerned his account of two

30

decades-old attempted murders that were not even subject to the actual charges at issue here, but rather were critical to the chain-of-command theory that was central to the case against Crea.

Finally, only three days later, the Government—knowing that it had not turned over the Spinelli notes—relied on Spinelli's testimony to bolster the case against Mr. Crea by asking the Court to revisit its pretrial ruling that the prosecution could not present evidence of statements against penal interest purportedly made by Londonio to cooperating witness David Evangelista.

The prosecutor not only emphasized the testimony of Carillo and Spinelli as purported corroboration, but expressly referenced the circumstances surrounding the Capozzalo shooting, in an effort to highlight that it was a unique exception to the general policy:

> And perhaps most directly on point, when asked if he had ever heard of "any murder that was sanctioned by the boss that did not involve the administration" or any "murder ordered by the boss . . . where the underboss was not also involved," SA Carillo unequivocally responded "No." (Tr. 1021:2–4, 1216:23–25).
>
> In addition, Spinelli testified that "usually the protocol" in the Luchese Family is that an order for murder would "go[] from Vic [the Boss] to the underboss to captain to solider." (Tr. 1739:7–9). In the case of the attempted murder of Patricia Capozzola, Spinelli explained that the order passed from the Boss to a Captain—corroborating the general point that murders are passed through the chain of command. Spinelli further explained that the Underboss at the time, Anthony Casso, a/k/a "Gaspipe," was not involved in passing this particular order only because he "was on the run at that time. He was in hiding." (Tr. 1802:22–23). As a result, the order went directly from the Boss (Vic Amuso) to the Captain (Richie Pagliarulo) and then to Spinelli's

31

brother, who was going to become a Soldier.  <u>Spinelli's testimony therefore corroborates SA Carillo with respect to chain of command</u>.  (Doc. # 873 at 4-5; emphasis added.)

The combination of factors—the prosecutor's direct personal knowledge of the information contained in the notes; the absence of any indication on the record that the notes had been furnished to the court or counsel; the failure during subsequent examination of Spinelli to mention the information contained in the notes regarding Chiodo, while revisiting and focusing on the Capozzalo shooting; the exploitation in the motion to revisit the Evangelista hearsay testimony without reference to the additional information regarding Chiodo contained in the notes; using the information as a sword in the effort to admit the Evangelista testimony while using it as a shield to prevent the defense from learning of the order to commit a second murder—gives every reason to conclude that the failure to disclose the Spinelli notes was intentionally done for tactical advantage at trial with respect to a critical issue of fact, all of which combined to deprive Crea of a fair trial.

Indeed, the circumstances suggest that the prosecution made that decision specifically <u>because</u> it recognized the marked difference between a single unique exception, as they sought to frame it, and the reality that exceptions to that claimed practice were not really that rare at all, which would have required the

prosecution to explain away much more and to correct its expert testimony mid-trial. Accordingly, the Court should consider the intentional nature of the Brady violation as further proof of its materiality, since it is "doubtful that any prosecutor would in bad faith act to suppress evidence unless he or she believed it could affect the outcome of the trial." United States v. Jackson, 780 F.2d at 1311 n.4.

**C. The Government's Suppression Of The Brady/Giglio Material Was Prejudicial And Otherwise Demonstrated The Failure To Correct Misleading Testimony, Depriving Crea Of A Fair Trial.**

Those same motivations also powerfully demonstrate that the suppression of the Spinelli notes was prejudicial to Mr. Crea. As discussed above, had the notes been timely disclosed to defense counsel, it would have allowed counsel to cast substantial doubt on the expert testimony of Agent Carillo, and the prosecution theory that the underboss would necessarily have been involved in the decision to order a murder. Of at least equal importance, the entire landscape of the trial would have been altered, since the Government's argument with respect to the Evangelista hearsay would have been unavailable to them, in that it could not have relied on Carillo's or Spinelli's testimony for purported corroboration of Evangelista. Thus, it is dubious that the Court could have reached the same conclusion on that crucial evidentiary issue.

