UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STEVEN CREA                                           :

                                                      :

               Petitioner,                            :               17 Cr. 89 (CS)

                                                      :               26 Civ. 1991 (CS)

          - v. -                                      :

                                                      :

UNITED STATES OF AMERICA,                             :

                                                      :

               Respondent.                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO PETITIONER STEVEN CREA'S MOTION TO VACATE HIS CONVICTION

JAY CLAYTON
United States Attorney
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Alexandra Rothman
Assistant United States Attorney
        *Of Counsel*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................................iii

PRELIMINARY STATEMENT..........................................................................................................1

BACKGROUND ...................................................................................................................................2

A.    The Trial and Conviction................................................................................................2

B.    The Government's Case....................................................................................................2

      1.    The Meldish Murder .............................................................................................3

      2.    Construction Racketeering....................................................................................6

      3.    The Attempted Murder of Carl Ulzheimer............................................................7

      4.    Other Racketeering Activity .................................................................................8

C.    The Rule 29 and 33 Motion ............................................................................................8

D.    The Second Rule 33 Motion ...........................................................................................9

E.    The Direct Appeal...........................................................................................................11

F.    The Section 2255 Motion ...............................................................................................12

ARGUMENT........................................................................................................................................12

I.  The 2255 Motion Should Be Denied ......................................................................................12

A.    Applicable Law................................................................................................................13

      1.    Legal Standard for Habeas Relief ........................................................................13

      2.    Legal Standard for Attacking a Conviction for an Alleged *Brady* Violation.............................13

      3.    Legal Standard for Attacking a Conviction for Alleged Witness Perjury................................15

      4.    Evidentiary Hearing ..............................................................................................16

B.    There Is No *Brady* Violation Based on the Spinelli Notes ...........................................16

      1.    Relevant Facts........................................................................................................17

      2.    The Court Need Not Address Whether the Notes Were Suppressed .......................18

      3.    The Spinelli Notes Are Not Exculpatory ...............................................................19

      4.    Crea Cannot Show Prejudice .................................................................................22

C.    There Is No Violation Under *Napue* Based on the Spinelli Notes.................................28

D.    There Is No *Brady* Violation Based on the Richard Letter...........................................30

      1.    Relevant Facts........................................................................................................31

      2.    There Were No Benefits Promised to Richard.......................................................32

      3.    Evidence of Any Purported Benefits Was Not Suppressed ...................................35

      4.    Crea Cannot Show Prejudice .................................................................................36

II. The Court Should Not Reconsider Its Prior Ruling on the Rule 33 Motion ........................................ 39

III.   A Hearing Is Unnecessary and Unwarranted.................................................................................. 40

CONCLUSION ......................................................................................................................................... 41

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Baldeo v. United States*,
 No. 17 Civ. 01692 (JLR), 2025 WL 3073997 (S.D.N.Y. Nov. 3, 2025) ................................. 34

*Banks v. United States*,
 920 F. Supp. 688 (E.D. Va. 1996) ........................................................................................ 38

*Bousley v. United States*,
 523 U.S. 614 (1998) ............................................................................................................ 30

*Boyette v. LeFevre*,
 246 F.3d 76 (2d Cir. 2001) .................................................................................................. 15

*Brady v. Maryland*,
 373 U.S. 83 (1963) .............................................................................................................. 12

*Chang v. United States*,
 250 F.3d 79 (2d Cir. 2001) ............................................................................................. 16, 40

*Clemmons v. Lee*,
 No. 13 Civ. 04969 (CS) (JCM), 2021 WL 6750664 (S.D.N.Y. Oct. 28, 2021) .................. 15, 16

*Cuoco v. United States*,
 208 F.3d 27 (2d Cir. 2000) .................................................................................................. 13

*DiSimone v. Phillips*,
 461 F.3d 181 (2d Cir. 2006) ................................................................................................ 35

*Giglio v. United States*,
 405 U.S. 150 (1972) ......................................................................................................... 12, 15

*Haouari v. United States*,
 510 F.3d 350 (2d Cir. 2007) ................................................................................................ 33

*Hernandez v. Senkowski*,
 No. 93 Civ. 5763 (FB), 1996 WL 285426 (E.D.N.Y. May 17, 1996) ..................................... 37

*Johnston v. Love*,
 940 F. Supp. 738 (E.D. Pa. 1996) ........................................................................................ 37

*Kassir v. United States*,
   3 F.4th 556 (2d Cir. 2021)......................................................................................... 28

*Krivoi v. Chappius*,
   No. 21-2934-PR, 2022 WL 17481816 (2d Cir. Dec. 7, 2022) .................................... 18

*Kyles v. Whitley*,
   514 U.S. 419 (1995) .................................................................................................. 14

*LoCascio v. United States*,
   395 F.3d 51 (2d Cir. 2005)......................................................................................... 16

*Murray v. United States,*
   704 F.3d 23 (1st Cir. 2013) ........................................................................................ 34

*Napue v. Illinois*,
   360 U.S. 264 (1959) .................................................................................................. 12

*Nkansah v. United States*,
   No. 24-2336, 2025 WL 2682552 (2d Cir. Sept. 19, 2025)......................................... 34

*Penick v. Filion*,
   144 F. Supp. 2d 145 (E.D.N.Y. 2001)........................................................................ 37

*Puglisi v. United States*,
   586 F.3d 209 (2d Cir. 2009)............................................................................. 16, 24, 33

*Ramirez v. Keyser*,
   No. 20 Civ. 8445 (KMK), 2024 WL 1076945 (S.D.N.Y. Mar. 12, 2024)................... 37

*Strickler v. Greene*,
   527 U.S. 263 (1999) .................................................................................................. 14

*Taylor v. Capra*,
   412 F. Supp. 3d 126 (E.D.N.Y. 2019)........................................................................ 37

*Thomas v. United States*,
   No. 04 Cr. 801 (PKC), 2018 WL 4006785 (S.D.N.Y. Mar. 9, 2018) ......................... 34

*Turner v. United States*,
   582 U.S. 313 (2017) .................................................................................................. 14

*United States v. Agurs,*
   427 U.S. 97 (1976) .................................................................................................... 15

*United States v. Aiello*,
   900 F.2d 528 (2d Cir. 1990)................................................................................................ 16

*United States v. Avellino*,
   136 F.3d 249 (2d Cir. 1998)......................................................................................... 25, 26

*United States v. Barcelo*,
   628 F. App'x 36 (2d Cir. 2015)............................................................................... 21, 23, 36

*United States v. Bin Laden*,
   397 F. Supp. 2d 465 (S.D.N.Y. 2005)......................................................................... 32, 38

*United States v. Bryant*,
   520 F. App'x 11 (2d Cir. 2013)........................................................................................ 15

*United States v. Coppa*,
   267 F.3d 132 (2d Cir. 2001)........................................................................................ passim

*United States v. DiPaolo*,
   835 F.2d 46 (2d Cir. 1987).............................................................................................. 34

*United States v. Escobar*,
   No. 24 Cr. 101 (JFB), 2024 WL 923591 (E.D.N.Y. Mar. 4, 2024) ......................................... 38

*United States v. Gershman*,
   31 F.4th 80 (2d Cir. 2022)............................................................................................... 28

*United States v. Gonzalez*,
   110 F.3d 936 (2d Cir. 1997)............................................................................................. 18

*United States v. Hunter*,
   32 F.4th 22 (2d Cir. 2022)......................................................................................... 18, 22

*United States v. Jackson*,
   780 F.2d 1305 (7th Cir. 1986)........................................................................................ 27

*United States v. Josephberg*,
   562 F.3d 478 (2d Cir. 2009)........................................................................................... 15

*United States v. LeRoy,*
   687 F.2d 610 (2d Cir. 1982)....................................................................................... 14, 35

*United States v. Londonio*,
   No. 20-2479-CR, 2024 WL 3770712 (2d Cir. Aug. 13, 2024) ........................................ passim

*United States v. Nkansah*,
No. 08 Cr. 1234 (JSR), 2024 WL 3330226 (S.D.N.Y. July 3, 2024) ...................................... 34

*United States v. Persico,*
645 F.3d 85 (2d Cir. 2011)............................................................................................ 14, 25

*United States v. Restrepo*,
547 F. App'x 34 (2d Cir. 2013)........................................................................................... 35

*United States v. Rodriguez*,
No. 05 Cr. 960 (JPO), 2022 WL 158685 (S.D.N.Y. Jan. 18, 2022) ........................................ 28

*United States v. Thorn*,
659 F.3d 227 (2d Cir. 2011).............................................................................................. 30

*United States v. Wallach*,
935 F.2d 445 (2d Cir. 1991)............................................................................................... 15

*United States v. Walters*,
910 F.3d 11 (2d Cir. 2018).................................................................................................. 15

*United States v. Williams*,
81 F.3d 1434 (7th Cir. 1996)............................................................................................... 37

*United States v. Wong*,
78 F.3d 73 (2d Cir. 1996).................................................................................................... 15

*United States v. Zhang*,
135 F.4th 44 (2d Cir. 2025)........................................................................................... 15, 36

*United States v. Zichettello*,
208 F.3d 72 (2d Cir. 2000)................................................................................................. 15

**Statutes**

28 U.S.C. § 2255................................................................................................... 13, 16, 40

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to petitioner Steven Crea's motion to vacate his conviction under Title 18, United States Code, Section 2255. (Dkts. 1329, 1330). The motion should be denied for the following reasons:

*First*, Crea's motion based on the purportedly belated disclosure of notes of an interview with cooperating witness Robert Spinelli should be denied. The notes, which consist of four sentence fragments, do not say what Crea claims they say, and in any event, they are not material. At trial, the Government presented overwhelming proof of Crea's guilt, including on the murder of Michael Meldish, and Crea's motion is but a rehashing of arguments Crea has raised—and lost—before this Court and the Second Circuit.

*Second*, Crea's motion based on the purported perjurious testimony of Special Agent John Carillo should be denied because Special Agent Carillo did not perjure himself and, in any event, the alleged perjury does not meet the standard to vacate Crea's conviction.

