```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
STEVEN CREA,                              :
                                          :
                    Petitioner,           :
                                          :   26 CV. 1991 (CS)
           - against -                    :   (17 CR 89 (CS))
                                          :
UNITED STATES OF AMERICA,                 :
                                          :
                    Respondent.           :
------------------------------------------X
```

### REPLY IN SUPPORT OF PETITIONER'S MOTION TO VACATE CONVICTION UNDER 28 U.S.C. § 2255

The Government's opposition fails on its face because it rests upon the trial prosecutor's unsworn factual assertions concerning what the suppressed notes from the Government's mid-testimony debriefing of cooperating witness Robert Spinelli purportedly mean, and whether undisclosed benefits were provided to Sean Richard in exchange for his testimony. But such unsworn assertions are not evidence and cannot defeat a facially plausible habeas claim. See Kulhawik v. Holder, 571 F.3d 296, 298 (2d Cir. 2009) ("[A]n attorney's unsworn statements in a brief are not evidence."); United States v. White, 366 F.3d 291, 300-01 (4th Cir. 2004) ("The Government's claimed entitlement to summary judgment rests largely on its repeated contention in court submissions that it did not orally agree to a conditional plea[; b]ut an attorney's unsworn argument does not constitute evidence, and the Government has offered no affidavit, deposition, sworn

1

statement, or other direct evidence that a Government agent did not make the oral promise."); Peavy v. United States, 31 F.3d 1341, 1346 (6th Cir. 1994) ("When presented with a record such as this, and a § 2255 motion supported by admissible evidence, the government must present evidence in support of its position. The unverified responses filed in this case were plainly inadequate."). Accordingly, should the Court even consider the prosecutor's unsworn rebuttal proffers, an evidentiary hearing would necessarily be required. See also Machibroda v. United States, 368 U.S. 487, 494-95 (1962); Pham v. United States, 317 F.3d 178, 184-85 (2d Cir. 2003).

In any event, Mr. Crea's entitlement to habeas relief remains because the Government's rebuttal arguments are themselves contradicted by the record, communications between counsel, and the surrounding circumstances, not to mention by logic and common sense. Those considerations overwhelmingly establish the suppression of Brady evidence, along with undisclosed Giglio material, resulting in substantial prejudice to Mr. Crea's defense.

## The Brady Violation Regarding the Spinelli Notes

The Government is wrong across the board with respect to their strained contentions that the statement "Vic ordered murder of Pete Chiodo" is consistent with the previously disclosed 3500

material and that the statement does not suggest one way or another whether Casso was involved. (Gov. Mem. at 17-22) First, and very obviously, the 3500 material of Spinelli regarding both the Pete Chiodo and Patricia Capozzalo shootings expressly state the shootings were ordered by both Amuso and Casso:

> "Spinelli understood that on Amuso and Gaspipe's order, Chiodo was shot multiple times at a gas station in the vicinity of Bay Street on Staten Island in an effort to prevent him from cooperating and/or testifying" (Exhibit F to 3/9/26 White Aff.; emphasis added);

> "In an attempt to deter Chiodo's cooperation /testimony, Spinelli understood from conversations with the [Luchese] Family, that Gaspipe and Amuso had put out an order to kill Chiodo's family. Spinelli further understood that the order to kill Chiodo's sister, Patricia Capozallo, was passed down from Gaspipe to Luchese captain Richie Pagliarulo." (Exhibit F to 3/9/26 White Aff.; emphasis added)

Yet, in his testimony Spinelli made clear that Amuso had acted alone in ordering the attempted murder of Capozzalo, without any involvement from Casso. (T 1733-35; T 1738; T 1802-03) Likewise, the statement in the Spinelli notes that "Vic ordered murder of Pete Chiodo," without any mention of Casso, not only flatly contradicted the 3500 material, but similarly supported the conclusion that, according to Spinelli's trial debriefing account, Amuso had again acted alone. The omission of any reference to Casso is especially significant because the debriefing itself and the statements were made in the context of the prosecutor asking

about why Casso had not been involved in giving the order to shoot Capozzalo.

Against that backdrop, the Government's current position simply cannot be squared with either the record or common sense. If Spinelli had reaffirmed during the debriefing that both Amuso and Casso ordered the Chiodo attempted murder, there would have been no reason for the prosecutor's notes to suddenly reduce the account to: "Vic ordered murder of Pete Chiodo."