It also cannot have been a coincidence that in the years following trial, the Government strategically flip-flopped its argument from its position at trial regarding the importance of Agent Carillo's testimony, which they had previously claimed corroborated the otherwise minimal evidence against Mr. Crea. Notably, in their summation, the Government continued its heavy reliance on the chain-of-command theory, and in particular Carillo's testimony that the underboss was always involved:

> I'm going to start with what Special Agent Carillo said. Special Agent Carrillo told you in all his study of the Mafia <u>he knew of no occasion when the underboss wasn't involved in a murder ordered by the boss</u>. (T 4427-28; emphasis added.)

Notably, in response to Mr. Crea's post-verdict Rule 29/33 motion, the Government, in seeking to emphasize the quantum of evidence, unintentionally made Mr. Crea's point that Carillo's testimony was the linchpin of its theory of liability. Although the Government emphasized the number of cooperating witnesses purporting to identify Mr. Crea as the underboss of the Lucchese Family, that evidence could only connect Mr. Crea to the Meldish murder if it were combined with Carillo's testimony that "any murder sanctioned by the Family's Boss would also involve the Underboss."[2]  (Doc. # 949 at 3)  Accordingly, the Government's

---

[2] Although the Government also invoked Spinelli's testimony in its response, for the reasons discussed throughout this Petition, Spinelli's account did not support that claim.

claim at the Rule 29/33 stage regarding the strength of the evidence does not withstand scrutiny here. Without the Carillo expert testimony, the quantum of evidence supporting the Government's theory was reduced drastically.[3]

On appeal however, after having disclosed the Spinelli notes, and likely having come to terms with the import of the late-disclosed notes, the Government attempted to minimize the extent to which they relied on Carillo's testimony at trial. (2d Cir. Dkt No. 20-2479, Doc. # 267 at ¶ 26(c)) (stating "[t]he Government's case against Crea did not depend on "chain of command" evidence—merely corroborated the other direct and circumstantial evidence that proved Crea's role in the murder"). But, as shown above, throughout the trial the Government directly relied on Carillo's testimony to argue that Mr. Crea must have been involved in the decision to kill Meldish due to his role as underboss.

Nor was this a case in which the suppressed statements were merely additional impeachment evidence of the witnesses' general credibility or motive to testify falsely under circumstances where the defendant had been thoroughly impeached regarding numerous other crimes or bad acts. Here, the impeachment value of the

---

[3] Since the Government has now acknowledged that it did not advise Agent Carillo with respect to Spinelli's statements regarding Amuso having ordered the murder of Pete Chiodo, there is no reason to be confident that the prosecutors had ever advised Carillo of the existence of other memorialized shootings ordered without the underboss being involved.

suppressed statements would have been considerably more damaging than what was available to jury at trial, since it would have been directly supportive of the defense theory and undercut the prosecution theory.

Thus it stands in contrast to such cases as United States v. Orena, 145 F.3d 551, 559 (2d Cir. 1998) ("[d]efendants already had in their possession absolutely devastating evidence with which to assail Scarpa's credibility; among the many crimes Scarpa had committed were numerous murders and attempted murders, not to mention his unrealized plans to murder Ambrosino's mother and his own daughter-in-law"), or United States v. Spinelli, 551 F.3d at 165 ("[w]e conclude that, against the very convincing background of the impeachment of Gioia that was revealed to the jury at trial, the additional potential for impeachment from the information that was not revealed would have added no meaningful likelihood of discrediting Gioia's testimony in the jury's eyes"), both of which involved massive amounts of impeachment regarding very serious criminal activity, and the suppressed information there was simply redundant at that point.

Finally, the evidence at trial against Mr. Crea was far from overwhelming. Not only were there no recordings or other statements attributed to Mr. Crea during the time of the alleged offenses, the prosecution itself acknowledged the paucity of direct evidence with respect to him, conceding in their summation

that "the last informant to speak to Crea spoke to him 20 years ago." (T 4384-85)

Moreover, the Government acknowledged on direct appeal, in seeking to establish that any error with respect to the admission of Evangelista's hearsay testimony was harmless, that the only other evidence purporting to tie Crea to that homicide boiled down to Spinelli's interpretation of a recorded statement by Datello that "they" had ordered it referred to Madonna and Crea, and the testimony that Crea was the underboss, and thus would necessarily have been involved in the decision to order a murder. (2d Cir. Dkt No. 20-2479, Doc. # 318, Gov. Brf. at 90)

POINT II

THE GOVERNMENT VIOLATED BRADY AND GIGLIO BY FAILING TO DISCLOSE TO THE DEFENSE BENEFITS THAT HAD BEEN PROMISED TO COOPERATING WITNESS SEAN RICHARD IN EXCHANGE FOR HIS TESTIMONY.