*Third*, Crea's motion based on the purported failure to disclose benefits promised to trial witness Sean Richard in exchange for his testimony should be denied. There were no benefits promised to Richard; his unsworn and self-serving letter need not be credited; and in any event, the Government's prior disclosures evinced that Richard wanted a new identity, making Crea aware of the "essential facts" to take advantage of this information. But even if not, and even if the allegations in the Richard letter were credited, the information is not material.

*Fourth*, the Court should not reconsider its prior decision to deny Crea's Rule 33 motion. Nothing in the instant motion provides any basis for reconsideration.

*Fifth*, the Court should not hold an evidentiary hearing, because the present record, without further factual finding, conclusively shows that Crea is not entitled to relief.

**BACKGROUND**

### A. The Trial and Conviction

On November 15, 2023, following a six-week jury trial, Steven Crea, along with his co-defendants Matthew Madonna, Christopher Londonio, and Terrence Caldwell, were convicted of several crimes relating to their participation in the Luchese Family of La Cosa Nostra. Crea was convicted of racketeering conspiracy (Count One); conspiracy to commit murder in aid of racketeering (Count Two); murder in aid of racketeering (Count Three); and use of a firearm resulting in death in furtherance of the murder charged in Count Three (Count Seven).

The Court sentenced Crea principally to concurrent terms of life imprisonment on Counts One and Three, a concurrent term of 10 years' imprisonment on Count Two, and a consecutive term of life imprisonment on Count Seven. (Dkt. 1123). Crea appealed from his conviction, and the Court of Appeals for the Second Circuit affirmed. *United States v. Londonio*, No. 20-2479-CR, 2024 WL 3770712 (2d Cir. Aug. 13, 2024), *cert. denied*, 145 S. Ct. 2685 (2025). Crea is currently serving his sentence.

### B. The Government's Case

The evidence at trial overwhelmingly established that Crea was the underboss of the Luchese Family, a top position within the Family's administration. (*E.g.*, Tr. 1366, 1409, 1730, 2691). Ample evidence proved the Luchese Family was a violent organization where each member had agreed to commit murder if asked. (Tr. 1444, 4321-22). The evidence further established that Crea and his co-defendants—Madonna, the acting boss of the Family; Londonio, an associate who became a soldier around September 2013; and Caldwell, an associate of the Family who performed acts of violence at the behest of others, including Londonio—committed crimes as part of their participation in the Luchese Family. These crimes included attempted murder, assault, robbery,

2

extortion, fraud, illegal gambling, drug trafficking, and the November 15, 2013 murder of Michael Meldish.

To prove these crimes, the Government presented the jury with substantial evidence, which included: the testimony of 10 accomplice witnesses who were involved in various aspects of the charged racketeering activity; the testimony of federal and state law enforcement officers who conducted surveillance and gathered physical evidence; the testimony of multiple expert witnesses, including a Mafia expert, a cell-site expert, and a DNA expert; the testimony of civilians who observed or were victims of some of the crimes of the defendants; more than 60 recordings of the defendants and their co-conspirators, in which they discussed Mafia-related business, including the Meldish murder; and forensic evidence, including DNA, ballistics, surveillance video, telephone records, and cell-site data.

### 1.  The Meldish Murder

The evidence at trial established that Crea and his co-defendants were responsible for the Meldish murder. Meldish was a longtime associate of La Cosa Nostra. (Tr. 1210, 1213, 1820). In the years leading up to his 2013 murder, he associated with Madonna. Meldish loansharked Madonna's money, borrowing $100,000 from Madonna and lending it out to smaller borrowers. (Tr. 2519, 3759; GX-702A). But Meldish became disrespectful to Madonna. Among other things, he eventually refused to collect the debts owed to Madonna, and he cursed out Madonna when Madonna demanded obedience. (Tr. 2519).

Madonna and Crea ordered that Meldish be killed. The Government offered an August 18, 2024 recording of Joseph Datello, a Luchese soldier with connections to Madonna and Crea, in which he explained to Luchese associate Robert Spinelli, acting as an informant, and an undercover FBI agent, posing as a drug trafficker, that Madonna and his underboss were the top

3

decisionmakers for a murder and "[t]hey clipped Meldish" because he was a "loose cannon" and refused to repay his debt to Madonna. (Tr. 1246). Spinelli testified that he understood "they" to mean Madonna and Crea. (Tr. 1843; GX-702A). At another point in the recording, after Datello said that he needed to repay Crea for a debt, Datello said, "I mean, this guy, this guy just clipped a guy because of $100,000." (Tr. 1839; GX-702A). Spinelli testified that he understood "this guy" to mean Crea. (Tr. 1839). In another recorded conversation, Datello said Londonio "could hurt everybody," including Madonna, if he "goes bad" and turns on the Luchese Family. (Tr. 1901).

On November 15, 2013, Caldwell met Meldish in Manhattan and drove with Meldish in Meldish's car to meet Londonio in the Bronx. Then Caldwell shot Meldish in the head and drove away with Londonio. Cell-site data, call records, and a license-plate reader photograph showed Meldish and Caldwell meeting in Manhattan and driving in Meldish's car to the Bronx neighborhood where the murder occurred at the same time Londonio drove there from his Westchester home. (GX 1402). Surveillance video showed Londonio's car arriving in the neighborhood before Meldish and Caldwell, then following Meldish's car to the scene of the murder right before it occurred. (Tr. 715-16, 722). A retired nurse and her daughter found Meldish, dead, just minutes after Londonio's car was recorded. (Tr. 635-62). Meldish was sitting in the driver's seat of his car with the door open and one foot out, consistent with having just stopped his car and begun to get out to meet Londonio. (GX 408, 411). Ballistics analysis showed that Meldish was killed with a single gunshot to the head, fired from his right side less than 24 inches away, consistent with having been shot from the front passenger seat, where Caldwell sat. (Tr. 3530-39). DNA found on the front passenger interior door handle of Meldish's car matched Caldwell's. (Tr. 792-93). And cell-site data, phone records, and another license-plate reader photograph showed

4

that right after the murder, Londonio drove Caldwell from the scene of the murder to his home in Manhattan, after which Londonio drove home to Westchester. (GX 1402).

Londonio told at least two confidants about the murder. Joseph Foti, a longtime Mafia associate who was secretly cooperating with law enforcement, testified that Londonio told him, "I drove and my friend shot him." (Tr. 2203). Londonio also told Foti that he had gotten rid of the car used during the murder (Tr. 2202), which was corroborated by dealership records (GX 1521), and that he had seen a doctor about nervous difficulties resulting from the murder (Tr. 2218), which was corroborated by medical records (GX 431).

David Evangelista, an inmate at the Metropolitan Detention Center with Londonio, testified that Londonio told him that he had participated in the murder by acting as "the driver," that Caldwell was "the shooter," and that "Meldridge" was killed because he had "disrespected" Madonna. (Tr. 2989). Another time, Londonio told Evangelista that "Stevie [Crea] gave the order" to kill Meldish, and that Crea's son was also involved. (Tr. 2990). Crea's son, Steven L. Crea (often referred to as "Crea Jr."), was Londonio's captain in the Luchese Family. (GX 702A; Tr. 1403).

Evangelista's testimony was corroborated by, among other things, a recording in which Londonio described his chain-of-command as running from Madonna and Crea through the consigliere and Crea Jr. (GX 751A); all of the evidence, described above, that Londonio was the driver, Caldwell the shooter, and Madonna and Crea "gave the order" with respect to the Meldish murder; and testimony from John Pennisi, a former soldier in the Luchese Family, and John Carillo, an expert in Mafia protocol, both of whom testified that a murder ordered by a boss would typically pass from the administration to a captain, who would then assign the task to a soldier (Tr. 1018, 1444).

At the same time, there was testimony at trial that Mafia rules, including with respect to murder, were often broken. (Tr. 1133-46, 1505, 1633, 4449-50, 4459-60). For instance, the Government offered proof of the attempted "sneak" murder of Enzo Stagno, in which Meldish and Caldwell shot Stagno as part of an ongoing feud between the Bonannos and the Luchese and without the approval of the Luchese senior leadership. (Tr. 2528).

### 2. Construction Racketeering

The evidence at trial also established that the Luchese Family profited from violence, threats of violence, and fraud in the construction industry. Much of this evidence was centered on Crea. Both before and during the early part of the charged period, Crea orchestrated a wide swath of racketeering activity, including labor racketeering, extortion, bid rigging, and fraud, at construction projects in and around New York City. Associate Sean Richard testified that he had been introduced to Crea through Datello, the Luchese soldier who Spinelli had been recording, and that Crea was involved in the construction rackets. (Tr. 2684, 2718-19). To corroborate Richard, the Government offered, among other things, a recording of Richard and Datello from January 2000 in which they discussed Crea and a construction-related debt that Richard owed him. (GX 764; Tr. 2779-84). Richard later became a cooperating witness against Crea and Datello, and Crea pled guilty to the federal crime of extortion and the state crime of enterprise corruption. (Tr. 2760, 2789). The Government offered proof of Crea's prior convictions as trial. (Tr. 2794-96). The Government also offered as corroboration several recordings that Spinelli had made of Datello, in which Datello described the debt he owed to Crea for Richard having cooperated. (Tr. 1835, 1855-60, 1873).

The Government also proved at trial that, for decades, Crea used the Luchese Family to help, and profit from, a construction contractor named Randy Silverstein. The evidence established

that Crea received millions of dollars from a construction project at Bronx Lebanon hospital, which was beset by fraud. Silverstein testified that his general construction company, Sparrow Construction, obtained a large contract at Bronx Lebanon hospital, even though his company was not qualified for the project; that, through Crea, he took out a sizeable loan from a "hard money lender" (with money lent by Crea) to obtain the contract; that he paid Crea $25,000 for helping him find the loan; that consistent with how Silverstein and Crea had operated in the past, he used Luchese-connected subcontractors on the project; and that Silverstein engaged in change-order fraud on the project with these subcontractors. (Tr. 3333-414).