The Government unpersuasively describes Crea as "pretending" the Spinelli notes have some imaginary meaning (Gov. Mem. at 19), although Crea is quoting the notes in their unaltered form and providing the most straightforward and literal reading of them in the context of this case.  Ironically, despite stating that "the notes are unambiguous" and "should be read, not interpreted" (Gov. Mem. at 20), it is only the Government that engages in a strained and unsworn efforts to attribute additional meaning to those words and to self-servingly expand each of the statements beyond what is memorialized in order to fit its post-hoc account.  (See Gov. Mem. at 21)

In similarly futile fashion, the Government argues that since "everyone knew" that Spinelli did not mean that he had gotten the orders directly from Amuso when he responded affirmatively to a question on cross-examination regarding "when you got that order from Vic," by extension "everyone" would have understood the

4

statement in the Spinelli notes did not mean that "the general's deputy was not involved in passing the order to the troops just because his or her name was not specifically mentioned in the sentence." (Gov. Mem. at 20)  But the context in which the cross-examination took place had nothing to do with the role of the underboss or the chain of command, so the Government's argument proves nothing with respect to the specific point at issue here.

Furthermore, as discussed supra, the Government itself concedes that "[t]he brief morning meeting with Spinelli was not about the Chiodo murder, which did not come up at trial[, and i]nstead, the Notes reflect an attempt by the prosecutor to better understand Spinelli's testimony from the prior day about the attempted murder of Chiodo's sister, Patricia Capozzalo." (Gov. Mem. at 21, emphasis added.)  But the ensuing argument that there is no reason to believe that the Government would have asked Spinelli about Casso's involvement in ordering the murder of Chiodo is at odds with the clear reality of the situation.  Putting aside that the attempted murders of Chiodo and Capozzalo were inextricably intertwined as part of an effort to prevent Chiodo from cooperating with law enforcement, the only reason why the prosecutor would have taken time in the middle of trial to "better understand Spinelli's testimony" about the Capozzalo shooting was because of its direct impact on the prosecution's chain-of-command theory against Mr. Crea.

Indeed, although the Capozzalo shooting occurred nearly 25 years prior to trial, was not within the charged time frame, and had no alleged relationship to any of the defendants at trial, the prosecutor debriefed Spinelli about it in the middle of his testimony, returned to that incident once Spinelli was back on the witness stand, and utilized that testimony in subsequent motion practice and in closing argument.

As is clear from the context, the prosecutor returned to this line of questioning specifically to elicit from Spinelli that the only reason Casso was not involved in that decision was because he was a fugitive at the time, thus providing an explanation for why the chain of command was not followed in that discrete instance (T 1802-03).  It plainly follows that this was an effort to minimize the harm to the Government's principal theory of liability arising from Spinelli's unexpected testimony the previous day, and the Government offers no alternate rationale for why it was so important to understand the circumstances behind that shooting, nor could they in light of the circumstances here.

Moreover, the Government's contention that "[n]or is there any reason to think the Government would have asked Spinelli about Casso's role in the Chiodo murder" (Gov. Mem. at 21) not only strains belief, for the reasons noted above, but it is irrelevant for the purposes of this Brady issue.  Once Spinelli told the prosecutor that the Chiodo shooting had been ordered by Amuso,

without any reference to Casso, it was inconsistent with his statements in the 3500 material, and favorable to the defense for both substantive reasons and for its impeachment value. Giglio v. United States, 405 U.S. 150, 154 (1972). Thus, the Government was required to turn it over regardless of whether the prosecutor affirmatively intended to ask Spinelli about the respective roles of Casso and Amuso in that shooting.

The Government's additional contention that the prosecutor "would have taken note if Spinelli had said that Casso was not involved in the murder, not the other way around," since such a statement "would have been inconsistent with Spinelli's prior statements on the Chiodo murder, which were documented in Spinelli's § 3500 material," and "[b]ecause that statement would have been exculpatory or at least helpful to Crea, the Government would have turned it over," (Gov. Mem. at 20-21), ignores the obvious flaw in that reasoning:  the cat was already out of the bag with respect to Casso's lack of involvement in the Capozzalo shooting.  Spinelli had testified about it in open court, to the evident surprise of the Government, and all the prosecution could do at that point was attempt damage control.

But there was no similar on-the-record testimony with respect to the attempted murder of Chiodo, or Casso's lack of involvement. The disclosure of that information would have presented the defense with a significant opportunity to attack the evidence supporting

the prosecution theory and its expert testimony. Accordingly, the prosecution would have had a considerable motivation not to disclose the information contained in the Spinelli notes.