By letter of November 18, 2023, while serving his sentence, Mr. Crea unexpectedly received a letter from Sean Richard, who had been a cooperating witness at trial against him. Richard's testimony was principally significant to the RICO conspiracy count in numerous ways, including that by the Government's own account, he had been the only cooperating witness actually to have spoken to Crea, albeit nearly 20 years prior to trial, and that he had had provided important information to prove the charged

37

conspiracy.    Additionally,  according  to  the  initial  indictment,

Mr. Crea  had  sought  to  have  Richard  killed  in  approximately  2017,

even  though  the  Government  failed  to  sustain  an  indictment  of  Mr.

Crea  on  such  offense  when  the  matter  was  presented  to  a  new  grand

jury in 2019.

Although  Richard  had  denied  expecting  any  benefit  for

testifying at trial against Mr. Crea, the information contained in

his  letter  directly  contradicted  that  denial.    Specifically,

Richard's letter stated the following:

Stevie--

I'm  probably  the  last  person  you'd  think  would
write you. Especially since everything that's happened.
That being said--the first thing I owe you is an apology.

I am sorry for what's happened.

But I'm not sorry for getting away from people like
Joey. When they showed me how his son-in-law and he would
take the Feldman money and stole $1.4 million from me,
I couldn't believe it.  I gave that guy money every week,
and every time he'd get in trouble. After that I wanted
out!

However  in  the  process  I  unfortunately  started
drinking and using and fucked up my life. In an ideal
world my father-in-law would have been home. Because if
that was the case none of this would have happened. Maybe
I should have gone to you at the time but I wasn't sure
how you would perceive me if I went to you to tell you
about Joey. Regardless the proof of what I'm saying
should be with the Manhattan D.A.'s case discovery.

Fast forward to 2019: I didn't want to testify
against you. I hadn't seen you in 20 years, I couldn't
even understand why they wanted me to. But then later
on, little by little, I started to figure it out.  I
have  a  lot of  information,  proof  of  Prosecutorial

Misconduct. Especially on that cocksucker Ted Otto. I contacted your lawyer Anthony and some other lawyer called me back. To be Frank I was shocked they didn't jump on it I saw your appeal and said a prayer that you catch a break.  But honestly- the information I have is life-changing. Maybe they don't understand that.

Why am I doing this? I'll start with the following. When they contacted me and said they wanted me to testify against you. I told them no! That prick Scotten told me he would force me to under subpoena. They also promised me a new identity. Unfortunately I needed help because, amongst other things, I was trying to get my wife a green card. Which they said they would help me with.

Then they didn't. They beat me! Those upstanding Americans. No identity. My wife had to leave the country. That disease Otto fucked me over. Wouldn't answer the phone after I testified, acted like I didn't exist. Left me to rot while they got awards and promotions. But that is the least of it.  I have so much shit they've done they should switch places with you.

I see that your lawyers put me in that appeal. Which I did not take kindly to. If they did that because they think they can make me testify later and get the information that way they couldn't be more wrong. But you are sitting there waiting, so what do you have to lose?  The Feds didn't send me to you. I don't deal with them. They have the worst crew! More treacherous than any street guys. I already told that Scotten to go fuck himself. They let Joey out because of dementia? That scumbag has had dementia since kindergarten.

Once again I apologize for everything. I'm sorry you 're spending what should be the best time of your life in there. To be honest I'm a little nervous about getting involved. The Feds are spiteful.  Vindictive. But I can help you get out. If you want that help your lawyer knows how to reach me.

Happy holidays Stevie. Keep your chin up.

--Sean   (Exhibit B; Emphasis added.)