Silverstein's testimony was corroborated in several ways. Peter Palmisano of Jones Lang Lasalle, the company Bronx Lebanon had originally hired to manage the construction project, testified that after he raised concerns about Sparrow, he was subjected to a campaign of intimidation that led Jones Lang Lasalle to withdraw from the project. (Tr. 3595). Special Agent Carillo testified that change-order fraud was a common construction-related racket in the Mafia. And Pennisi testified that work on the Bronx Lebanon project was funneled to Luchese Family members and associates. (Tr. 1095, 1429).

### 3. The Attempted Murder of Carl Ulzheimer

The Government also presented evidence of the attempted murder of Carl Ulzheimer, a Bonanno associate, who had personally offended Crea. In 2012, an armed group of Bonannos invaded a social club in the Bronx that the Lucheses used as a headquarters, in retaliation for Madonna's refusal to respect the Bonannos' boss. (Tr. 1375, 3625-72, 3790-801). During the incursion, a Bonanno associate named Carl Ulzheimer offended Crea, who threatened retaliation. (Tr. 3790-91). Crea, through his son, later sent two men to kill Ulzheimer: Luchese soldier Paul Cassano and Luchese associate Vincent Bruno. (GX 735A; Tr. 3792-804). Cassano twice drove

Bruno to Ulzheimer's Bronx apartment, where Bruno took a gun to Ulzheimer's doorstep, knocked, and waited for Ulzheimer to emerge, intending to shoot him, but Ulzheimer wisely remained inside. (Tr. 3766, 3800, 3920). Evidence of that crime came from two cooperating witnesses—one a former Bonanno captain, Peter Lovaglio, and the other a former Mafia associate, who was corroborated by a surreptitious recording in which another mobster discussed Bruno's admission to attempting the murder at the Creas' behest (GX 735A; Tr. 3803-10).[1]

### 4. Other Racketeering Activity

The trial evidence also established other racketeering activities committed by Crea, his co-defendants, and their co-conspirators. For instance, the Government offered evidence that Crea had ordered Pennisi, through his captain, John Castellucci, to assault his former son-in-law, Edward Davidson, with whom Crea was having a financial dispute. (Tr. 1445-56).

### C. The Rule 29 and 33 Motion

On December 30, 2019, following conviction, Crea moved under Rules 29 and 33 for a judgment of acquittal or, in the alternative, for a new trial. (Dkt. 928). As relevant here, Crea argued there was insufficient evidence to support the jury's verdicts on Counts Two, Three and Seven, the counts related to the Meldish murder. Crea claimed the only evidence offered against him was Datello's statement to Spinelli during the August 18, 2024 recording that "this guy just clipped a guy because of a $100,000," and Londonio's statement to Evangelista that Crea "gave the order," both of which he alleged were improperly admitted. (Dkt. 928). The Government opposed the motion. (Dkt. 949).

---

[11] The jury acquitted Crea on the counts relating to the Ulzheimer attempted murder.

The Court denied the motion in an oral ruling on March 13, 2020. (Dkt. 1063). As relevant here, the Court held:

> Those two statements along with the evidence that Crea was the underboss and the evidence of the role of the underboss are more than sufficient, when viewed in the light most favorable to the government, to lead a rational fact finder to conclude that Crea was guilty beyond a reasonable doubt for each element of the crimes charged in Counts Two, Three and Seven. And again, because *Pinkerton* was charged here, even if Crea's involvement in the murder plot was to advise against it, of which there's no evidence, that would still be enough to convict. So Crea has failed to meet the heavy burden to overturn his conviction on sufficiency grounds.

(Dkt. 1063, at 19).[2]

### D.    The Second Rule 33 Motion

On October 4, 2021, Crea, along with his co-defendants, moved for a new trial under Rule 33. (Dkts. 1214-1216). The motion was based on purported "newly-discovered evidence" in the form of (1) statements by Pennisi and non-testifying witness Frank Pasqua II in podcast interviews after the trial; (2) recordings of prison telephone calls by Evangelista before he testified at trial but not received by the Government until well after his testimony; and (3) statements by Evangelista

---

[2] Crea also moved for a new trial based on purportedly false testimony from Special Agent Carillo that he was unfamiliar with "any murder that was not sanctioned by the boss that did not involve the administration." (Dkt. 928). The Court held that none of the evidence proffered by Crea, including an affidavit from Gambino cooperator Salvatore Gravano (in which Gravano claimed an underboss counseled John Gotti against a murder), made Carillo's testimony false. (Dkt. 1063 at 15). The Court added, under a *Pinkerton* theory, a conversation in which an underboss had allegedly urged a boss not to do a murder "likely would be sufficient to convict." (Dkt. 1063 at 15). The Court also considered the evidence as potential impeachment but found

> [I]t would not have affected the verdict if Carillo had testified that, in his more than 35 years of law enforcement investigating scores or maybe hundreds of murders, he had heard of only one instance where the underboss was not on board with the murder, and, in that case, the underboss thought collecting money from the victim was a better idea, but had discussions with the boss about the murder.

(Dkt. 1063 at 16).

and his counsel at his sentencing. Crea argued that Pennisi's podcast statements about "sneak murders" undermined the Government's "chain of command" theory that the murder of Meldish required the knowledge and approval of Madonna and Crea, and that the Pennisi podcasts and Evangelista prison calls could have been used to impeach Pennisi and Evangelista. (*Id.*). The Government opposed the motion. (Dkt. 1226).

The Court denied the motion in an oral ruling on May 5, 2022, and June 13, 2022. (Dkts. 1265, 1267; 6/13/22 Tr.). As relevant here, the Court rejected Crea's "chain of command" arguments, finding

> [T]he concept of sneak murders is not new, nor is it inconsistent with the government's theory. The government's theory was that sanctioned murders – not all violence but sanctioned murders had to be approved by the administration, but the government acknowledged that this did not always happen. It was in agent Carillo's 3500 material and in his testimony at pages 1018 to 20, 1143 to 46, and 1218 to 19. And it was in other trial evidence, including all of the proof of the Stagno attempted murder by Meldish and Caldwell.… So the evidence was that although sanctioned murders were supposed to be approved by the administration, that didn't always happen…
>
> [T]he government argued that this was a sanctioned murder ordered by the administration, but it did not make that argument on the basis that all murders have to be sanctioned or ordered, that murders could take place without such an order was before the jury…
>
> [T]he government never argued that every mob-related murder comes down the chain of command.…
>
> The jury was already aware that unauthorized hits take place, and mob rules are often broken.…
>
> [T]here was ample evidence beyond the chain of command evidence as well as ample chain of command evidence from other sources.

(6/13/22 Tr. at 16-18).

The Court also rejected Crea's arguments regarding the additional impeachment evidence for Evangelista, finding:

10

> Evangelista's testimony was not the only evidence linking [Crea] to the murder, nor would the jury's disbelief of Evangelista have undermined a critical element of the prosecution's case. …
>
> In addition to Evangelista's testimony about Londonio's statements in prison about Crea, Sr., and Jr. being the ones who passed down the order to kill Meldish -- as to Madonna and Crea, the government had corroboration from Datello's recorded statement and chain of command evidence of Carillo, Pennisi, and Spinelli, Bash's testimony about Meldish disregarding Madonna's direction to cool it with his retaliation against the Bonannos and disrespecting Madonna's direction to collect debts owed to Madonna as well as Madonna's voice mails to Londonio after Londonio's arrest, not to mention the *Pinkerton* theory.

(6/13/22 Tr. at 29, 34 (citations omitted)).

### E.  The Direct Appeal

Crea appealed his conviction, challenging the Court's decision to (i) admit Londonio's confession to Evangelista, and deny his motion for a severance to call Londonio at trial; (ii) deny a motion to dismiss an earlier indictment based on purported errors in the grand jury process; (iii) instruct the jury on *Pinkerton*; (iv) admit evidence regarding Crea's involvement in construction-related rackets from the late 1990s until 2008; and (5) impose a life sentence on Count One. Crea also argued there was insufficient evidence to convict him of the Meldish murder, and that the Court erred in denying the second Rule 33 motion.

The Circuit rejected each of Crea's arguments and affirmed his conviction, along with the convictions of his co-defendants.[3] *United States v. Londonio*, No. 20-2479-CR, 2024 WL 3770712 (2d Cir. Aug. 13, 2024). As relevant here, the Circuit rejected Crea's challenge to the sufficiency of the evidence, finding "a rational juror could have found that Madonna and Crea ordered the murder of Meldish." *Id.* at \*2. In upholding the Court's *Pinkerton* instruction, the Circuit found

---

[3] The Circuit also denied as moot Crea's motion for bail pending appeal. (20-2980 Dkt. 258, 272). Crea had argued, among other things, that he was entitled to bail pending appeal based on the Government's belated disclosure of the Spinelli Notes, described *infra*.

11

"[t]here was ample evidence to support the government's theory that Madonna and Crea shared membership in a RICO conspiracy that condoned acts of murder with Londonio and Caldwell, the perpetrators of the Meldish murder." *Id.* at \*6. And the Second Circuit affirmed the Court's denial of the Rule 33 motion for the same reasons as those cited by the Court. *Id.* at \*7. Crea sought panel rehearing and rehearing en banc, which the Second Circuit denied. (20-2980, Dkt. 311). Crea did not file a petition for a writ of certiorari.

### F. The Section 2255 Motion

On March 9, 2026, Crea filed a motion to vacate his conviction under Section 2255. In his motion, Crea claims the Government suppressed the following evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264, 269 (1959): (1) notes of a meeting with cooperating witness Robert Spinelli regarding a murder purportedly ordered "directly by the 'boss' of the Luchese Crime Family," which Crea alleges "undermined" the Government's theory that Crea "would have been involved in the decision to order the murder of Michael Meldish and to pass down that order" (the "Spinelli Notes"), and (2) evidence of "benefits" the Government purportedly had promised to "cooperating witness Sean Richard in exchange for his testimony," which Crea alleges "only became known to the defense when Richard personally contacted Mr. Crea by letter [] several years after trial" (the "Richard Letter"). (Mot. 2-3).