The Government nevertheless takes issue with what Crea maintains is the obvious meaning of the notes, i.e., that the decision to shoot Chiodo came from Amuso alone, without Casso being involved, because at the time of the decision there was disarray in the family.  (Gov. Mem. at 21, n.8)   But unless the Government is suggesting that the Spinelli notes represented four random lines of text with no relationship to one another, it is difficult to imagine what other explanation—other than a causal relationship— there was for the inclusion of "disarray in family @ time."  This is especially so since it was the third line in a sequence immediately following two statements indisputably relating to the circumstances surrounding the Chiodo shooting.  And the Government offers no alternate explanation, let alone a plausible one, but simply a generic denial.

In any event, the Government can hardly be heard to complain now, seven years after trial, when any question as to what Spinelli said or meant could and should have been resolved by turning over the notes at the time of trial, where he could have been subject to questioning by both sides, and the jury could have determined the meaning of the notes, and their impact on the testimony of Spinelli and Carillo, and the Government'S case as a whole.

8

In an effort to counter the statements of Crea's trial counsel that they were never given copies of the Spinelli notes, the Government states only that "it would have been the assigned prosecutor's practice to make copies of the notes and hand them to defense counsel that morning before the trial day resumed." (Gov. Mem. at 18)  Putting aside that the prosecutor concedes that she has no recollection of actually having disclosed the notes at the time of trial (Gov. Mem. at 18), the Government fails to address the fact—expressly noted in Crea's opening memorandum—that there is no reference in the trial transcript of the prosecutor alerting the Court of having disclosed those statements or any documents reflecting such disclosures. Nor did the Spinelli notes make their way to the Court's trial binder, as they would have if they had in fact been disclosed at the time of trial.

The Government does not even attempt to establish through some other means that the notes were disclosed, such as through an affirmation from one of the other trial prosecutors or paralegals, or even an affirmation from one of the attorneys for any of the three co-defendants that they had received a copy of the notes. Accordingly, the Court must reject the Government's attempt to construct an obstacle where none actually existed. The circumstances make it quite clear that the notes were not disclosed, and thus were withheld for <u>Brady</u> purposes.  <u>United States v. Payne</u>, 63 F.2d 1200, 1208 (2d Cir. 1995).

Remarkably, the Government relies on Puglisi v. United States, 586 F.3d 209, 214 (2d Cir. 2009), for the position that the Court need not credit the assertions of trial counsel that they would have used the information in the Spinelli notes on cross-examination and in jury argument to establish reasonable doubt. The circumstances in Puglisi were the polar opposite of those here, however, including that the Petitioner in Puglisi not only failed to include an affirmation from his trial attorney, but the attorney representing him in his 2255 petition affirmatively invoked the attorney-client privilege when the court sought information from trial counsel, thus preventing the court from inquiring about the relevant facts. Id. at 211. Petitioner in Puglisi submitted only a statement adopting the information contained in the memorandum of law submitted by his present counsel, which the Second Circuit held was inadequate. Id. at 216-17. Thus, Puglisi provides no support for the Government's argument, since Crea provided fact-based affirmations from trial counsel that were not inconsistent with the trial record.

Additionally, in their affirmations, both trial counsel explained not only that they did not receive the Spinelli notes, but why they would have remembered if they had, and most importantly for these purposes, how they would have used the information contained in the notes had they received them. (Exhibits G & H to 3/9/26 White Aff.)

10

The Government argues that, regardless of these detailed statements, the Court may discredit counsel's statements and deny the motion because, under different circumstances, counsel acted differently than they would have if they had been properly given the Spinelli notes.  (Gov. Mem. at 24-25)  But, for obvious reasons, that cannot undermine what counsel would have done had they been aware of the <u>Brady</u> material at issue here.  Among other considerations, as noted in Crea's opening memorandum, evidence of multiple instances in which the purported general practice of the underboss being directly involved in the decision to commit a murder would have cast considerable doubt on the existence of such a practice, much more so than a single instance (Crea Mem. at 32-33), with respect to which the prosecution took great pains to highlight why it was a unique exception.