39

At trial, in contrast, Richard had expressly denied that he ever received, asked for, or had been promised any benefit in exchange for his testimony, nor had he been otherwise pressured or threatened.  In describing his initial decision in 1999 to cooperate with New York State law enforcement and subsequent agreement—nearly 20 years later—to testify in the federal trial against Mr. Crea, he stated the following:

Q. Who did you reach out to in law enforcement?

A. An ADA by the name of Michael Scotto.

Q. And how did you get in touch with Mr. Scotto?

A. I found out that he was the lead prosecutor on the case, and I contacted him.  I called him up at the DA's Office.

Q. Now, jumping forward a bit for a second, did you eventually also come to speak with the Federal Government?

A. I did, yes.

Q. Who in the Federal Government did you speak with? Not necessarily people, but agencies.

A. Lou DeGregorio.

Q. Where did Mr. DeGregorio work?

A. He was in the Queens office of the FBI.

Q. Did you also eventually come to speak with federal prosecutors?

A. I did, yes.

Q. Did you ever enter any kind of cooperation agreement with the Federal Government?

A. <u>Never.  No</u>.

Q. Did you enter an agreement with any prosecutor's office?

A. With the Manhattan District Attorney's Office, yes.

***

Q. What benefit, if any, did you hope to get from entering this cooperation agreement with the State District Attorney's Office?

A. Probation.

Q. Did you ever testify in any state cases?

A. I did, yes.

Q. What sentence did you ultimately receive from the state?

A. It was I think three or four years probation.

Q. Have you ever testified in any federal cases before today?

A. No.

Q. <u>Do you expect to receive any benefit for your testimony today</u>?

A.   <u>None whatsoever</u>.  (T 2760-62; emphasis added.)

Plainly, Richard's trial testimony cannot be reconciled with his statements in his letter that he had in fact been coerced into testifying, and even more significantly, that the Government had promised him substantial benefits in exchange for that testimony, and the judgment must be vacated on that basis as well.

Applying the same legal analysis to the Richard Letter as to the Spinelli notes discussed above, it was plainly suppressed by

41

the Government, was material, and resulted in prejudice to Mr. Crea, and thus requires that the judgment of conviction be vacated.

There can be no argument that the information contained in the Richard Letter was otherwise available to Mr. Crea. Richard had been a cooperating witness since 1999 and was in the witness protection program, affording Mr. Crea no access to him or to information originating from him. And Richard's letter identified Agent Otto and at least one of the trial prosecutors by name as having been personally involved in the communications, so knowledge of all the information contained in the Richard Letter is properly attributed to the Government. See Payne, 63 F.2d at 1208; United States v. Mahaffy, 693 F.3d 113. Since the Government has not contested that it possessed the information and that it did not disclose the information to the defendants, despite timely requests from the defense, the information was suppressed within the context of Brady.[4]  Id.

As noted, evidence favorable to the defendant includes evidence that could be used to impeach the credibility of witnesses against him. Giglio v. United States, 405 U.S. 150, 154 (1972); see also U.S. Const., Amend. VI ("[i]n all criminal prosecutions,

_____

[4]  In response to a discovery demand from defense counsel in connection with which counsel forwarded a copy of the Richard Letter, the Government provided only the generic statement that: "We are not aware of any unproduced, discoverable material with respect to Sean Richard."  (Exhibit I)

the accused shall enjoy the right ... to be confronted with witnesses against him"). Among this type of evidence are undisclosed benefits or promises bestowed to a witness that might have served as motivation to testify in a particular way, including favorable immigration treatment from the Government, and other benefits for a witness and his wife, such as was promised here. See United States v. Escobar, 2024 WL 923591, at *9 (E.D.N.Y. Mar. 4, 2024) (cooperating witness acknowledged he "was testifying pursuant to a cooperation agreement with the government, with the hope of receiving a letter from the government under U.S.S.G. § 5K1.1, as well as immigration benefits and a recommendation for the Witness Security Program"); United States v. Bin Laden, 397 F. Supp. 2d 465, 506 (S.D.N.Y. 2005) ("I have no doubt that the most valuable 3500 Material contained in the videoconferences is al-Fadl's statement arguably suggesting that he fears a quid pro quo may exist between his testimony and his immigration status in the United States[; i]n my forty-seven years at the bar and on the bench, I have seen few routes to impeachment that are more effective than words from a witness's own mouth suggesting that he understands he must shade his testimony in order to win the favor of one of the parties").