## ARGUMENT

### I. The 2255 Motion Should Be Denied

Crea argues his conviction should be overturned because the Government failed to disclose purportedly exculpatory and impeachment material in the Spinelli Notes and Richard Letter. On the Spinelli Notes, Crea principally makes three arguments: (1) the Notes undermine the

Government's theory that an underboss would necessarily have been involved in the decision to murder Meldish; (2) the Notes contradict Special Agent Carillo's testimony that he had never heard of a murder ordered by the boss that did not include the underboss, and the Government's failure to correct Special Agent Carillo's testimony provides a separate basis for relief under *Napue*; and (3) the suppression of the Notes affected the outcome of several of the Court's prior rulings. On the Richard Letter, Crea argues that he could have used the evidence to impeach both Richard and the broader Government's investigation, including by securing the testimony of FBI Special Agent Ted Otto. None of these attacks has merit, and the motion should be denied without a hearing.

### A. Applicable Law

#### 1. Legal Standard for Habeas Relief

Section 2255 permits a prisoner in custody to move to vacate, set aside, or correct the sentence on the grounds that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). To merit relief under Section 2255, a petitioner must demonstrate "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000).

#### 2. Legal Standard for Attacking a Conviction for an Alleged *Brady* Violation

"The basic rule of *Brady* is that the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001). This includes "not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the

credibility of a government witness." *Id.* "Because *Brady* and its progeny are grounded in the Due Process Clauses of the Constitution, the essential purpose of the rules enunciated in these cases is to protect a defendant's right to a fair trial by ensuring the reliability of any criminal verdict against him." *Id.* "Thus, a *Brady* violation occurs only where the government suppresses evidence that 'could reasonably [have been] taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

To prevail on a *Brady* claim, "a defendant must show that: (1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *Coppa*, 267 F.3d at 139. "[T]here is never a real '*Brady* violation' unless the [Government's] nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). "To make that determination, [a] Court 'evaluate[s]' the withheld evidence 'in the context of the entire record.'" *Turner v. United States*, 582 U.S. 313, 325 (2017).

In assessing a *Brady* claim, "[e]vidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. LeRoy,* 687 F.2d 610, 618 (2d Cir. 1982) (citations omitted). "The rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence only known to the Government." *Id.* at 619.

"[U]ndisclosed impeachment evidence is not material in the *Brady* sense when, although 'possibly useful to the defense,' it is 'not likely to have changed the verdict.'" *United States v.*

14

*Persico,* 645 F.3d 85, 111 (2d Cir. 2011) (quoting *Giglio v. United States,* 405 U.S. 150, 154 (1972)); *United States v. Bryant*, 520 F. App'x 11, 14 (2d Cir. 2013). "Evidence of impeachment is material if the witness whose testimony is attacked supplied the only evidence linking the defendant(s) to the crime or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." *United States v. Zhang*, 135 F.4th 44, 53 (2d Cir. 2025) (citing *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996)); *see also Boyette v. LeFevre*, 246 F.3d 76, 93 (2d Cir. 2001) (undisclosed impeachment evidence was material where the witness's identification testimony was the only evidence against defendant).

### 3.  Legal Standard for Attacking a Conviction for Alleged Witness Perjury

"A defendant claiming that his conviction should be reversed based upon allegations of perjured testimony must show: (i) the witness actually committed perjury, (ii) the alleged perjury was material, (iii) the government knew or should have known of the alleged perjury at time of trial, and (iv) the perjured testimony remained undisclosed during trial." *United States v. Walters*, 910 F.3d 11, 29 (2d Cir. 2018); *see also United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009); *United States v. Zichettello*, 208 F.3d 72, 102 (2d Cir. 2000).  Where the Government was not aware of the perjury, the conviction must be set aside "only if the testimony was material and the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Walters*, 910 F.3d at 29 (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)). Where, on the other hand, the Government was aware of the perjury, the conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103 (1976).

Under either standard, "[p]erjury requires more than just showing a witness's testimony to be false—it must have been intentionally false as to a material matter." *Clemmons v. Lee*, No. 13

Civ. 04969 (CS) (JCM), 2021 WL 6750664, at *22 (S.D.N.Y. Oct. 28, 2021), *report and recommendation adopted*, No. 13 Civ. 4969 (CS) (JCM), 2022 WL 255737 (S.D.N.Y. Jan. 27, 2022).

### 4. Evidentiary Hearing

A petition for habeas corpus requires a hearing to resolve disputed issues of fact unless the record shows that the petitioner is not entitled to relief. 28 U.S.C. § 2255; *LoCascio v. United States*, 395 F.3d 51, 57 (2d Cir. 2005). Where "the judge that tried the underlying proceedings also presides over the Section 2255 motion, a less-than full-fledged evidentiary hearing may permissibly dispose of claims where the credibility assessment would inevitably be adverse to the petitioner." *Id.*; *see United States v. Aiello*, 900 F.2d 528, 534 (2d Cir. 1990) (affirming the denial of a § 2255 without a hearing where the judge "presided over both of Aiello's trials" and was thus "intimately familiar with the detailed factual record"). Indeed, in *Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001), the Second Circuit recognized that it will often be most prudent "to choose a middle road [of examining affidavits and record supplementations] that avoid[s] the delay, the needless expenditure of judicial resources, the burden on trial counsel and the government, and perhaps the encouragement of other prisoners to make similar baseless claims that would have resulted from a full testimonial hearing." *Id.* "[A] district court need not assume the credibility of factual assertions, as it would in civil cases, where the assertions are contradicted by the record in the underlying proceeding." *Puglisi v. United States*, 586 F.3d 209, 214 (2d Cir. 2009) (collecting cases).

### B. There Is No *Brady* Violation Based on the Spinelli Notes

Crea first moves to vacate his conviction based on the Spinelli Notes. For the reasons set forth below, Crea's motion based on the Spinelli Notes should be denied.

## 1.  Relevant Facts

The Spinelli Notes are notes of a brief meeting with cooperating witness Robert Spinelli on the morning of October 17, 2019, before the second day of his direct examination. The Notes consist of four handwritten sentence fragments jotted down on a piece of paper.[4] In his motion, Crea principally relies on the second line of the notes: "Vic ordered murder of Pete Chiodo." That line is a reference to the 1991 attempted murder of Peter Chiodo—a murder that did not come up at trial but that Spinelli discussed in prior meetings with the Government, the notes of which had been produced to the defense in advance of trial.[5]

The Government produced the Spinelli Notes to the defense on May 4, 2023, after a paralegal, while boxing up records, found a small number of notes, including the Spinelli Notes, had not been produced before trial. (Rothman Decl. Ex. C). With respect to the Spinelli Notes, the Government informed the defense:

> While these notes were not included in a stamped production to the defense, the best recollection of the AUSA who conducted the meeting is that, consistent with that AUSA's practice, she would have made a photocopy of the notes and handed them to defense counsel on the morning of trial.

---

[4] The Notes, in their entirety, consist of the following four lines:

- Vic & Gaspipe on lam in '91 when Pete gets shot
- Vic ordered murder of Pete Chiodo
- disarray in admin family @ time
- Gaspipe still on lam in 1992

(Rothman Decl. Ex. A).

[5] Spinelli's § 3500 material included the following: "Luchese boss Vic Amuso and Luchese underboss Anthony 'Gaspipe' Casso were both indicted on the 'Windows' case and were concerned that Luchese captain and co-defendant Peter Chiodo a/k/a Fat Pete, was cooperating with law enforcement and would testify against them at trial. Spinelli understood that on Amuso and Gaspipe's order, Chiodo was shot multiple times . . . Chiodo survived and ultimately began cooperating." (Rothman Decl. Ex. B at 4).

(*Id.*).[6]

### 2.  The Court Need Not Address Whether the Notes Were Suppressed

"[T]rue *Brady* material must be (1) favorable, (2) suppressed, and (3) prejudicial." *United States v. Hunter*, 32 F.4th 22, 31 (2d Cir. 2022). In this case, the Court need not resolve whether the notes were suppressed because, for the reasons set forth below, the notes are neither favorable nor material. *See, e.g.*, *id.* at 35 ("Because we have determined that the withheld information was not 'material,' we need not determine whether it was 'suppressed' in order to decide this appeal."); *Krivoi v. Chappius*, No. 21-2934-PR, 2022 WL 17481816, at *2 (2d Cir. Dec. 7, 2022) ("Because we conclude that the state court's materiality determination was not an unreasonable application of law, we need not decide whether Nayfeld's statements were "suppressed" within the meaning of the Brady rule."); *United States v. Gonzalez*, 110 F.3d 936, 944 (2d Cir. 1997) ("We need not decide whether or not the evidence was suppressed, however, because we believe, in any event, that the evidence was not material.").

For the Court's background, however, and without asking the Court to make any factual findings with respect to this prong of the *Brady* inquiry, the Government notes the following: after a brief meeting with Spinelli on the morning of October 17, 2019, it would have been the assigned prosecutor's practice to make copies of the notes and hand them to defense counsel that morning before the trial day resumed. More than six years after trial, the prosecutor does not have a recollection of what she did with the notes after entering the courtroom that morning. Crea has submitted affidavits from his trial attorneys, Anthony DiPietro, Esq., and Robert Franklin, Esq., in which they state they did not receive the notes. (Dkts. 1330-8, 1330-9). The Court does not need

---

[6] The Government and Crea exchanged a few additional emails and letters, some of which Crea attached to his motion. The Government can provide a record of these communications, if requested by the Court.

to resolve whether the Spinelli Notes were provided to the defense the morning of trial or whether they were somehow inadvertently not turned over because the Court can deny Crea's motion on either (or both) of the bases below.