The Government's contention that trial counsel's statements are "self-serving" (Gov. Mem. at 24), is also undermined by the record. In fact, upon receiving the Spinelli notes on May 4, 2023, trial counsel immediately contacted the prosecution and identified the statement in the Spinelli notes regarding the Amuso order to kill Chiodo as information that had not been previously disclosed:

> I don't recall any testimony or disclosures from Spinelli that, in addition to stating the order to murder Chiodo's sister came solely from Amuso in 1992 (because Gaspipe was on the lam), that he had also stated that Amuso ordered Chiodo's attempted murder in 1991 (without refence to Gaspipe, the Underboss (as dictated by these notes). If you know the reference for this (and am wrong

in my recollection), I would appreciate the exact pinpoint so that I can avoid having to read everything again.  (Exhibit AA)

Most tellingly, the Government did not ever provide any of the post-hoc explanations it now offers when it was confronted—more than 3 years ago—with trial counsel's unequivocal identification of the Government's suppression of Brady material, and further identification of the Government having misled the defense in both its disclosure letter and subsequent email by claiming that the Spinelli notes were duplicative to the 3500 material:

> The provided citations to the 3500 materials don't include what is contained in the 10-17-2019 notes—that Amuso directly ordered the murder of Chiodo and that there was disarray in the administration of the Luchese Family at such time. In fact, although three citations have been provided, they all involve the same 2016/2017 Spinelli proffer, dictating that he had heard that both Amuso and Gaspipe ordered the attempted murder of Chiodo (i.e, the first citation being the proffer note itself, which is then dictated to the form 302 (citation two) and the substance of the same is later parroted by agent otto in the GJ (citation three). The provided citations don't reveal that Amuso directly ordered the murder as provided by the 10-17-19 note.

> Notably, the same provided citations (proffer note/302) also dictate that as of 2017 Spinelli understood that Amuso and Gaspipe ordered the attempted murder of Chiodo's sister—even noting that the order itself was passed from Gaspipe to Richie Pagliarulo (3513-35 at 4-5). But, as we all now know, Spinelli's 2019 trial testimony was that only Amuso ordered the murder of Chiodo's sister and that Gaspipe had NO involvement (i.e., Spinelli testified that Amuso directly ordered Richie Pagliarulo Tr. 1734-35). This alone proves the inaccuracy of those prior records and a stark change in Spinelli's true account that multiple murders were ordered without the underboss.

12

Apparently, the Government was caught off guard by Spinelli's account at trial (as Carillo had also already testified to the absoluteness of the Underboss's involvement in sanctioned murders), which clearly prompted its 10-17-19 inquiry of Spinelli regarding the otherwise irrelevant subject of the attempt on Chiodo, which also now has shown to have produced the negative result of Gaspipe's involvement and clear *Brady* material for Crea's defense. Of course, rather than having to own that it happened more than once as evidenced by the 10-17-19 notes in regard to the 1991 shooting of Chiodo (*i.e.,* that the Underboss had no involvement in an authorized murder), the Government inexplicably sought at trial to cast the occurrence of Amuso passing the order directly to Pagliarulo as an outlier based on the fact that in 1992 Gaspipe was on the lam. Tr. 1802.

Ultimately, as it concerns Crea, this is a SERIOUS *Brady* violation for a multitude of obvious reasons that those familiar with the Government's theory of prosecution and trial record would fully appreciate. Also, the Government's footnote 1 in its recent letter (apparently attempting to get ahead of this and essentially mount a dubious defense to avoid a potential reversal for a *Brady* violation) is equally SERIOUS. My client is doing life in prison as a result of this case and such attempted foul blows by the Government are intolerable. Regardless of how the nondisclosure came about, it is a nondisclosure that was material. There is no such defense as alleged in the Government's letter and this email serves as Crea's confirmation that the defense never got the 10-17-19 note at trial.

(Exhibit BB)

Notably, although the Government now argues that the Spinelli notes had nothing to do with Casso's lack of involvement in the Chiodo shooting, they did not take that position in the various communications with defense counsel in the contentious aftermath that followed disclosure, nor when defense counsel further inquired whether Agent Carillo had ever been told about Spinelli's mid-trial debriefing. Rather, the prosecutor stated

only that Carillo had not been advised of the meeting and added that "October 17, 2019 was several days after Special Agent Carillo completed his trial testimony." (Exhibit E to 3/9/26 White Aff.)