Other courts throughout the Federal system have reached similar conclusions. See United States v. Williams, 81 F.3d 1434, 1438 (7th Cir. 1996) ("members of the prosecutorial team gave

43

presents to the witnesses, allowed them the free use of telephones to make long distance calls for themselves and their friends, allowed conjugal visits in the prosecutors' offices, and even threw parties for the witnesses [; n]one of these favors was disclosed to the defense, even though they could have been used to impeach the witnesses' credibility[; and t]he government's failure to disclose these things was a violation of the rule of Brady v. Maryland"); Banks v. United States, 920 F.Supp. 688, 692 (E.D. Va. 1996) ("[t]he information regarding the conjugal visits was clearly favorable in that it could have been used to attack the credibility of Weathers and of the government's agents who arranged the 'sting' operation," and reversing for new trial) (emphasis added).

In Banks, the court specifically noted that "[i]t is reasonable to conclude that this information would be explosive and damaging to the government's case if presented to a jury[, and i]t is impeachment evidence that a jury would be entitled to consider in evaluating the credibility and integrity of both Weathers and the federal law enforcement agents." Id. at 693.

Not only does undisclosed Brady information of that sort constitute powerful evidence in attacking the general credibility of the cooperating witnesses, even more importantly, it is a strong indication of bias or motivation to testify in a way helpful to the prosecution. "Bias may be induced by a witness' like, dislike,

or fear of a party, or by the witness' self-interest [; p]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." United States v. Abel, 469 U.S. 45, 52 (1984); United States v. Figueroa, 548 F.3d 222, 230 (2d Cir. 2007).

This was particularly so here, where the prosecution elicited from Richard that he did not have a cooperation agreement with the Federal Government, was not facing Federal charges nor had he previously been charged federally, had already finished serving his state sentence, and had not been promised any benefits for testifying at the trial. (T 2760-62) The obvious import of that testimony was that Richard had no motivation to testify falsely against the defendants or to curry favor with the Government, and was simply there to tell the truth.

In fact, Richard had a strong motivation to give the Government what it wanted. As the Supreme Court noted in Padilla v. Kentucky, 559 U.S 356 (2010), in the context of guilty pleas, "as a matter of federal law, deportation is an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants." Id. at 364. Logic and common sense dictate that the same dynamic would hold true in the case of a witness seeking to avoid the potential deportation of his wife.

This was no idle concern for Richard.  As he stated in his letter, his wife did indeed have to leave the United States after the Government failed to live up to its end of the bargain following Richard's trial testimony.  (Exhibit B)  But it is nevertheless clear from his letter that, at the time he agreed to testify and at the time he did testify, Richard believed that the Government would assist in getting a green card for his wife, and expected them to do so.  (Exhibit B)

Ultimately, Richard testified at length at trial, implicating Crea in the charged enterprise, and discussed the allegations that he had been targeted to be murdered.  (T 2683-2787)  The prosecution invoked his testimony repeatedly in summation, to connect Mr. Crea to the charged enterprise (T 4312 ("[a]nd you know that was the Lucchese Family, not something else[;] Sean Richard, who was involved in that case, came here and testified")); to connect him to other members of the charged enterprise (T 4313 ("Joe Datello, who I just pointed to, was the soldier that Crea did business with for more than 20 years, back in the late '90s with Sean Richard and moving all the way forward")); and to provide evidence of organized crime influence in construction industry charge order fraud.  (T 4635 ("[it's] the Mafia's bread and butter[;] Richard told you that[; i]t happens all the time and Crea knew that")).  And, of course, the Government invoked Richard's name multiple times to paint Mr. Crea as a

dangerous man capable of ordering violence. (e.g., T 4636 ("you know why Crea and Richard aren't talking after 1999 because Crea was trying to kill him and he entered the Witness Protection Program")).