### 3. The Spinelli Notes Are Not Exculpatory

Crea's *Brady* claim fails because the Spinelli Notes are not exculpatory; they simply do not say what Crea pretends they say. The Spinelli Notes reflect that "Vic ordered murder of Pete Chiodo." The line is a reference to the 1991 attempted murder of Pete Chiodo, who was believed to be cooperating at the time. If anything, the statement is inculpatory, not exculpatory. The Government proved at trial that Crea was the underboss of the Luchese Family, (*e.g.*, Tr. 1366, 1409, 1730, 2691), and that the Luchese Family was a violent organization that sanctioned murder, among other crimes, (Tr. 1444). The Government introduced evidence of Crea's decades-old mob-related convictions and close association with Madonna. (Tr. 2794-96, 1041, 1049). And Special Agent John Carillo, among other witnesses, testified about the typical "chain of command" in the Family, and that approved murders came from orders of the Boss. (Tr. 1801 ("an approved murder can only be made, the final decision is by the boss or the acting boss")). That a Luchese Boss ordered a perceived cooperator killed in 1991 is consistent with the Government's theory that the Luchese Family was a hierarchical and violent organization that used murder, and other acts of violence, to maintain its dominance. It does nothing to exculpate Crea of any crimes, let alone the separate murder of Michael Meldish that occurred more than twenty years later.[7]

In arguing that the Spinelli Notes are exculpatory, Crea claims the "only logical interpretation" of the statement "Vic ordered murder of Pete Chiodo" is that "Casso was not

---

[7] Crea seems to concede as much, noting the "decades-old attempted murders were not even subject to the actual charges at issue here." (Mot. 30-31).

involved." (Mot. 27). But why? There is nothing logical about adding words to the notes that do not appear in the Notes. The Notes are unambiguous. They should be read, not interpreted. And a plain reading of the Notes is that Amuso ordered the murder. Not that Casso was not involved. By way of example, no one would "logical[ly] interpret" the statement "the general ordered an attack" to mean the general's deputy was not involved in passing the order to the troops just because his or her name was not specifically mentioned in the sentence. The same is true here.

The trial transcript offers another example. During cross-examination of Spinelli, Madonna's attorney asked a few questions about the Capozzalo murder, although none about the apparent lack of involvement of the then-Underboss. At one point, counsel asked, "when you got that order from Vic, Matty wasn't the Boss." (Tr. 2046:11-12). Spinelli, of course, did not get the order *directly from* Amuso. As Spinelli testified, Richard Pagliarulo, the Captain, passed the order to his brother, and his brother passed the order to him. (Tr. 1734:23-1735:1). But everyone knew what counsel meant by the question.

Perhaps recognizing that the Notes do not bear the weight Crea has placed on them, Crea speculates that the "prosecutor surely would have asked" if Casso was involved and "would have taken note of it had Spinelli indicated that he was." (Mot. 27). Crea's argument seems to be that the Court should infer Casso's lack of involvement from the fact that his name does not appear in this specific line of the notes. But here Crea has it backwards. The Government would have taken note *if* Spinelli had said that Casso was *not* involved in the murder, not the other way around. A statement that Casso was not involved in the Chiodo murder (which Spinelli never said) would have been inconsistent with Spinelli's prior statements on the Chiodo murder, which were documented in Spinelli's § 3500 material. (Rothman Decl. Ex. B at 4). Because that statement

20

would have been exculpatory or at least helpful to Crea, the Government would have turned it over. The absence in the notes proves that Spinelli never said what Crea speculates he said.[8]

Nor is there any reason to think the Government would have asked Spinelli about Casso's involvement in the Chiodo murder. The brief morning meeting with Spinelli was not about the Chiodo murder, which did not come up at trial. Instead, the Notes reflect an attempt by the prosecutor to better understand Spinelli's testimony from the prior day about the attempted murder of Chiodo's sister, Patricia Capozzalo. Even a cursory review of the Notes proves the point. The notes end with the conclusion—that Casso was not involved in the Capozzalo murder plot because "Gaspipe still on the lam in 1992."[9] The other three notes of the page reflect background for this conclusion: First, that "Vic & Gaspipe on the lam in '91 when Pete got shot." Second, that Amuso (who was with Gaspipe on the lam) had "ordered the murder of Pete Chiodo." Third, that there was "disarray in admin family @ time" after Amuso, the Boss of the Family, had been arrested.[10] And finally, the conclusion that, when Amuso ordered the murder of Capozzalo in 1992, he did so

---

[8] Nor do the notes say, as Crea claims, that "Spinelli had stated that the order came directly from Amuso *because* there was 'disarray in family @ time.'" (Mot. 27 (emphasis added)). The Notes do not include the word "directly." Nor do they draw a causal link between Amuso giving the order to kill Chiodo and there being "disarray in family." Nor was there one.

[9] The Government then elicited this testimony at trial. (Tr. 1802:22-24). Crea has not raised a *Brady* claim on the basis of this statement. Nor could he as the information was not suppressed. *See United States v. Barcelo*, 628 F. App'x 36, 39 (2d Cir. 2015) ("[E]vidence is not suppressed for *Brady* purposes if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.") (cleaned up).

[10] It was no secret that Amuso was arrested first and before the attempted murder of Capozzalo, leaving Casso "on the run" by himself. *See* https://en.wikipedia.org/wiki/Victor_Amuso ("On July 29, 1991, FBI agents captured Amuso at a suburban mall [while] Casso managed to remain free for two more years until he himself was apprehended in 1993.") (last visited Apr. 21, 2026).

without Casso because Amuso had been arrested and "Gaspipe [was] still on the lam in 1992." (Rothman Decl. Ex. A).

Finally, on this point, it bears mention that Crea has seemingly conflated the different prongs of the *Brady* analysis. (Mot. 25-37). Crea argues the Spinelli Notes are "material" (Mot. 25-33) and then argues they are "prejudicial." (Mot. 33-37). But information is material if its suppression by the Government was prejudicial. *See Hunter*, 32 F.4th at 31 ("To establish 'materiality,' a defendant must show that he was prejudiced by the prosecution's failure to disclose."). Before getting to the question of prejudice (or materiality), Crea first must establish the Notes are favorable. For the reasons set forth above, he cannot make this showing, and the motion should be denied.[11]

Because the Notes are not exculpatory, or otherwise favorable, Crea's *Brady* claim should be denied.

### 4. Crea Cannot Show Prejudice

Even if the Court were to disagree and find the Spinelli Notes are exculpatory or, at a minimum, ambiguous in their meaning, Crea's *Brady* claim still fails because Crea cannot

---

[11] Crea complains that the Government sought reconsideration of the Court's *in limine* ruling on the Evangelista statement "only three days" after the Spinelli Notes were taken, and suggests the Government "us[ed] the information as a sword in any effort to admit the Evangelista testimony while using it as a shield to prevent the defense from learning of the order to commit a second murder." (Mot. 13, 31). Crea is wrong. As set forth above, the Notes do not say what Crea claims. In any event, the Government's renewed motion to admit the Evangelista statement was not based exclusively, or even principally, on chain of command testimony from Special Agent Carillo or Spinelli. The Government began its letter seeking reconsideration by citing to the Datello recording (GX 702A) and Spinelli testimony that "this guy just clipped a guy because of a $100,000" was a reference to "Crea." (Dkt. 873 at 4). Notably, when Spinelli was asked "why do you believe that," he responded that Datello had "said 'this guy' [and] he was going to see him directly, and I know he wasn't seeing Matty. He told me he wasn't seeing Matty." (Dkt. 873 at 4). Thus, Spinelli's testimony on this point had little to do with the chain of command.

22

demonstrate prejudice. Crea's arguments are but a rehashing of prior arguments raised and rejected by this Court and, more recently, by the Second Circuit. Given the strength of the Government's evidence, the minimal (if any) probative value of the purportedly undisclosed material, and the Court's *Pinkerton* charge, there is no "reasonable probability that the suppressed evidence would have produced a different result." *United States v. Barcelo*, 628 F. App'x 36, 39 (2d Cir. 2015). At most, the Spinelli Notes provide marginal additional impeachment evidence of Special Agent Carillo and Spinelli but that is not a basis for habeas relief.

Crea's motion depends on yet another flawed premise; that there was "little to no direct evidence implicating" him in the violent crimes for which he was charged. (Mot. 8). He is wrong. The Government presented significant evidence, both direct and circumstantial, of Crea's involvement in the Meldish murder and other acts of violence. (*See* Dkt. 949 (summarizing Government's proof in opposing Crea's Rule 29 motion)). Crea has repeatedly raised some version of this argument in seeking to overturn his conviction, and courts continue to reject it. This Court denied Crea's Rule 29 motion on this basis shortly after trial. (Dkt. 1063 at 19). And the Circuit rejected Crea's challenge to the sufficiency of the evidence on similar grounds. *Londonio*, 2024 WL 3770712, at *2. Thus, despite Crea's repeated claims that the evidence against him was "minimal," the trial proof was to the contrary.

Equally flawed is Crea's rehashed argument that the Government's "chain of command" evidence was "the central basis of the prosecution theory of trial." (Mot. 9, 25). It was not. In his second Rule 33 motion, Crea argued that the Government relied on an "indispensable theory" that the approval of Madonna and Crea was a "prerequisite" to the Meldish murder. (Dkt. 1214 at 61). This Court rejected this argument. (*See* 6/13/22 Tr. at 18 ("[T]he Government never argued that every mob-related murder comes down the chain of command"); *id.* at 18 ("The jury was already

23

aware that unauthorized hits take place, and mob rules are often broken."). Crea appealed the Court's decision, and the Second Circuit affirmed for the same reason. *Londonio*, 2024 WL 3770712, at *7.