Thus, the contemporaneous exchanges between the defense and prosecution expose the weakness of the Government's post-hoc account and its baseless claim that counsel's statements are part of a self-serving and calculated strategy. To the contrary, trial counsel's account was provided immediately upon disclosure with respect to both nondisclosure and materiality. Therefore, the information in the Spinelli notes has plainly always been viewed by Mr. Crea's trial counsel as favorable. The Government's contention that counsel would not have used the information in the Spinelli notes, because there was limited cross-examination regarding the Capozzalo shooting, should be afforded no weight.

The Government continues to urge that its decision to renew the motion seeking to admit the Evangelista statement "was not based exclusively, or even principally, on the chain of command testimony from Special Agent Carillo or Spinelli." (Gov. Mem. at 22, n.11) But this claim is belied by the Government's own words in its motion, where they asserted that Carillo's testimony was "perhaps most directly on point," and then buttressed that argument by stating "[i]n addition, Spinelli testified that 'usually the protocol' in the Luchese Family is that an order for murder would 'go[] from Vic [the Boss] to the underboss to captain to solider,'"

and then explained away the testimony regarding the Capozallo shooting without mentioning anything about the Chiodo shooting. (Doc. # 873 at 4-5)  Accordingly, the Government's argument rings hollow, since the record shows that prosecution relied heavily on those two witnesses in seeking to reopen the argument—ultimately successful—that Evangelista's testimony should be admitted.

Finally, the Government seeks to fall back on the Pinkerton theory of liability to argue that, if the Court were to find a Brady violation that resulted in prejudice, the convictions for murder in aid of racketeering and murder by use of a firearm would remain unaffected.  (Gov. Mem. at 27-28)  This argument fails for several reasons.  First, the Government cites no case in which a Brady violation was found but in which the court nevertheless declined to vacate the conviction because the jury had also been instructed on Pinkerton liability.  (Gov. Mem. at 27-28)  Indeed, research covering all Federal Courts has uncovered no such case.

Even if such hypothetical case were shown to exist, the circumstances make it inconceivable that it could be applied here. The Brady violation with respect to the Spinelli notes cut directly against the Government's expert testimony and the heart of the alleged conspiracy, relating to the hierarchical structure, the decision-making process, and the means for carrying out such decisions.  With those considerations undermined, it is difficult to imagine that any reasonable juror could have found that Crea

15

was criminally liable simply because there was evidence of his role as underboss, if the same juror were to conclude that the evidence was insufficient to establish that Crea actively participated in or even knew about the decision to kill Meldish. Indeed, the fact that the Government went to such lengths to introduce evidence purporting to show Crea's actual participation in the chain of command demonstrates that they themselves had little, if any, faith in the theory of <u>Pinkerton</u> liability in view of the facts here.

<u>The Brady Violation Regarding the Richard Letter</u>

Tellingly, the Government ignores almost entirely the central focus of Crea's motion with respect to the Richard letter, to wit, Richard's allegation that the Government had promised him that they would assist in obtaining a Green Card for his wife in exchange for his testimony against Crea at trial. It is clear from the text of the Richard letter that this promise was important to him, and he expressed his anger that as a result of the Government's failure to come through on that promise, his wife ultimately had to leave the United States. (Exhibit B to 3/9/26 White Aff.) The Government has undoubtedly been in a position to confirm or refute that claim since defense counsel first provided them with a copy of the Richard letter in early 2024. Given that opportunity here, the Government continues to remain silent. And

contrary to the Government's argument (Gov. Mem. at 36), there is no way that Crea could have been aware of the Government's promise regarding a green card for Richard's wife.

Although the Government cites the well-established principle that witness recantations are typically viewed by courts with skepticism (Gov. Mem. at 34), that principle is of limited utility here.  In Haouari v. United States, 510 F.3d 350, 353 (2d Cir. 2007), the Second Circuit noted that witness recantations are particularly suspect when "the recanting witness is one who was involved in the same criminal scheme and, having received the benefit of his cooperation agreement, now sits in jail with nothing to lose by recanting."  Id.  Here, as the Government itself has recognized, and as Richard testified, he did not have a cooperation agreement, he could not have received a benefit with respect to his own case, and thus the logic of Haouri does not apply.

WHEREFORE, the petition should be granted, the judgment of conviction vacated, or a hearing ordered.

DATED:    New York, New York
          May 21, 2026

                              WHITE & WHITE

                    By:    /s/ Brendan White
                           Brendan White
                           524 East 20th Street, #6D
                           New York, NY 10009
                           (646) 303-0267
                           hendonbgb@gmail.com

                           Attorney for Petitioner
                           Steven Crea

17