Moreover, the Government continued to rely on Richard's testimony in its brief on appeal:

> Richard's testimony about Crea's pre-2000 involvement in construction rackets was also relevant and admissible. The testimony explained, among other things, the nature of the Luchese Family's long-time control of the construction industry, Crea's influence over that business, and the origin of the Datello-Crea debt that became the impetus of Datello's cocaine and cigarette deals with Spinelli and the UC. In addition, Richard testified—as did Silverstein, without objection—about Silverstein's relationship with Crea in the 1990s. In sum, Richard's testimony explained and corroborated the background of Sparrow and Silverstein's relationship with the Luchese Family and Crea, as well as Datello's relationship with and debt to Crea. (2d Cir. Dkt No. 20-2479, Doc. # 318, Gov. Brf. at 116)

The Government further argued in its brief that Richard's testimony regarding "Datello's agreement to commit murder—for Crea, no less—in December 1999 was offered as proof of the racketeering conspiracy count, and specifically as part of a laundry list of evidence showing that joining the Mafia involved an agreement to commit the predicate act of murder." (2d Cir. Dkt No. 20-2479, Doc. # 318, Gov. Brf. at 116-17)

In light of the acknowledged significance of Richard's testimony to the Government's case against Mr. Crea, evidence that Richard had been promised important personal benefits in exchange

47

for his testimony would have substantially undermined his credibility and established a clear motivation to have falsely implicated Mr. Crea in hopes of giving the prosecution what it wanted.

Such evidence of favorable treatment and other benefits promised to Richard here could easily have been used by defense counsel to impeach him with respect to his general credibility and to argue to the jury specifically that Richard had a particular motivation to testify falsely in exchange for benefits he had received.  See United States v. Abel, 469 U.S. at 52; United States v. Williams, 81 F.3d at 1438; United States v. Figueroa, 548 F.3d at 230.

It would not be difficult for a jury to conclude that a witness who had received this sort of special treatment would have an understanding, either implicitly or explicitly, or even decided unilaterally, that he would be willing to give testimony that he believed would help the prosecution obtain convictions, thus undermining confidence in that testimony and increasing reasonable doubt. Additionally, counsel could have emphasized—and a jury could very easily conclude from this—that the prosecution's case was weak in reality if the Government were willing to allow this kind of special treatment to what it deemed to be important witnesses.  United States v. Abel, 469 U.S. at 52; United States v. Figueroa, 548 F.3d at 230.

This is further supported by the fact that in Richard's letter, he makes clear that he did not want to testify against Mr. Crea, did so only because the Government threatened to compel him by subpoena, and that he needed a green card for his wife to remain in the United States.  Moreover, the substance and tone of his letter stands in stark contrast to the Government's position at trial that Richard was in fear of Mr. Crea because Mr. Crea had ordered that he be murdered, or for any other reason.  (Exhibit B)  Thus, the evidence that Richard was motivated to testify in hopes of obtaining a personal benefit took on particular importance.

In addition to its clear impact on Richard's credibility and his self-interest in testifying against Mr. Crea, the Brady/Giglio material necessarily would have had a broader effect on the integrity of the investigation.  Of particular significance, by letter motion of October 14, 2017, co-defendant Londonio advised the Court that he sought to compel the testimony of case agent Ted Otto, a motion that was joined by Mr. Crea.  (T 2823)  Among the bases for the motion were the failure of investigators to investigate the possibility that a different LCN Crime Family was in fact responsible for the Meldish homicide, as well as that Otto

had a history of investigative improprieties that had resulted in dismissal, acquittal, or a hung jury.[5]

Throughout trial, the various defendants, including Mr. Crea, sought to demonstrate that the Government's witnesses were acting at the behest of federal investigators, and alerted the Court of a recorded communication between Spinelli and Otto, in which Otto instructed Spinelli to "try to get [Datello] to talk about Stevie." (T 1993)   Had the defense been timely been made aware of this information at the time of trial, including that Otto had promised Richard benefits in exchange for his testimony, counsel would have used that information to materially impeach the integrity the investigation, to support of the defense motion to compel Agent Otto's testimony, and to subject Otto to questioning about his investigative practices in this and related matters.   This would have provided a strong jury argument for defense counsel, especially when viewed in conjunction with the overall weakness of the case against Mr. Crea.