In an attempt to avoid these prior rulings by the Court and Second Circuit, Crea submits affidavits from his trial attorneys, Mr. Franklin and Mr. DiPietro, in which both attorneys claim they would have used the Spinelli Notes "on cross-examination and in jury argument." (Dkt. 1330-8, Dkt. 1330-9; *see* Mot. 24 ("it is beyond imagination that defense counsel would have avoided cross-examining on the topic had they been independently aware of the information contained in the undisclosed notes")). Mr. Franklin even claims he would have tried to "recall [] expert witness Carillo" based on this information. (Dkt. 1330-9). The Court need not credit these self-serving claims, *see Puglisi*, 586 F.3d at 214, and there is good reason to doubt them. As Crea acknowledges, Spinelli testified at trial about the murder plot of Patricia Capozzalo in which he recalled, for the first time on the witness stand, that the underboss was not involved. (Tr. 1733-35, 1738, 1802-03). This testimony—of a murder apparently happening without involvement of the underboss—was available to Crea's trial attorneys and yet, Crea's attorneys did nothing with the testimony at trial. Counsel did not cross-examine Spinelli on this testimony. (Tr. 2007-043).[12] Counsel did not ask to recall Special Agent Carillo. Counsel did not even mention Spinelli's

---

[12] Crea claims that "defense counsel briefly cross-examined Spinelli on the attempted murder of Capozzolo." (Mot. 23 (citing Tr. 2043-44)). That is misleading. The transcript citation is to cross-examination conducted by counsel for Madonna, who at no point asked Spinelli about Casso's lack of involvement in the murder plot (for obvious reasons). Instead, counsel used the incident to elicit that the attempted murder of Capozzolo was another instance of Mafia rules being broken (Tr. 2043-44), and that "[n]o one in this room had anything to do with" that attempted murder, (Tr. 2047).

24

testimony on this point in summation. (Tr. 4454-522). And so there is good reason to doubt counsel's claims that they would have used the Spinelli Notes at trial.

In response, Crea argues that counsel did not draw the jury's attention to the Capozzalo incident because "a single exception [] likely could be explained away by the prosecution as the exception that proves the rule" but "more than one exception [] would instead cast serious doubt on the very existence of the purported rule." (Mot. 27). The trial record proves otherwise. As the Court previously found, the trial record was replete with examples of Mafia rules being broken. (Tr. 1133-46, 1505, 1633, 4449-50, 4459-60). And, when it was helpful to their defense, counsel, including Crea's counsel, were not shy about drawing the jury's attention to these broken rules. (Tr. 4459). Crea could have easily added the Capozzalo attempted murder to the list of examples of broken rules, if the incident mattered in the slightest. That Crea did not, proves it did not.

But even if the Court were to credit Crea's claims that his counsel would have used this information at trial (and it should not), the question for the Court is not whether any particular evidence would have been "possibly useful to the defense," *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998), but whether the evidence "undermines confidence in the outcome of the trial.'" *Coppa*, 267 F.3d at 141. Here, it does not. Crea argues the Spinelli Notes would have allowed them to attack Special Agent Carillo's testimony. But Special Agent Carillo was impeached—or at least the defense tried to impeach him—by asking questions about mob protocol and broken rules. (Tr. 4459 (summarizing Carillo's testimony as "he described for you the rules of La Cosa Nostra, the Mafia. And then in the same breath he tells you that, and he admits that the rules are constantly broken.")). The same was true for Spinelli who was impeached on his bias against Madonna and Crea. (Tr. 2007-08) The additional impeachment from the Spinelli Notes is therefore properly viewed as cumulative and not material. *See United States v. Persico*, 645 F.3d

25

85, 111 (2d Cir. 2011) ("[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or is subject to extensive attack by reason of other evidence, the undisclosed evidence may properly be viewed as cumulative, and hence not material, and not worthy of a new trial.").

Because neither Carillo nor Spinelli were the "only evidence" linking Crea to the Meldish murder, *see Avellino*, 136 F.3d at 256, any additional impeachment from the Spinelli Notes does not entitle Crea to relief. Perhaps anticipating this outcome, Crea claims that Carillo's testimony was "central to the case against" him. (Mot. 9, 28). In support, Crea points to the Government's opening statement, in which the Government previewed that the jury would "hear from an expert in organized crime," and the fact that Carillo testified "[e]arly in the Government's case." (Mot. 28). But Crea's snippet of the Government's opening statement presents a misleading picture of how the Government previewed its case to the jury. On the very next page, which Crea fails to quote, the Government ticked through several categories of evidence that would prove Madonna and Crea had ordered the murder, including "surveillance photos, [] recordings, [] the testimony of insiders proving that Madonna and Crea ran" the Family, and a recording of Datello that he "owed Crea a big debt" and was "scared of ending up just like Meldish. He says it plainly, this guy just clipped a guy for $100,000" (Tr. 577). That evidence was far more probative of Crea's involvement in the murder than Special Agent Carillo's background testimony. And Carillo's placement "[e]arly in the Government's case" reflects only the Government's assessment that it would be helpful for the jury to learn background information on the Mafia before hearing from cooperators who were associated with the Mafia, not that Carillo was "central" to the case.

Crea also claims—without a shred of support in the record—that the Government's "failure to disclose the Spinelli notes was intentionally done for tactical advantage." (Mot. 3, 32). That is

26

false, and the Court should reject the baseless accusation. If anything, the record demonstrates that the Government tried to be careful, and at no point attempted to mislead the Court or the defendants. (Mot. 13, 51). Again, the Government is not asking the Court to make any factual findings on the question of suppression, but notes the following: upon noticing that Spinelli's testimony on the Capozzalo attempted murder was different than his § 3500 material (in a way that inured to Crea's benefit), the assigned prosecutor spoke with the witness the following morning to ensure his testimony was accurate before he returned to the witness stand. The prosecutor then memorialized the substance of the meeting in the Spinelli Notes, and consistent with the prosecutor's practice, would have made a copy of the notes in order to hand them to defense counsel that morning. The prosecutor then elicited testimony that was helpful to Crea—that "Gaspipe [was] on the lam" and not involved in ordering the Capozzalo murder—at trial. And finally, when a paralegal, while boxing records for storage, noticed a small number of notes that may not have been produced, the prosecutors, after reviewing the notes, produced the notes to the defense on their own initiative. Nothing about this, or any other conduct, reflects bad faith or intentional misconduct by the Government.[13]

Finally, even if the Notes so meaningfully called into question the Government's proof of Crea's direct involvement in the Meldish murder (they do not), Crea is still not entitled to relief

---

[13] Crea's reliance on *United States v. Jackson*, 780 F.2d 1305, 1311 (7th Cir. 1986), is misplaced. (Mot. 33). There, the Government failed to disclose an employment relationship between a cooperating witness and an oil company that was known to the case agent but not the prosecutors. Even so, the Seventh Circuit affirmed the conviction finding the undisclosed information was immaterial. The defendant asked the Court to consider the "bad faith" on the part of the Government in assessing materiality, but the Court held that only "in cases where the materiality of the evidence has not been conclusively determined, we will look to the bad faith of the government, if it exists, to assist our judgment." *Id.* at 1311. *Jackson* is not binding on this court but, even if it were, the case is inapplicable because, first, the Court can find conclusively that the Spinelli Notes are immaterial, and second, the Government did not act in "bad faith."

because his convictions and life sentences on Counts Three and Seven, where the Court instructed on *Pinkerton*, and which the Circuit affirmed, would be unaffected. *See Londonio*, 2024 WL 3770712 at *6 (affirming *Pinkerton* jury instruction); *see United States v. Gershman*, 31 F.4th 80, 99 (2d Cir. 2022) (*Pinkerton* "informs the jury that it may find a defendant guilty of a substantive offense that he did not personally commit if it was committed by a coconspirator in furtherance of the conspiracy, and if commission of that offense was a reasonably foreseeable consequence of the conspiratorial agreement."). This Court already recognized the interplay between Crea's post-trial challenges on the Meldish murder and the Court's *Pinkerton* instruction in denying Crea's Rule 29 motion. (*See* Dkt. 1063 at 19 ("And again, because *Pinkerton* was charged here, even if Crea's involvement in the murder plot was to advise against it, of which there's no evidence, that would still be enough to convict.")). Because two valid consecutive life sentences would remain regardless of any impact the Spinelli Notes might have on Count Two (the conspiracy count), the defendant is not entitled to relief. *See Kassir v. United States*, 3 F.4th 556, 569 (2d Cir. 2021) ("[A]bsent a showing of prejudice with respect to custody, a court proceeding under § 2255 retains discretion to decline to consider such a challenge."); *United States v. Rodriguez*, No. 05 Cr. 960 (JPO), 2022 WL 158685, at *2 (S.D.N.Y. Jan. 18, 2022) (declining to consider Section 2255 motion where the defendant "would still be subject to a fifty-year term of imprisonment for [his] conviction" even if one count was vacated).

## C. There Is No Violation Under *Napue* Based on the Spinelli Notes

Crea next argues that the Spinelli Notes reveal that Special Agent Carillo committed perjury, and that this testimony, along with the Government's failure to correct Special Agent Carillo's testimony, entitles Crea to habeas relief under *Napue v. Illinois*. (Mot. 2). That argument

fails because Crea cannot show that Special Agent Carillo perjured himself, or that the perjury he alleges meets the standard to vacate his conviction.

Crea appears to identify two lines in Special Agent Carillo's testimony that he claims to be perjurious. (Mot. 2, 29-30), First, when asked "are you familiar with any murder that was sanctioned by the administration by the boss that did not involve the administration," and Carillo said, "Not to my knowledge, no." (Tr. 1020-21). And second, when asked "[i]n the case of a murder ordered by the boss, have you ever heard of an instance where the underboss was not also involved?" and Special Agent Carillo said, "No, I haven't." (Tr. 1216). But Crea has failed to establish that either of these lines was perjurious.

*First*, Special Agent Carillo testified that he was not "familiar" with and "ha[d]n't" heard of an instance in which the underboss was not involved in the case of a murder ordered by the boss. He did not testify that no such instance had ever occurred. Thus, even reading the Spinelli Notes in the manner that Crea urges, the notes do not make Special Agent Carillo's testimony perjurious because they do not establish that Special Agent Carillo knew about this incident, and there was nothing for the Government to correct.

*Second*, and relatedly, there is no reason to conclude that Special Agent Carillo would have been aware of the notes or testimony from Spinelli. Special Agent Carillo testified on October 10, and October 11, 2019. Spinelli did not begin testifying until October 16, 2019. The meeting that gave rise to the Spinelli Notes did not take place until the next morning, October 17, 2019. Carillo did not attend that meeting, as the Government previously informed the defense. Nor would it have mattered if he did because the meeting post-dated his testimony. Crea claims that Special Agent Carillo's testimony was based on Spinelli's pretrial proffer statements. (Mot. 13). But that claim is contradicted by the trial record. Special Agent Carillo was asked on cross-examination if he "sat

29

on proffers with Mr. Spinelli, correct?" and Special Agent Carillo responded that he had met Spinelli but had not attended any "proffers." (Tr. 1194).