---

[5]   The motion to compel Agent Otto's testimony was filed with the Court under seal via e-mail on October 14, 2019.  The following day, October 15, 2019, a sealed document was entered on the docket at document # 869.

POINT III

GIVEN THAT <u>BRADY</u> REQUIRES A CUMULATIVE ANALYSIS, THE
COURT MUST RECONSIDER INSTANCES OF PREVIOUSLY SUPPRESSED
EVIDENCE IN CONNECTION WITH THE <u>BRADY</u> EVIDENCE AT ISSUE
IN THIS 2255 PROCEEDING.

The previously filed and litigated Rule 33 motions, including
the joint motion filed on behalf of all defendants during the
pendency of Mr. Crea's direct appeal, and which alleged a multitude
of other <u>Brady</u>/<u>Giglio</u> violations, is incorporated herein by
reference and requires consideration anew as part of the Court's
weighing of the materiality of the instant <u>Brady</u> evidence. <u>Kyles</u>
<u>v. Whitley</u>, 514 U.S. 419 (1995); <u>United States v. Tang Yuk</u>, 885
F.3d 57 (2d Cir. 2018); <u>Cone v. Bell</u>, 556 U.S. 449 (2009); <u>Ranta</u>
<u>v. Bennett</u>, 189 Fed. Appx. 54 (2d Cir. 2006); <u>United States v.</u>
<u>Jackson</u>, 345 F.3d 59.

Furthermore, the Court must now reevaluate the underlying
circumstances relating to the suppressed prison recordings of
jailhouse informant David Evangelista, and its prior decision not
to conduct an evidentiary hearing regarding such evidence, as it
then accepted unsworn representations from the same trial
prosecutor who now is known to have suppressed the Spinelli notes
and directly engaged in misleading motion practice before the Court
thereafter. Perhaps as best articulated by the district court in
its prior analysis of whether a hearing was then required,

> I don't have any reason to dispute the government's
> representations that they did not know of and did not

51

possess the jail calls. As far as I'm concerned, any AUSA worth her salt doesn't need to be put under oath to know that she can't BS a federal judge. The government has made representations. And I would have a hearing if there were facts undermining those representations. But the representation that the government did not have these calls until after the trial is based on firsthand knowledge, and there's absolutely nothing to suggest otherwise.

***

But the fact that the disc had Ms. Rothman's name on it I think renders that concern moot. And we know that Ms. Rothman didn't join the team until fairly late in the game, well beyond six months. So, yeah, the recordings were still available after six months. That much we know. But we also know that the creation of the disc was prompted by something to do with Ms. Rothman, and her representation that she had sent the subpoena for different information makes perfect sense.

(May 5, 2022, Tr. at 97-98, Rule 33 Hearing).

Accordingly, there is now sufficient contrary evidence to render the prosecutor's unsworn representations insufficient, thus requiring an evidentiary hearing, and the law otherwise clearly mandates a full and current analysis by the Court of all litigated Brady/Giglio evidence.

POINT IV

AN EVIDENTIARY HEARING IS FURTHER WARRANTED TO DETERMINE THE SCOPE OF THE BRADY/GIGLIO VIOLATION AND TO ENGAGE IN ADDITIONAL FACTFINDING WITH RESPECT TO THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE AND ULTIMATELY DISCLOSED TO THE DEFENSE.

In light of all prior proceedings and the present showing of evidence obtained subsequent to trial due to Brady violations,

52

Petitioner submits that the facts and arguments presented in this Petition are sufficient to support an Order vacating the judgment of conviction.  However, should the Court determine that additional factfinding is warranted to uncover the circumstances surrounding the late disclosure, the Court should order a hearing in connection with this motion pursuant to 28 U.S.C. § 2255(b).

WHEREFORE, the petition should be granted, the judgment of conviction vacated, or a hearing ordered.

DATED:    New York, New York

March 9, 2026

WHITE & WHITE

By:    /s/ Brendan White
Brendan White
524 East 20th Street, #6D
New York, NY 10075
(646) 303-0267
hendonbgb@gmail.com

Attorney for Petitioner
Steven Crea