*Third*, even if Special Agent Carillo's testimony were perjurious (and it is not), Crea cannot establish prejudice. For all the reasons set forth above, there is no reasonable likelihood that the purportedly false testimony would have affected the judgment of the jury. This claim should be rejected.[14]

### D.  There Is No *Brady* Violation Based on the Richard Letter

Crea next moves to vacate his conviction based on undisclosed benefits he claims the Government provided to trial witness Sean Richard in exchange for his testimony, as set forth in the Richard Letter. For the reasons set forth below, Crea's motion based on the Richard Letter should be denied.

---

[14] Crea also should be barred from raising this argument because it is procedurally defaulted; he could have (but did not) raise the same baseless perjury claim before the Court or on appeal based on Spinelli's trial testimony about the Capozzalo attempted murder. *See United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011) ("In general, a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal." (citations omitted)). If an issue could have been raised on direct appeal and was not, a habeas petition is not a substitute remedy for raising that issue. *See Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." (citations and internal quotation marks omitted)). The crux of Crea's argument is that Special Agent Carillo's testimony was false because the Government knew of an occasion (from the Spinelli Notes) in which a murder was ordered without the underboss's involvement, contrary to Carillo's testimony. But Crea had this argument available to him at trial based on Spinelli's other testimony, and yet chose not to raise it, either during or after. The late disclosure of the Spinelli Notes does not create "cause" to excuse the procedural default because the argument existed with the one instance that came out at trial.

### 1. Relevant Facts

The Richard Letter is an unsworn and unsigned letter purportedly sent by Sean Richard to Crea on November 18, 2023. (Dkt. 1330-3). In relevant part, the Richard Letter includes the following information:

> Why I am doing this? I'll start with the following. When they contacted me and said they wanted me to testify against you. I told them no! That prick Scotten told me he would force me to under subpoena. They also promised me a new identity. Unfortunately I needed help because, amongst other things, I was trying to get my wife a green card. Which they said they would help me with.

> Then they didn't. They beat me! Those upstanding Americans. No identity. My wife had to leave the country. That disease Otto fucked me over. Wouldn't answer the phone after I testified, acted like I didn't exist.

(Dkt. 1330-3).[15]

On February 2, 2024, Crea's trial counsel, Mr. DiPietro, emailed the Government a written demand that it produce "all outstanding discovery concerning cooperating witness Sean Richard," and enclosed a copy of the Richard Letter. (Dkt. 1330-10). On February 13, 2024, the Government responded by email that "[w]e are not aware of any unproduced, discoverable material with respect to Sean Richard." (Dkt. 1330-10).

Richard's § 3500 materials reflect that Richard contacted the Government seeking help in obtaining a new identity. On October 29, 2018, Richard sent an email to then U.S. Attorney Geoffrey Berman in which he described his concerns that members of the Luchese Family would kill him and wrote, among other things, "I therefore implore you to assist me with the acquisition of a new identity." (Rothman Decl. Ex. D). On November 2, 2018, a *New York Times* reporter contacted the Government to share that "Richard believes there are people trying to kill him" and

---

[15] The Richard Letter also claims, in conclusory fashion, "I have a lot of information, proof of Prosecutorial Misconduct. Especially on that cocksucker Ted Otto." (Dkt. 1330-3). The Letter offers no specifics, however, and this assertion does not give rise to a *Brady* claim either.

that "Richard told [the reporter] there have been threats to his sister and other family members via text messages." (Rothman Decl. Ex. E). Notes from his first meeting with the FBI reflect that Richard was "able to testify. Clear memory of events." (Rothman Decl. Ex. F). And in February 15, 2019, after the Government had counsel appointed for Richard, Richard's appointed attorney, James Neuman, Esq., reported that Richard had "[n]o legal concerns. Has some safety concerns and may want help with a new identity." (Rothman Decl. Ex. G). The Government produced all of these materials to Crea in advance of trial.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████.[16]

### 2. There Were No Benefits Promised to Richard

As an initial matter, Crea's *Brady* motion should be denied because the Government did not promise Richard any benefits in exchange for his testimony, as his contemporaneous § 3500 material and sworn trial testimony confirm. At trial, Richard testified, under oath, that he did not expect to receive any benefits in connection with his testimony. (Tr. 2760-62 ("Q: Do you expect to receive any benefit for your testimony today? A. None whatsoever.")). Richard did not have a cooperation agreement with the Government, and Crea has not meaningfully argued otherwise.[17] The § 3500 materials for Richard reflect that Richard reached out to the Government out of fear for his safety, and asked the Government for help "with the acquisition of a new identity."

---

[16] FBI Special Agent Ted Otto, now retired, has informed the Government that, ████████████ ████████████████████████, the FBI provided Richard with a $25,000 stipend to assist with relocation costs. That stipend cannot give rise to a *Brady* claim because it happened years after Richard testified and would only be impeachment material had it been promised in advance of his testimony, which it was not.

[17] Crea refers to Richard as a "cooperating witness" (Mot. 37), but not even the Richard Letter claims that Richard had a cooperation agreement with the Government. And he did not.

(Rothman Decl. Ex. D). At most, the FBI informed Richard that it ███████████████ ████████████████ and after trial, it did. That the FBI would ██████████ for Richard is not a benefit, or favorable information, that could have been used to impeach Richard.[18]

There is no credible support for the claims in the Richard Letter that the Government "coerced" Richard into testifying or promised him a new identity and help with his wife's green card. (Mot. 41). The Richard Letter, and its self-serving attacks on the Government, are belied by the record. The § 3500 materials demonstrate that it was Richard who reached out to the Government. (Rothman Decl. Ex. D). And far from being coerced into testifying, notes from what appear to be his first meeting with the Government reflect that he was "able to testify." (Rothman Decl. Ex. F). At most, the so-called "coercion" that Crea cites to is a threat to subpoena the witness if he did not cooperate, which is a routine law enforcement mechanism to secure a witness's testimony, and which is no worse of an outcome than he was offering to do anyway. Thereafter, Richard was represented by counsel, who advocated on his behalf. (Rothman Decl. Ex. G). Moreover, even Richard's claim about what happened after he testified are false; Richard alleges the FBI "wouldn't answer the phone," but the ███████████████████████████. Where, as here, the claims are so contrary to the facts in the record, the Court can, and should, dismiss

---

[18] Among other things, ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████.

them out of hand. *See Puglisi*, 586 F.3d at 214 (court "need not assume the credibility of factual assertions [] where the assertions are contradicted by the record in the underlying proceeding").

Courts routinely view with suspicion, and reject, unsworn, self-serving witness recantations and allegations of prosecutorial misconduct, similar to those set forth in the Richard Letter. *See, e.g.*, *Haouari v. United States*, 510 F.3d 350, 353 (2d Cir. 2007) ("It is axiomatic that witness recantations must be looked upon with the utmost suspicion."); *United States v. DiPaolo*, 835 F.2d 46, 50 (2d Cir. 1987) ("Even if [the witness's] recantation clearly disputed her trial testimony, its credibility is doubtful because the transcription of the taped interview was never initialed, signed, or sworn to by [the witness]."); *Thomas v. United States*, No. 04 Cr. 801 (PKC), 2018 WL 4006785, at *2 (S.D.N.Y. Mar. 9, 2018), *aff'd*, No. 18-3697-PR, 2022 WL 2446301 (2d Cir. July 6, 2022), and *aff'd*, No. 18-3697-PR, 2022 WL 2446301 (2d Cir. July 6, 2022) (denying 2255 claim based on unsworn affidavits that were "general, vague and unsupported by any evidence"); *United States v. Nkansah*, No. 08 Cr. 1234 (JSR), 2024 WL 3330226, at *4 (S.D.N.Y. July 3, 2024) (denying coram nobis petition where defendant submitted affidavit from trial witness recanting testimony and finding that "[i]t is not credible that 'everything' [witness] said at trial was made up as part of a scheme concocted by the prosecutors."), *aff'd Nkansah v. United States*, No. 24-2336, 2025 WL 2682552, at *1 (2d Cir. Sept. 19, 2025); *Baldeo v. United States*, No. 17 Civ. 01692 (JLR), 2025 WL 3073997, at *2 (S.D.N.Y. Nov. 3, 2025) (denying writ for audita querela and finding "insufficient" a report from a PI firm "submitted inexplicably nearly seven years after [the defendant] left prison" that claimed the defendant "at no time did he ever approach anyone to lie on his behalf to anyone, or try to obstruct the case or intimidate or threaten anyone, or otherwise"); *Murray v. United States*, 704 F.3d 23, 33 (1st Cir. 2013) (denying *coram nobis* application, in part, because the petition was based on the "thoroughly improbable theory that the

34

FBI agents lied about everything in [the petitioner's] case" and not just about how they knew about a specific location relevant in the petitioner's case). The Court should do the same here.

### 3.  Evidence of Any Purported Benefits Was Not Suppressed

Even if the Court were to find that the Government did not fully disclose its intention to ████████████████████████████████, where he would get a new identity, Crea is not entitled to relief because he knew, or should have known, of the "essential facts" to take advantage of this information. Richard's desire for a new identity was all over his § 3500 material. (Rothman Decl. Exs. D, E, G). Richard also testified that he did not feel safe in the New York and New Jersey area because of "past events that have threatened [his] life." (Tr. 2683). And Richard had previously been in witness protection, a fact about which he also testified. (Tr. 2785). Crea could have easily inferred that Richard would wish to enter some form of witness protection after trial and could have asked about those plans and any promises from the Government. For the same reasons that the Court rejected Crea's Rule 33 motion based on the Government's purported failure to disclose the transfer of cooperating witness David Evangelista to Orange County Jail (which, the Court found was "easily inferable" from the materials provided, (6/13/22 Tr. at 32-33)), the Court should reject Crea's feigned ignorance and attempt to cast this information as *Brady* material. *See United States v. Restrepo*, 547 F. App'x 34, 43 (2d Cir. 2013) ("Evidence is not 'suppressed' for *Brady* purposes if the defendant "'either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.'" (quoting *DiSimone*, 461 F.3d at 197)); *Leroy*, 687 F.2d at 619 (same).

In arguing otherwise, Crea claims that the Government "has not contested that it possessed the information and that it did not disclose the information to the defendant." (Mot. 42). There is no support for that argument. In fact, all Crea can cite for this baseless claim is the Government's response to counsel's February 2, 2024 demand, in which the Government wrote "[w]e are not

35

aware of any unproduced, discoverable material with respect to Sean Richard." (Dkt. 1330-10). But nothing about that response concedes suppression, and for the reasons set forth above, there was none.

### 4. Crea Cannot Show Prejudice

Even if Crea could show that the Government somehow suppressed favorable information relating to purported benefits promised to Richard in exchange for his testimony, Crea's *Brady* claim still fails because this information, even if credited, would not "undermine[] confidence in the outcome of the trial." *Coppa*, 267 F.3d at 141.

*First*, Richard did not supply "the only evidence linking [Crea] to the crime." *Zhang*, 135 F.4th at 53. At best, Richard was a peripheral witness, as Crea himself argued at trial. (Tr. 2721-29; Tr. 2788 (Q: "December 5th, 1999. Anything you've told this jury is prior to that, correct?" A: "Yes, sir, that's correct."); Tr. 4515 ("Sean Richard, last saw him December '99")).[19] His testimony largely corroborated the testimony of other witnesses who had more recent information on Crea. (Tr. 2717-20, 2730-35, 2742-48). Crea argues that Richard's testimony was "significan[t]" because the Government mentioned his name four times in a multi-hour summation, (Mot. 46), and cited his testimony on appeal (Mot. 47). But Crea's citation to the Government's appellee brief proves him wrong. Crea quotes a portion of the brief that identifies a "laundry list of evidence showing that joining the Mafia involved an agreement to commit the predicate act of murder," and includes Richard's testimony on that list. (Mot. 47 (citing 20-2479, Dkt. 318 at 116-

---

[19] At Crea's request, the Court instructed the jury that Richard's testimony "is background, but it's no substitute for evidence of the particular crimes charged in the particular time frame in the indictment." (Tr. 2730).

17)). But a "laundry list" necessarily implies more than one piece of evidence, and Crea cannot credibly argue that Richard supplied the only evidence linking Crea to the crimes. He did not.

*Second*, and for all the reasons set forth above, there was overwhelming other evidence of Crea's guilt, which both this Court and the Second Circuit recognized in denying Crea's various motions for relief following his conviction. (*See supra* Background at C, D, and E; § I.B.4).

*Third*, at most, evidence of the benefits purportedly promised to Richard would be marginal additional impeachment for which there is no reasonable likelihood that they would have affected the judgment of the jury. *See Barcelo*, 628 F. App'x at 39. For this reason, courts routinely deny habeas motions based on claims of undisclosed minor benefits to witnesses, especially when those benefits relate to relocation or other safety concerns. *See, e.g.*, *Ramirez v. Keyser*, No. 20 Civ. 8445 (KMK), 2024 WL 1076945, at *7 (S.D.N.Y. Mar. 12, 2024) (denying habeas petition, even assuming prosecutors had failed to disclose payments to witness's mother for relocation, because payments were not material where, among other things, counsel conducted a "limited examination of" the witness and the witness's "testimony was just one piece in the large trove of evidence at trial"); *Taylor v. Capra*, 412 F. Supp. 3d 126, 139 (E.D.N.Y. 2019) (denying habeas petition where prosecutors failed to disclose efforts to assist the relocation of a witness); *Penick v. Filion*, 144 F. Supp. 2d 145, 158 (E.D.N.Y. 2001) ("the failure to disclose the routine benefits provided to Singletary after he had been shot in the head, possibly in retaliation for his grand jury testimony in this case, are not material for *Brady* purposes); *Hernandez v. Senkowski*, No. 93 Civ. 5763 (FB), 1996 WL 285426, at *2 (E.D.N.Y. May 17, 1996) ("The undisclosed material, revealing routine benefits provided to a witness whose life was endangered by testifying, when evaluated collectively, under the totality of the circumstances, falls far short of placing the case 'in such a different light as to undermine confidence in the verdict.'"); *Johnston v. Love*, 940 F. Supp. 738,

37

765-66 (E.D. Pa. 1996) (holding that failure to disclose that Government secured release of cooperating witness conditioned on provision of testimony did not justify a new trial because, "disclosure could not, without any reasonable likelihood, have affected the judgment of the jury").

Crea cites a handful of cases, which he claims stand for the proposition that evidence of benefits afforded to witnesses, including in the immigration context, can serve as motivation for a witness to testify in a particular way. (Mot. 43-45). That general statement may be true but does little to advance the ball; none of the case cited bear any semblance to the facts here. *See United States v. Williams*, 81 F.3d 1434, 1438 (7th Cir. 1996) (where government failed to disclose that it "gave presents to the witnesses, allowed them the free use of telephones to make long-distance calls for themselves, allowed conjugal visits [] and even threw parties for the witnesses," court upheld decision that benefits would not have affected the outcome, although reversed on other grounds); *Banks v. United States*, 920 F. Supp. 688, 692 (E.D. Va. 1996) (guilty plea vacated where government failed to disclose benefits of conjugal visits provided); *United States v. Escobar*, No. 24 Cr. 101 (JFB), 2024 WL 923591, at *9 (E.D.N.Y. Mar. 4, 2024) (finding belated disclosure of notes of a non-testifying witness were immaterial where they "merely furnishe[d] an additional basis on which to impeach a witness whose credibility has already been shown to be questionable");[20] *Bin Laden*, 397 F. Supp. 2d at 518 (denying motion for a new trial where government failed to disclose recordings of cooperating witness in WitSec because "none of the

---

[20] The court in *Escobar* listed all the ways a cooperating witness had been impeached, including his gang membership, prior murders, drug use, lies to law enforcement, and that he was testifying pursuant to a cooperation agreement "with the hope of receiving a letter from the government under [Section] 5K1.1, as well as immigration benefits and a recommendation for the Witness Security Program." 2024 WL 923591, at *9. But nothing about the decision suggests the potential immigration benefits or a recommendation for ▇▇▇▇ were the impeachment the court had in mind, as compared to the witness's cooperation agreement, which was cited in the same sentence. *Id.*

undisclosed material is powerful enough to displace the Government's other evidence of El-Hage's guilt").[21]

Finally, the Court should reject Crea's claim that he would have used the information in the Richard Letter, not only to impeach Richard, but "to materially impeach the integrity [of] the investigation, to support [] the defense motion to compel Agent Otto's testimony, and to subject Otto to questioning about his investigative practices in this and related matters." (Mot. 50). The Court correctly precluded these lines of questioning at trial. (Tr. 2831-42). And nothing about the Richard Letter would have opened the door to this type of "free-floating general shoddy investigation defense with no connection to the proof." (Tr. 2837). The argument was improper then, and it remains improper now. The motion should be denied.

## II. The Court Should Not Reconsider Its Prior Ruling on the Rule 33 Motion

In a throwaway argument, Crea asks the Court to reconsider its prior ruling on Crea's Rule 33 motion, and specifically, its decision not to hold an evidentiary hearing regarding the Evangelista prison recordings. (Mot. 51-52). The Court should decline to do so.

Crea argues that the Court "accepted unsworn representations from the same trial prosecutor who now is known to have suppressed the Spinelli notes and directly engaged in misleading motion practice before the Court." (Mot. 52). But the factual record does not support Crea's baseless accusations of misconduct. As explained above, there is not a shred of evidence in the record to reflect intentional misconduct or misleading of the Court by the Government. Moreover, as before, Crea has failed to offer any evidence to contradict the Government's claim

---

[21] Crea quotes *Bin Laden* for the line, "I have no doubt that the most valuable 3500 Material contained in the videoconferences is al-Fadl's statement arguably suggesting that he fears a quid pro quo may exist between his testimony and his immigration status in the United States." (Mot. 43 (citing *Bin Laden*, 397 F. Supp. 2d at 506)). But the Richard Letter (even accepting it as true) does not allege a quid pro quo, and in any event, the court in *Bin Laden* denied the motion.

that it did not know of or possess the jail calls until after trial, a decision the Second Circuit has since upheld on appeal. *Londonio*, 2024 WL 3770712, at *7 n.7 (holding "[t]he district court correctly concluded there was no *Brady* violation with respect to [] the recorded prison calls which were not in the government's possession at the time of trial."). The Court correctly exercised its discretion not to hold an evidentiary hearing at the time, and there is no basis—more than three years later—to reconsider that decision.

### III. A Hearing Is Unnecessary and Unwarranted

The defendant argues his motion should be granted on the papers but were the Court to "determine that additional factfinding is warranted to uncover the circumstances surrounding the late disclosure," the Court should order a hearing. (Mot. 53). The Court should deny the request for a hearing.

The present record, as supplemented by the Government's brief and supplemental materials, "conclusively shows" that Crea is "entitled to no relief." 28 U.S.C. § 2255; *see Chang*, 250 F.3d at 86. There is simply no "reasonable probability" that the evidence Crea alleges was suppressed "undermines confidence in the outcome of the trial." *Coppa*, 267 F.3d at 141. The motion should be denied.

**CONCLUSION**

For the foregoing reasons, this Court should deny Crea's motion to vacate his conviction and order a new trial without a hearing. Because the defendant has not made a substantial showing of the denial of a constitutional right, no certificate of appealability should issue.

Dated: White Plains, New York
      April 21, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney
for the Southern District of New York

By:      _Alexandra Rothman_

Alexandra Rothman
Assistant United States Attorney
Tel: (212) 637-2580

41